# Appendix A

AO 88B  (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York  ▼

| | |
|---|---|
| In re Application of Refinería de Cartagena S.A.S. _____ | ) |
| *Plaintiff* | ) |
| v. | ) |
| for an Order Directing Discovery from Mason Capital _____ Management, LLC Pursuant to 28 U.S.C.§1782 | ) ) ) |
| *Defendant* | ) |

Civil Action No. _____

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

Mason Capital Management, LLC

To: _____

*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A

| Place: KING & SPALDING 1185 Avenue of the Americas 34th Floor New York, NY 10036-2601 | Date and Time: |
|---|---|

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

| *CLERK OF COURT* | OR | |
|---|---|---|
| _____ *Signature of Clerk or Deputy Clerk* | | _____ *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Refinería de Cartagena S.A.S. _____ , who issues or requests this subpoena, are:
Thomas C. Childs, 1185 Avenue of the Americas, 34th Floor, New York, NY 10036-2601, tchilds@kslaw.com, (212) 556-2100

**Notice to the person who issues or requests this subpoena**
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $        0.00        .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                         *Server's signature*

                                                    _____
                                                         *Printed name and title*

                                                    _____
                                                         *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

SCHEDULE A – DOCUMENTS

# ATTACHMENT A
## Definitions

1.      **"Ad Hoc Group"** has the meaning set out at paragraph 5.7 of the PSL.

2.      **"Arbitration Award"** has the meaning set out at paragraph 5.10 of the PSL.

3.      **"CB&I N.V."** shall mean McDermott International Holdings B.V., f/k/a Comet II B.V., f/k/a Chicago Bridge & Iron Company N.V., and includes any employees, agents, representatives, or other persons acting on behalf of CB&I N.V.

4.      **"CB&I UK"** shall mean CB&I UK Limited, and includes any employees, agents, representatives, or other persons acting on behalf of CB&I UK.

5.      **"Grant Thornton"** has the meaning set out at paragraph 11.3 of the PSL.

6.      **"Group"** has the meaning set out at paragraph 4.3 of the PSL.

7.      **"Initial Public Offering"** refers to the potential initial public offering (IPO) contemplated by McDermott as reported in the Reorg Research, Inc. article dated July 10, 2022, which is attached hereto as **Appendix A**, or any other potential IPO considered after June 2020.

8.      "**Mason**" shall mean Mason Capital Management, L.L.C., a privately owned hedge fund manager.

9.      **"McDermott"** shall mean McDermott International, Ltd., and includes any employees, agents, representatives, or other persons acting on behalf of McDermott.

10.     **"PSL"** shall mean the Practice Statement Letter issued by CB&I UK dated September 8, 2023, which is attached hereto as **Appendix B**.

11.     **"Reficar"** refers to Refinería de Cartagena S.A.S., f/k/a Refinería de Cartagena S.A., and includes any employees, agents, representatives, or other persons acting on behalf of Reficar.

12.     **"Relevant Alternative"** has the meaning set out at paragraph 11.4 of the PSL.

13.     **"Steering Committee"** has the meaning set out at paragraph 5.7 of the PSL.

SCHEDULE A – DOCUMENTS

14.     **"Tanks Credit Facilities"** has the meaning set out at paragraph 4.35 of the PSL.

15.     **"Tanks Transactions"** has the meaning set out at paragraph 4.32 of the PSL.

16.     **"Transaction Support Agreement"** has the meaning set out at paragraph 5.21 of the PSL.

17.     The term **"document"** is defined to be synonymous in meaning and equal in scope to the usage of the term in Federal Rule of Civil Procedure 34(1), including without limitation, electronic or computerized data compilations.  A draft or non-identical copy of any document is a separate document within the meaning of this term.

18.     The terms **"concerning," "involving," "relating to," "referring to," "in connection with," "pertaining to," "describing," "discussing," "analyzing," "reflecting," "summarizing," "evidencing," "embodying,"** and **"constituting"** are interchangeable in meaning.

SCHEDULE A – DOCUMENTS

## Instructions

1.      Unless otherwise specified, these document requests shall cover the period from June 30, 2020 through the present.

2.      The use of the singular form of any word includes the plural and vice versa.

3.      The connectives "**and**" or "**or**" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all documents that might otherwise be construed to be outside of its scope.

4.      The tense of any verb shall be construed to include any other tenses of the verb as necessary to bring within the scope of the request all documents that might otherwise be construed to be outside of its scope.

5.      To the extent not otherwise defined, all words shall have their usual and ordinary meaning as the context of the sentence would indicate.

6.      In responding to these requests, Mason shall produce all responsive documents that are in Mason's possession, custody, or control or in the possession, custody, or control of Mason's attorneys, accountants or other representatives.  A document shall be deemed to be within Mason's control if Mason has the right to secure the document or a copy of the document from another person having possession or custody of the document.

7.      If any otherwise responsive document was, but is no longer, in existence or in Mason's possession, custody, or control, or has been lost, discarded, or destroyed, the document shall be identified as completely as possible including, but not limited to, the following information:  (a) the date of disposal or disposition from Mason's possession, custody, or control;  (b) the manner of disposal or disposition from Mason's possession, custody, or control;  (c) the reason for disposal or disposition from Mason's possession, custody, or control;  (d) the person authorizing disposal or disposition from Mason's possession, custody, or control;  (e) the document's current or last known custodian;  (f) the circumstances surrounding the document's disposition from Mason's possession, custody, or control;  (g) the generic category of the document, *e.g.*, memo, letter, computer print-out, etc.;  (h) the type(s) of information contained in the document; and  (i) the identity of all persons having knowledge or who had knowledge of the contents of the document.

3

SCHEDULE A – DOCUMENTS

8.      Mason is to produce for inspection and copying original responsive documents in the order they are kept in the usual course of business, and such documents shall be produced in their original folders, binders, covers, or containers or a copy thereof.

9.      In producing for inspection and copying Mason shall organize and label such responsive documents to correspond with the categories in these requests.

10.     If a document responsive to these requests is withheld under a claim of privilege or upon any other ground, as to each such document, provide the following information in sufficient detail to permit the court to rule on Mason's claim:

       a.   The privilege being asserted;

       b.   A precise statement of the facts upon which the claim of privilege is based;

       c.   The party who is asserting the privilege; and

       d.   The following information about the purportedly privileged document:

              i.   the author, primary addressee, and secondary addressees or persons copied, including the relationship of those persons to any party in this litigation and/or author of the document;

              ii.   a brief description sufficient to identify the type, subject matter, and purpose of the document;

             iii.   all persons to whom its contents have been disclosed; and

             iv.   the date the document was prepared, the date the document bears, the date the document was sent and the date the document was received.

11.     Where an objection is made to any document request, the objection shall state with specificity all grounds. Any ground not stated in an objection within the time provided by the Federal Rules of Civil Procedure, or any extensions thereof, shall be waived.

12.     If a portion of any document responsive to these requests is withheld under a claim of privilege, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.

SCHEDULE A – DOCUMENTS

13.     Mason is to produce each document requested herein in its entirety, without deletion or excision (except as qualified above), regardless of whether Mason considers the entire document to be relevant or responsive to the requests.

14.     Notwithstanding the assertion of any objection to production, any document to which an objection is raised containing non-objectionable subject matter that is relevant and material to a request must be produced, but that portion of the document for which the objection is asserted may be withheld or redacted provided that the above-requested information is furnished.

SCHEDULE A – DOCUMENTS

## **Document Requests**

1.     All documents related to any valuation placed on McDermott, CB&I UK and/or CB&I N.V. by Mason or its advisors or consultants.

2.     All documents concerning the valuation placed on CB&I UK and/or CB&I N.V. by McDermott or its advisors or consultants, including Grant Thornton.

3.     All documents concerning the Transaction Support Agreement entered into on September 8, 2023 between the Group, the Ad Hoc Group, the Steering Committee, and the other relevant stakeholders.

4.     All documents concerning the Tanks Transactions and the Tanks Credit Facilities implemented to secure additional funding.

5.     All documents concerning CB&I UK's proposed Relevant Alternative and the conclusion that returns to the creditors in the Relevant Alternative would be materially worse than the return available to plan creditors through the restructuring.

6.     All documents concerning the impact of the Arbitration Award on Mason and the funds it advises.

7.     All correspondence within Mason (internally) or between Mason and a member of the Ad Hoc Group (or their advisors) relating to Reficar and/or the Arbitration Award.

8.     All documents evidencing the Ad Hoc Group's role and/or involvement in the appointment of a board of directors for McDermott.

9.     All documents evidencing the Ad Hoc Group's investments in McDermott or its subsidiaries as a secured creditor, as a holder of preferred equity and/or as a holder of common stock.

10.    All documents evidencing any plan for McDermott to pursue an Initial Public Offering.

11.    Documents evidencing Mason's financial or accounting treatment of performance guarantee letters of credit issued in connection with construction projects of McDermott and other similarly situated entities.

12.    All documents related to the process by which Mason and/or the Ad Hoc Group determined the Relevant Alternative.

# Appendix A

# Reorg®

## McDermott International

# McDermott Eyes Debt Refinancing in 2023, Mulls Potential IPO in 2024

Fri 10/07/2022 14:43 PM

McDermott International this week provided lenders with a summary of key annual benchmarks that it is targeting from the current fiscal year through 2025, according to sources.

For the current year, the company is looking to achieve EBITDA breakeven, after which it will seek to complete a debt refinancing in 2023, sources said.

McDermott International would consider a potential IPO conditional on market opportunities and company performance in 2024, and is aiming to reach 8% EBITDA margins in 2025, sources added.

The average price for the company's L+400 bps exit term loan is 52.33 as of today, slightly up from 50.64 three months ago, according to Solve Advisors.

McDermott International did not respond to a request for comment.

--Patrick Fitzgerald

This publication has been prepared by Reorg Research, Inc. or one of its affiliates (collectively, "Reorg") and is being provided to the recipient in connection with a subscription to one or more Reorg products. Recipient's use of the Reorg platform is subject to Reorg's Terms of Use or the user agreement pursuant to which the recipient has access to the platform (the "Applicable Terms").  The recipient of this publication may not redistribute or republish any portion of the information contained herein other than with Reorg's express written consent or in accordance with the Applicable Terms. The information in this publication is for general informational purposes only and should not be construed as legal, investment, accounting or other professional advice on any subject matter or as a substitute for such advice. The recipient of this publication must comply with all applicable laws, including laws regarding the purchase and sale of securities. Reorg obtains information from a wide variety of sources, which it believes to be reliable, but Reorg does not make any representation, warranty, or certification as to the materiality or public availability of the information in this publication or that such information is accurate, complete, comprehensive or fit for a particular purpose. Recipients must make their own decisions about investment strategies or securities mentioned in this publication. Reorg and its officers, directors, partners and employees expressly disclaim all liability relating to or arising from actions taken or not taken based on any or all of the information contained in this publication. © 2023 Reorg. All rights reserved. Reorg® is a registered trademark of Reorg Research, Inc.

© Copyright 2012 - 2023

# Appendix B

**THIS LETTER REQUIRES YOUR IMMEDIATE AND URGENT ATTENTION AS IT RELATES TO A RESTRUCTURING PLAN PROPOSED BY CB&I UK LIMITED, WHICH WILL BE CONSIDERED BY THE HIGH COURT OF JUSTICE OF ENGLAND AND WALES AT THE CONVENING HEARING WHICH IS EXPECTED TO TAKE PLACE ON 28 SEPTEMBER 2023.**

**AT PRESENT THE CONVENING HEARING IS ANTICIPATED TO TAKE PLACE ON 28 SEPTEMBER 2023 BUT THIS MAY BE SUBJECT TO CHANGE. THE SPECIFIC DETAILS OF THE CONVENING HEARING (INCLUDING THE DATE AND TIME) WILL BE CONFIRMED TO PLAN CREDITORS (AS DEFINED HEREIN) IN THE NOTICE OF CONVENING HEARING. THIS NOTICE WILL BE MADE AVAILABLE TO ALL PLAN CREDITORS ELIGIBLE TO VOTE ON THE PROPOSED RESTRUCTURING PLAN BY EMAIL AND ON THE PLAN PORTAL WHICH WILL BE MADE AVAILABLE TO ALL PLAN CREDITORS.**

**YOU ARE BEING CONTACTED AS WE BELIEVE THAT YOU ARE A PLAN CREDITOR OF CB&I UK LIMITED AND WILL THEREFORE BE AFFECTED UNDER THE APPLICABLE PROPOSED RESTRUCTURING PLAN.**

**CONCURRENTLY WITH THE PROPOSED RESTRUCTURING PLAN BY CB&I UK LIMITED, CERTAIN OF ITS GROUP ENTITIES, NAMELY MCDERMOTT INTERNATIONAL HOLDINGS B.V. AND LEALAND FINANCE COMPANY B.V., WILL PREPARE A PROPOSAL PURSUANT TO THE *WET HOMOLOGATIE ONDERHANDS AKKOORD* (WHOA) IN THE NETHERLANDS TO RESTRUCTURE DEBT OWED TO THE WHOA CREDITORS. WITH THE EXCEPTION OF THE CONTRALORÍA CLAIM PLAN CREDITOR AND THE CONTRALORÍA CONTRIBUTION CLAIM PLAN CREDITORS, WE BELIEVE THAT YOU ARE A WHOA CREDITOR OF MCDERMOTT INTERNATIONAL HOLDINGS B.V., AND, IF APPLICABLE, LEALAND FINANCE COMPANY B.V., AND WILL THEREFORE BE AFFECTED UNDER THE APPLICABLE WHOA PROPOSAL (REFERENCE IS MADE IN THIS RESPECT TO PARAGRAPHS 6.6 AND 6.7 OF THIS LETTER).**

**THE PLAN CREDITORS MUST RELY ON THEIR OWN EXAMINATION OF THE TERMS OF THE RESTRUCTURING PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.**

**THIS LETTER CONCERNS MATTERS WHICH MAY AFFECT YOUR LEGAL RIGHTS AND ENTITLEMENTS AND YOU SHOULD TAKE APPROPRIATE LEGAL ADVICE ON ITS CONTENTS.**

## Table of Contents

Page

| | | |
|---|---|---|
| 1 | PURPOSE OF THIS LETTER | 1 |
| 2 | WHAT IS A RESTRUCTURING PLAN? | 2 |
| 3 | WHO IS ENTITLED TO VOTE AND WHOSE RIGHTS ARE AFFECTED BY THE RESTRUCTURING PLAN | 3 |
| 4 | BACKGROUND TO THE PLAN COMPANY AND THE GROUP | 4 |
| 5 | BACKGROUND TO THE GROUP'S FINANCIAL DIFFICULTIES | 12 |
| 6 | OVERVIEW OF THE RESTRUCTURING | 19 |
| 7 | PURPOSE OF THE RESTRUCTURING PLAN | 22 |
| 8 | INTERESTS SUBJECT TO THE RESTRUCTURING PLAN | 23 |
| 9 | ARRANGEMENTS THAT ARE NOT SUBJECT TO THE RESTRUCTURING PLAN | 23 |
| 10 | KEY TERMS OF THE RESTRUCTURING PLAN | 26 |
| 11 | CONSEQUENCES IF THE RESTRUCTURING PLAN IS NOT SUCCESSFUL | 31 |
| 12 | RECOMMENDATION OF THE BOARD | 32 |
| 13 | PROPOSED CLASS CONSTITUTION OF PLAN CREDITORS | 32 |
| 14 | EFFECTIVENESS OF THE RESTRUCTURING PLAN AND THE RESTRUCTURING | 38 |
| 15 | JURISDICTION | 38 |
| 16 | RECOGNITION AND EFFECTIVENESS | 39 |
| 17 | CREDITOR ISSUES | 39 |
| 18 | NEXT STEPS | 40 |
| 19 | ENQUIRIES AND FURTHER INFORMATION | 44 |
| 20 | REQUEST FOR SUPPORT | 45 |
| APPENDIX 1 DEFINITIONS | | 2 |
| APPENDIX 2 SIMPLIFIED STRUCTURE CHART | | 8 |

## PRACTICE STATEMENT LETTER

From:   **CB&I UK Limited** (the "**Plan Company**")

To:   The **Plan Creditors** (as defined below)

Date:   8 September 2023

**THIS LETTER CONCERNS MATTERS WHICH MAY AFFECT YOUR LEGAL RIGHTS AND ENTITLEMENTS AND YOU MAY THEREFORE WISH TO TAKE APPROPRIATE LEGAL ADVICE ON ITS CONTENTS.**

Dear Sir or Madam,

**Proposed Restructuring Plan under Part 26A of the Companies Act 2006 between the Plan Company and the Plan Creditors (as defined below)**

**1      PURPOSE OF THIS LETTER**

1.1      The Plan Company is sending you this letter in accordance with the practice statement in relation to schemes of arrangement under Parts 26 and 26A of the Companies Act 2006 issued on 26 June 2020 (the "**Practice Statement**") by the Chancellor of the High Court of Justice of England and Wales (the "**Court**"), in relation to proposed restructuring plan under Part 26A of the Companies Act 2006 between the Plan Company and certain of its creditors (as set out in Section 3 (*Who is entitled to Vote and whose rights are affected by the Restructuring Plan*) below) (the "**Plan Creditors**") (the "**Restructuring Plan**", and alternatively the "**Plan**").

1.2      You are being contacted as the Plan Company believes that you are a Plan Creditor, who is or may be entitled to vote on the Restructuring Plan. The claims of each Plan Creditor against the Plan Company, together with all related rights in respect of such claims, will be affected by the Restructuring Plan.

1.3      In accordance with the Practice Statement, the purpose of this letter is to inform you:

(a)      of the Plan Company's decision to formally promote the Restructuring Plan to implement the Restructuring (as defined below), (see further Section 6 (*Overview of the Restructuring*));

(b)      of the background to the Restructuring Plan, the purpose which the Restructuring Plan is designed to achieve and its effect (see further Section 7 (*Purpose of the Restructuring Plan*));

(c)      that the Plan Company intends to apply to the Court at a court hearing (the "**Convening Hearing**") expected to be held on 28 September 2023 at the Chancery Division, Companies Court of the High Court of Justice of England and Wales at the Rolls Buildings Courts, 7 Rolls Buildings, Fetter Lane, London EC4A 1NL for an order granting the Plan Company certain directions in relation to the Restructuring Plan, including permission to convene the meetings of the classes of Plan Creditors who are entitled to vote on the Restructuring Plan (the "**Plan Meetings**") for the purpose of considering and, if thought fit, approving the Restructuring Plan (see further Section 18.1 (*Convening Hearing*));

(d)      of other matters that are to be addressed at the Convening Hearing (see further Section 18.1 (*Convening Hearing*)), including Creditor Issues (as defined below) (see Section 17 (*Creditor Issues*));

(e)     that you are entitled to attend the Convening Hearing and the Sanction Hearing (defined below) (see further Section 18 (*Next Steps*));

(f)     of the proposed class composition of the Plan Creditors for the purposes of the Plan Meetings (see further Section 13 (*Proposed Class Constitution of Plan Creditors*));

(g)     of the reasons why the Plan Company considers the Court has jurisdiction to sanction the Restructuring Plan (see further Section 15 (*Jurisdiction*)); and

(h)     how you may make further enquiries about the Restructuring Plan (see further Section 19 (*Enquiries And Further Information*)).

1.4     This letter is being made available to Plan Creditors by way of the following:

(a)     Kroll Issuer Services Limited (the "**Information Agent**"), as information agent appointed by the Plan Company in respect of the Restructuring Plan, sending it to Plan Creditors by email; and

(b)     the Information Agent making it available on the documents portal (the "**Plan Portal**") which will be made available to Plan Creditors and which Plan Creditors will be invited to access shortly. If any Plan Creditors have not received an invitation to access the Plan Portal or have difficulty accessing the Plan Portal, please contact the Information Agent via email at mcdermott@is.kroll.com.

*The date of the Plan Meetings will be confirmed in an explanatory statement (the "Explanatory Statement") which, provided the Court gives its permission to convene the Plan Meetings, will be circulated to Plan Creditors shortly after the Court has ordered the Plan Meetings to be convened at the Convening Hearing.*

*If you have assigned, sold or otherwise transferred your interests as a Plan Creditor or intend to do so before the Plan Meetings, you should forward a copy of this letter to the person or persons to whom you have assigned, sold or otherwise transferred, or the person or persons to whom you intend to assign, sell or transfer, such interests.*

## 2       WHAT IS A RESTRUCTURING PLAN?

2.1     A restructuring plan is an English law statutory procedure under Part 26A of the Companies Act 2006 which allows a company to propose and agree a compromise or arrangement with its creditors (or classes of creditors and/or members), and for the terms of that compromise or arrangement to bind any non-consenting or opposing creditors (or classes of creditors and/or members).

2.2     A restructuring plan may be proposed by a company that has encountered, or is likely to encounter, financial difficulties that are affecting or will or may affect, its ability to carry on business as a going concern. The financial difficulties facing the Plan Company and the wider Group are described in detail at Section 5 *(Background to the Group's financial difficulties)* of this letter. A restructuring plan must have the purpose of eliminating, reducing or preventing, or mitigating the effect of any of the financial difficulties faced by the proposing company. The financial difficulties facing the Plan Company will be eliminated, reduced and/or mitigated by implementing the Restructuring Plan which will place the Plan Company and the remaining Group on a viable footing in the long-term.

2.3     If the Court is satisfied at the Convening Hearing that the proposed class or classes of plan creditors for voting purposes have been correctly constituted, the Court will order the plan meeting or meetings for the relevant classes of creditors to be convened.

2.4     A restructuring plan will take effect between a company and its creditors (or any class of them) and become binding on all the creditors to whom it applies if:

(a)     the restructuring plan is approved by 75% in value of the creditors (or each class of creditors and/or members) present in person or by proxy and voting at each meeting convened to consider the restructuring plan; or

(b)     in the event that the restructuring plan is not approved by a number representing at least 75% in value of any class of creditors or members of the company present in person or by proxy and voting at the relevant plan meeting (the "**Dissenting Class**"):

(i)     the Court must be satisfied that, if it were to sanction the restructuring plan, none of the members of the Dissenting Class would be any worse off than they would be under the relevant alternative to the restructuring plan; and

(ii)    a number representing at least 75% in value of a class of creditors or members present in person or by proxy and voting at the relevant plan meeting who would receive a payment, or have a genuine economic interest in the company in the relevant alternative must have approved the restructuring plan;

(c)     the restructuring plan is subsequently sanctioned by the Court at a specific hearing (the "**Sanction Hearing**"); and

(d)     a copy of the order sanctioning the restructuring plan is delivered to the Registrar of Companies for England and Wales.

2.5     If the restructuring plan becomes effective, it will bind the company and all classes of plan creditors according to its terms, including those plan creditors who did not vote on the restructuring plan or who voted against it.

2.6     The Restructuring Plan is being launched in parallel with the WHOA Proposals (as defined below). A description of the WHOA Proposals is provided at paragraphs 6.6 to 6.7 below.

## 3       WHO IS ENTITLED TO VOTE AND WHOSE RIGHTS ARE AFFECTED BY THE RESTRUCTURING PLAN

3.1     The Plan Creditors comprise each of the following persons:

(a)     the financial institutions holding commitments to participate in Super Senior Letters of Credit issued under the Super Senior LC Facility (the "**Super Senior LC Facility Lenders**" or "**Super Senior LC Facility Plan Creditors**");

(b)     the financial institutions and other parties holding term loans made available under the Make-Whole Term Loan Facility (the "**Make-Whole Term Loan Facility Lenders**" or the "**Make-Whole Facility Plan Creditors**");

(c)     the financial institutions holding commitments to participate in Senior Letters of Credit issued under the Senior LC Facility (the "**Senior LC Facility Lenders**" or "**Senior LC Facility Plan Creditor**s");

(d)     the parties identified as Participants under the Escrow LC Facility (the "**Escrow LC Facility Lenders**" or the "**Escrow LC Facility Plan Creditors**");

(e)     the financial institutions and other parties holding term loans made available under the Takeback Term Loan Facility (the "**Takeback Term Loan Facility Lender**s" or the "**Takeback Facility Plan Creditors**");

(f)     the Reficar Claim Plan Creditor (as defined in paragraph 5.8 below);

(g)     the Reficar Contribution Claim Plan Creditors (each as defined in paragraph 5.11 below);

(h)     the Contraloría Claim Plan Creditor (as defined in paragraph 5.12 below); and

(i)     the Contraloría Contribution Claim Plan Creditors (each as defined in paragraph 5.15 below).

3.2     For the avoidance of doubt, the Super Senior LC Facility Plan Creditors, Make-Whole Facility Plan Creditors, Senior LC Facility Plan Creditors, Escrow LC Facility Plan Creditors and Takeback Facility Plan Creditors include only the relevant lenders of record under each of the respective facilities.

# 4     BACKGROUND TO THE PLAN COMPANY AND THE GROUP

4.1     The Plan Company, with its registered office in 2 New Square, Bedfont Lakes Business Park, Feltham, Middlesex, United Kingdom, TW14 8HA is an English company that is involved in the construction of civil engineering projects.

4.2     CB&I Company B.V. (The Netherlands) holds 127,704,958 ordinary shares in the Plan Company, representing the entire share capital of the Plan Company. The ultimate parent of the Plan Company is McDermott International, Ltd (Bermuda) (the "**Parent**"). The shareholders of the Parent include entities managed and/or controlled by various investment funds which were financial creditors of the group as at 2020 and which received such ordinary shares as part of the Chapter 11 Process (see below at paragraph 4.9).

4.3     In conducting its business, the Plan Company makes use of the support of a group of companies that are direct or indirect subsidiaries and/or parent companies of the Plan Company, all of which are direct or indirect subsidiaries of the Parent (together, the "**Group**").

4.4     A simplified structure chart of the Group is appended to this letter at Appendix 2 *(Simplified structure chart)*.

**Business of the Plan Company**

4.5     The Plan Company is part of a Houston, Texas-based services corporate group which provides various services for traditional energy and energy transition services and is a leading provider of integrated engineering, procurement, construction and installation, front-end engineering and design, module fabrication services, and technology to offshore, subsea, power, liquefied natural gas, downstream energy projects, and upstream field developments worldwide.

4.6     The Plan Company, as part of the Group, offers comprehensive engineering and construction services from conceptual design through start up and operations. The principal activities of the Plan Company are to provide engineering, procurement and construction services to customers predominantly operating in the oil and gas and energy transition industry sector. The Plan Company designs projects for a worldwide client base. The Group's engineering services include conceptual design, economic analyses, feasibility studies, process design, front end engineering and design, detailed engineering, project engineering, modularization design and construction and fabrication engineering, installation engineering, commissioning and start up.

4.7    The Group in its current form is the product of a combination between the legacy McDermott corporate group and the Chicago Bridge & Iron group, a downstream provider of onshore refining, power, gasification, and gas processing technology, in May 2018. As a result of the combination, the Group is now a fully integrated, onshore-offshore corporate group.

**Previous restructuring proceedings**

4.8    Throughout the course of 2020, the Group effected a restructuring transaction which was implemented through a pre-packaged Chapter 11 process following significant cost overruns at two key construction projects as well as an unsustainable debt capital structure (the "**Chapter 11 Process**"). On 21 January 2020, various Group entities entered into a restructuring support agreement with certain of their lenders, letter of credit issuers and holders of certain senior notes due 2024 and filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas to pursue a joint pre-packaged Chapter 11 Plan of Reorganization. The relevant Group entities ultimately met all conditions precedent to emergence in accordance with its plan of reorganisation and successfully emerged from bankruptcy as a reorganized enterprise.

4.9    As part of the Chapter 11 Process and related recognition proceedings in Panama, all previously existing equity interests attributable to the Group's previous parent company were cancelled and the holders of those equity interests, including the holders of outstanding shares of common stock, were entitled to no recovery relating to those equity interests. The Group's primary equity interests were distributed to holders of the Group's primary funded indebtedness, who also received take-back debt in satisfaction of their claims. The Group also preserved approximately $2.4 billion in prepetition letters of credit, which were reinstated under several exit facilities through new commitments. All general unsecured claims were unimpaired by the Chapter 11 Process.

**Key existing financial obligations of the Group**

4.10    As at the date of this letter, the principal financial indebtedness and other liabilities of the Group are as follows:

(a)    the Exit Credit Agreement Facilities;

(b)    the Escrow LC Facility;

(c)    the Hedging Agreements;

(d)    the Bilateral Facilities;

(e)    the Surety Arrangements;

(f)    the Tanks Credit Facilities;

(g)    the Amazon Facility; and

(h)    the Preferred Interests,

(each as defined below).

Exit Credit Agreement

4.11    In connection with emergence from the Chapter 11 Process, on 30 June 2020, Lealand Finance Company B.V. ("**LFC**") (as borrower), McDermott International Holdings B.V. ("**MIH**") and

the Plan Company (as guarantors) (among others) entered into a New York law governed credit agreement with, among others, the Lenders (as defined therein), the Term Loan Administrative Agent (as defined therein), and the LC Administrative Agent (as defined therein) (the "**Exit Credit Agreement**").

4.12   Pursuant to the Exit Credit Agreement, the Group secured committed exit financing of over $2.4 billion in letter of credit facility capacity and emerged from the Chapter 11 Process with approximately $544,000,000 in funded debt.

4.13   The following facilities have been made available to LFC under the Exit Credit Agreement which the Plan Company (among others) guaranteed under the guaranty agreement:

(a)   a $743,000,000 super senior letter of credit facility between LFC and the Super Senior LC Facility Lenders (as defined in the Exit Credit Agreement) with a maturity of 30 June 2024 (the "**Super Senior LC Facility**"). As at 30 June 2023, $651,000,000 of letters of credit were issued under the Super Senior LC Facility;

(b)   a $44,288,255.73 term loan facility between LFC and the Make-Whole Term Lenders (as defined in the Exit Credit Agreement) with a maturity on 30 June 2024 (the "**Make-Whole Term Loan Facility**"). As at 30 June 2023, $43,000,000 was outstanding under the Make-Whole Term Loan Facility;

(c)   a $1,176,000,000 senior letter of credit facility between LFC and the Senior LC Facility Lenders (as defined in the Exit Credit Agreement) capped at $1,176,000,000 and with a maturity on 30 June 2024 (the "**Senior LC Facility**"). As at 30 June 2023, $1,015,000,000 of letters of credit were issued under the Senior LC Facility; and

(d)   a $500,000,000 in principal term loan facility between LFC and the Take-back Term Lenders (as defined in the Exit Credit Agreement) with a maturity on 30 June 2025 (the "**Takeback Term Loan Facility**"). As at 30 June 2023, $508,000,000 was outstanding (including accrued PIK interest) under the Takeback Term Loan Facility.

4.14   For the purposes of this Practice Statement Letter:

(a)   the Super Senior LC Facility, the Make-Whole Term Loan Facility, the Senior LC Facility and the Takeback Term Loan Facility shall collectively be referred to as the "**Exit Credit Agreement Facilities**";

(b)   the Super Senior LC Facility and the Senior LC Facility shall together be referred to as the "**Exit LC Facilities**";

(c)   the Super Senior LC Facility Lenders, the Make-Whole Term Loan Facility Lenders, the Senior LC Facility Lenders and the Takeback Term Loan Facility Lenders shall collectively be referred to as the "**Exit Credit Agreement Facilities Lenders**"; and

(d)   the Super Senior LC Facility Lenders and the Senior LC Facility Lenders shall together be referred to as the "**Exit LC Lenders**".

Exit Escrow LC Facility Agreement

4.15   On 31 December 2020 LFC (as borrower) and the Plan Company (as guarantor) (among others) entered into a senior secured escrow letter of credit facility agreement which provided for the issuance of up to $371,000,000 face amount of letters of credit based on a $389,550,000 of cash escrow (the "**Escrow LC Facility**") with, amongst others, the Participants (as defined therein) or their affiliates (the "**Exit Escrow LC Facility Agreement**") in order to replace an existing

cash secured letter of credit facility on similar terms and permit a release of the cash collateral securing the existing cash secured letter of credit facility. The Exit Escrow LC Facility Agreement has a maturity of 30 June 2024 and is governed by New York law. As at 30 June 2023, $339,000,000 was issued and outstanding under the Exit Escrow LC Facility Agreement.

4.16    In addition to the Secured Property, the Escrow LC Facility is backed by cash in an escrow account (the "**Escrow Account**") with 105% of the commitment provided by the Escrow LC Facility Lenders. The Escrow Account is not security provided by the Plan Company, rather, funds were provided by each relevant Escrow LC Facility Lender to backstop the relevant letter of credit issuer for any draws under an issued letter of credit.

4.17    For the purposes of this Practice Statement Letter the Exit Escrow LC Facility Agreement and the Exit Credit Agreement will together be referred to as the "**Secured Exit Credit Agreements**" with the facilities established thereunder as the "**Secured Exit Credit Facilities**", and the Escrow LC Facility Lenders and the Exit Credit Agreement Facilities Lenders will together be referred to as the "**Secured Exit Credit Facility Lenders**").

4.18    The Plan Company is a guarantor in respect of the Secured Exit Credit Facilities.

4.19    The Plan Company considers that the Group would be unable to continue as a going concern without the continued existence of the Secured Exit Credit Agreements (or other committed indebtedness which had a similar effect).

4.20    Under the terms of the Exit LC Facilities, the Issuers (as defined therein) are required to issue letters of credit in support of the Group's operations until 31 May 2024, subject to customary conditions, and the Exit LC Lenders are required to participate in the issued Letters of Credit (as defined below). The expiration dates of such Letters of Credit are not able to be more than 12 months after the date of issuance or auto-renewal (unless otherwise agreed by the issuer), which can be after 30 June 2024.

4.21    The maturity date of the Secured Exit Credit Facilities is 30 June 2024, other than in respect of the Takeback Term Loan Facility in respect of which the maturity is 30 June 2025. Without an extension to the maturity date of the Secured Exit Credit Agreements, on 27 March 2024 the Group would be required to cash collateralise all outstanding letters of credit which have been issued in connection with the Secured Exit Credit Agreements. This would require the Group to transfer cash in the amount of the relevant letters of credit to the issuing bank of such letters of credit for the purposes of payment in the event that the relevant letter of credit is called. As at the date of this Practice Statement Letter the Group had approximately $2.005 billion as at 30 June 2023 (equivalent) in letters of credit issued pursuant to the Secured Exit Credit Agreements. If such a cash collateralisation requirement were triggered, the Group would be unable to cash collateralise each of the issued but uncalled letters of credit which had been issued in connection with the Secured Exit Credit Agreements.

4.22    In addition to the Exit Credit Agreement:

(a)     on 30 June 2020 LFC, the Parent and each other guarantor of the Secured Exit Credit Agreements (including the Plan Company) entered into a pledge and security agreement with Wilmington Trust, National Association as collateral agent, as well as certain other local law security agreements in respect of which the relevant Group entities granted security interests over substantially all of its assets (including shares and vessels) subject to certain exclusions (the "**Secured Property**") as collateral for its obligations to the Secured Parties (as defined below). The Secured Property is subject to first ranking security granted to Wilmington Trust, National Association as collateral agent acting on behalf of the Secured Parties (the "**Collateral Agent**");

(b)      on 30 June 2020 LFC and the Parent entered into a collateral agency agreement with, among others, Crédit Agricole Corporate and Investment Bank (in its capacity as LC Administrative Agent (as defined therein)), Barclays Bank PLC (in its capacity as Term Loan Administrative Agent (as defined therein)) and the Collateral Agent, (the "**Exit Collateral Agency Agreement**"); and

(c)      on 30 June 2020 LFC (as borrower) and the Plan Company (as guarantor) (among others) entered into a New York law governed intercreditor agreement with among others the Parent (as parent), and Wilmington Trust, National Association as first priority agent and second priority agent (the "**Exit Intercreditor Agreement**").

4.23    One of the key substantive effects of the Exit Credit Agreement, the Exit Escrow LC Facility Agreement (as defined below), the Exit Collateral Agency Agreement and the Exit Intercreditor Agreement is that, in summary, the Secured Property secures the claims of the following parties in the priority set out below:

(a)      firstly, pari passu between the Super Senior LC Facility Lenders and the Hedging Counterparties (defined below);

(b)      secondly, pari passu between the Make-Whole Term Loan Facility Lenders;

(c)      thirdly, pari passu between the Senior LC Facility Lenders and the Escrow LC Facility Lenders (defined below); and

(d)      fourthly, the Takeback Term Loan Facility Lenders,

(together, the "**Secured Parties**").

4.24    The Secured Exit Credit Agreements (and in particular the Super Senior LC Facility, the Senior LC Facility and the Escrow LC Facility) establish committed facilities which provide the Group with access to letters of credit which can be issued in connection with its ongoing commercial operations. Having access to additional letters of credit issued from reputable financial institutions is critical to the Group's continuing operations. The capital-intensive nature of the onshore-offshore energy services industry necessitates the Group's significant exposure to letter of credit facilities, which is currently placing significant strain on the Group's balance sheet. In order to front-end capital investment, each new project requires new letters of credit to support the Group's performance obligations under the applicable project contract. Further, given that the Group's business is substantially reliant on the confidence of its customers, the Group's significant exposure to letter of credit facilities places it in a uniquely vulnerable position. A draw of a single letter of credit by a beneficiary could encourage multiple other customers to draw on other letters of credit, triggering a 'run on the bank' scenario which would have catastrophic consequences for the financial stability of the Group and ultimately cause negative consequences to its stake holders.

<u>Hedging Agreements</u>

4.25    McDermott International, Ltd has entered into various hedging agreements with hedging counterparties for the purposes of hedging the Group's exposure to currency and/or interest rates (the "**Hedging Agreements**" and the "**Hedging Counterparties**"). The Hedging Agreements are guaranteed by the obligors to the Secured Exit Credit Facilities (including the Plan Company) pursuant to a guaranty agreement dated 30 June 2020.

4.26    The Plan Company has identified five Hedging Agreements with five Hedging Counterparties whose claims will not be compromised by the Plan (as detailed at paragraph 9.2 below). As at the date of this Practice Statement Letter, the Plan Company estimates, based on a fair-value

analysis, that its net mark-to-market liability of the Hedging Agreements was approximately $6,000,000 as at 30 June 2023.

4.27    Four of the Hedging Counterparties have acceded to the Exit Intercreditor Agreement and has the benefit of security interests against the Secured Property. The claims of the Hedging Counterparties rank pari passu with the Super Senior LC Facility Lenders.

Bilateral Facilities

4.28    Various members of the Group are party to various financial arrangements which provide credit support to the Group in connection with its ongoing operations. Broadly speaking, those financial arrangements involve:

    (a)    various bilateral letter of credit facility arrangements with issuing banks and associated letters of credit which have been issued to the Group's commercial counterparties by such issuing banks; and

    (b)    various surety bond arrangements with insurance organisations in respect of which a Group company is the principal and certain of the Group's commercial counterparties are the obligees,

(together the "**Bilateral Facilities**", and the providers of the same being the "**Bilateral Facility Lenders**").

4.29    The Plan Company is not a primary obligor or guarantor of any of the Bilateral Facilities.

Surety Arrangements

4.30    In addition to the Bilateral Letters of Credit, certain members of the Group have entered into guaranty and/or surety arrangements in connection with certain of the Bilateral Facilities (the "**Surety Arrangements**").

Tanks Credit Facilities

4.31    On 8 September 2023, the Group finalised a transaction with certain of its lenders pursuant to which the relevant lenders (the "**Tanks Term Loan Facility Lenders**") agreed to provide the Group with $250,000,000 of new money by way of a term loan facility (the "**Tanks Term Loan Facility**") in order to provide the Group with critical additional liquidity to bridge to completion of the Restructuring and to provide the Group with sufficient working capital to fund the Group's operations following the date on which the transaction contemplated by the Restructuring Plan and WHOA Proposals becomes effective (the "**Restructuring Effective Date**").

4.32    It was a condition of obtaining the Tanks Term Loan Facility and the Tanks LC Facility that the Group completed a structural reorganisation and ringfencing of the Group's storage tanks business. The Group accordingly completed a structural reorganisation and ringfencing of the Group's storage tanks business on or around 7 September 2023, referred to herein as the "**Tanks Transactions**". A summary of the Tanks Credit Facilities and the Tanks Transactions (as defined below) has been provided at paragraph 5.20 *(Tanks Transaction)* below.

4.33    In short, the reorganisation involved the transfer of the storage tanks business (referred to herein as the *Tanks Business*, as defined below) to an unrestricted subsidiary in the Group and the granting of a security interest in the Tanks Business to the Tanks Term Loan Facility Lenders and the Tanks Senior LC Facility Lenders (each as defined and described further below).

4.34    In connection with the reorganisation, also on 8 September 2023, certain of the Super Senior LC Facility Lenders elected (following a consent solicitation process) to take up their pro rata share of a new letter of credit facility in support of the Tanks Business (the "**Tanks Senior LC Facility Lenders**") in an amount of $161,450,000 (the "**Tanks Senior LC Facility**"). As part of the Tanks Transactions, on or around 8 September 2023, an escrow letter of credit facility in an amount of approximately $66,000,000, was made available to the CB&I STS Delaware LLC as borrower (the "**Tanks Escrow LC Facility**", and together with the Tanks Senior LC Facility, the "**Tanks LC Facilities**") by certain of the Escrow LC Facility Lenders "**Tanks Escrow LC Facility Lenders**") to provide for the issuance of financial and performance letters of credit. The Tanks LC Facilities are required in order to support the Tanks Business which relies on the provision of letters of credit to enable its ongoing operation and success.

4.35    The Tanks Term Loan Facility and the Tanks Senior LC Facility are referred to in this Practice Statement Letter as the "**Tanks Credit Facilities**".

Amazon Facility

4.36    On 19 February 2021 McDermott (Amazon Chartering), Inc. (as borrower) (among others) entered into a $285,000,000 term loan facility agreement with, amongst others, ABN Amro Bank N.V in its capacity as facility agent and certain lenders thereto (the "**Amazon Facility**"). The Amazon Facility has a maturity of 31 December 2033 and is governed by New York law. As at 30 June 2023, the aggregate amount outstanding under the Amazon Facility is $228,000,000.

4.37    The Plan Company is not a primary obligor or guarantor of the Amazon Facility.

Preferred Interests

4.38    On 18 November 2020 the Parent issued to the Escrow LC Facility Lenders an aggregate liquidation preference of $220,000,000 plus accrued and unpaid dividends of preferred shares of the Parent in consideration for the Escrow LC Facility Lenders' entry into the Escrow LC Facility (the "**Preferred Interests**"). The Preferred Interests may be redeemed at the option of any holder on or after 31 December 2025.

4.39    The Plan Company is not a primary obligor or guarantor of any payments due under the Preferred Interests.

Letters of Credit

4.40    As noted above, each of the Super Senior LC Facility, the Senior LC Facility, the Escrow LC Facility and the Bilateral Facilities provide the Group with committed agreements from certain lenders to issue letters of credit to the Group's commercial counterparties to support the Group's operations, subject to the satisfaction of certain issuance conditions (the "**Letters of Credit**"). Various entities in the Group have accordingly requested that the Issuers issue the Letters of Credit pursuant to their obligations under the Super Senior LC Facility, the Senior LC Facility and the Bilateral Facilities and the Escrow LC Facility (each an "**Letter of Credit Issuer**"), and such issuing banks have issued such letters of credit pursuant to the terms of the relevant facility (the "**Super Senior Letters of Credit**", "**Senior Letters of Credit**", "**Escrow Letters of Credit**" and "**Bilateral Letters of Credit**" respectively).

4.41    A summary of the Super Senior Letters of Credit, the Senior Letters of Credit, the Escrow Letters of Credit and the Bilateral Letters of Credit that have been issued by Letter of Credit Issuers, as at 30 June 2023, at the request of Group entities is set out below.

| Type | Issued Letter of Credit amount |
|---|---|
| Super Senior Letters of Credit | $651,000,000 |
| Senior Letters of Credit | $1,015,000,000 |
| Escrow Letters of Credit | $339,000,000 |
| Bilateral Letters of Credit | $1,405,000,000 |

4.42  The Letters of Credit do not form part of the indebtedness of the Group. Rather, the Letters of Credit are obligations of the applicable Letter of Credit Issuer to their relevant beneficiaries. The Group's liabilities exist pursuant to the relevant letter of credit facility as outlined in this letter.

**Other liabilities of the Plan Company**

4.43  As at the date of this letter, the Plan Company is subject to certain other unsecured liabilities in addition to the financial indebtedness described above. These primarily include:

(a)  certain dispute proceedings relating to the Reficar Claim and the Contraloría Claim (each as defined below);

(b)  Trade Liabilities;

(c)  Intercompany Indebtedness; and

(d)  Pension Plans,

(each as defined below).

Dispute Proceedings

4.44  The Plan Company is party to certain dispute proceedings in respect of current and former projects, and in particular the Reficar Claim and the Contraloría Claim. Further information is provided with respect to these proceedings at paragraphs 5.8 to 5.15 below.

Trade Liabilities

4.45  The Plan Company is party to a large number of contracts for the supply of goods and services including, but not limited to, contracts for:

(a)  the exchange of goods and services during the normal course of the Plan Company's business, primarily in respect of vendors or other suppliers of goods and services;

(b)  the provision of banking services to the Plan Company;

(c)  the provision of consulting, advisory, legal and/or financial services to the Plan Company; and

(d)  the provision of employee and/or human resources services to the Plan Company,

(the "**Trade Liabilities**" and the "**Trade Creditors**").

4.46    As at 30 June 2023, $30,119,216 was owed by the Plan Company to Trade Creditors in respect of the Trade Liabilities.

Intercompany Indebtedness

4.47    The Plan Company is party to a number of financial arrangements with certain other members of the Group, including intercompany payables to certain Group companies amounting to $70,980,535 (the "**Intercompany Indebtedness**", and the "**Intercompany Creditors**").

Pension Plans

4.48    The Plan Company operates three defined benefit pension schemes, being the CB&I John Brown Pension Scheme, the Shaw Group UK 1997 Pension Scheme and the S&W Plan, as well as a defined contribution plan (the "**Pension Plans**").

5    **BACKGROUND TO THE GROUP'S FINANCIAL DIFFICULTIES**

5.1    A number of events have taken place since the Chapter 11 Process which have had a material impact on the Group's liquidity position.

**Business performance**

5.2    Since 2021, the Group has recognized material unfavourable changes in estimates in relation to a group of challenging projects. These projects caused a significant strain on the Group's liquidity. The Reficar Claim (as described below at paragraphs 5.8 to 5.11) and the ongoing discussions relating to the amendment and extension of the Secured Exit Credit Agreements have created greater uncertainty in the Group's operating environment. This uncertainty has caused the Group's customers, vendors, and banks to behave more cautiously when doing business with the Group. During the most recent financial quarter in particular, the Group received a retraction of previously announced significant awards as a result of the Group's inability to post requisite letters of credit. Absent the relief contemplated by the Restructuring Plan, this uncertainty could continue to impact the Group's bidding activity and ongoing projects in the backlog for the remainder of 2023. Additionally, the Group has increasingly unfavourable payment terms with its critical suppliers, which can lead to delays in project completion and achievement of customer's payment milestones, further exacerbating the unfavourable payment terms.

5.3    Further, the Group's industry was adversely affected by geopolitical events that increased the supply of low-priced oil to the global market at the same time that worldwide demand weakened due to the effects of the coronavirus pandemic, leading to a collapse in oil prices during March 2020. In 2021 U.S. oil production stabilized as commodity prices increased and demand for oil rebounded. This trend continued into 2022. In its report issued on 14 February 2023, the Organization of the Petroleum Exporting Counties ("**OPEC**") noted that for 2023, the forecast for world oil demand growth stands at 2.3 million barrels per day. Following the February report, in April 2023, OPEC and partner countries announced a crude oil production cut of approximately 1.2 million barrels per day, bringing the total voluntary crude oil production cut to approximately 1.6 million barrels per day. This cut is to extend through the end of 2023. On 4 June 2023, these production cuts were further extended through the end of 2024 for total production cuts of approximately 3.6 million barrels per day. Although the world oil demand in 2023 is expected to be supported by solid economic performance in major oil consuming countries, as well as improvements in coronavirus pandemic restrictions, the Group cannot predict the ultimate impact of these events on commodity prices. We expect to see continued volatility in oil and natural gas prices for the foreseeable future due to near-term production instability, potential sanctions and embargoes, the possibility of recession or financial market instability, and supply chain disruption resulting from, among other things, the Russia-Ukraine

crisis and adverse developments affecting financial institutions and companies in the financial services industry.

5.4     The Russia-Ukraine crisis is expected to have further global economic consequences, including continued disruptions of the global supply chain and energy markets. The global market is also experiencing inflationary pressures, including rising costs, a tightening steel market and labour shortages, which could result in increases to our operating costs that are not fixed, in addition to raising costs for our customers. While the Group considers that demand for hydrocarbon resources for both fuel and other downstream activities will continue increasing in the second half of 2023, the Group expects to see continued volatility in oil and natural gas prices for the foreseeable future due to, among other things, the Russia-Ukraine crisis, which could, over the long term, adversely impact our industry and create uncertainty in our business. The Group is currently experiencing disruptions to its global supply chain which have resulted in project prolongations, and which have negatively impacted performance. These disruptions and the resulting impacts have led to an increase in the number and amounts of unapproved change orders that the Group is currently pursuing with its customers. The ultimate impact of the Russia-Ukraine crisis will depend on future developments and the timing and extent to which normal economic and operating conditions resume.

**Cybersecurity incident**

5.5     In April 2023, the Group experienced a cybersecurity incident involving social engineering followed by the encryption of certain McDermott systems. After detecting the incident, the Group took certain of its global IT systems offline to prevent further compromise and engaged third-party cybersecurity experts to assist in the containment of the threat and restoration of its systems. During the second quarter of 2023, the Group incurred approximately $26,000,000 of expenses related to this incident, including expenses to respond to, remediate, and investigate this matter.

**Engagement with the Ad Hoc Group and the Steering Committee**

5.6     Due to the factors described above, and given the critical nature of the Secured Exit Credit Agreements to the Group's ability to continue as a going concern and the upcoming maturity dates in respect of the Secured Exit Credit Agreements, in order to proactively address the Group's liquidity needs and to address to upcoming maturity of the Secured Exit Credit Agreements, the Group commenced negotiations with certain of the Secured Exit Credit Facility Lenders with respect to, among other things, an extension of the term of the Secured Exit Credit Facilities.

5.7     The Group commenced engaging with certain of the lenders to the Secured Exit Credit Agreements, including: (i) an ad hoc group of certain cross-over lenders under the Group's credit facilities and shareholders of the Parent (the "**Ad Hoc Group**") and (ii) a steering group comprising Crédit Agricole Corporate and Investment Bank, in its capacity as LC Administrative Agent (as defined therein) under certain of the Group's letter of credit facilities and certain other lenders and issuers to the Group's credit facilities (comprising the "**Steering Committee**") in or around December 2022 with a view to agreeing a transaction that would provide the Group with, among other things, a maturity extension in respect of the Secured Exit Credit Facilities.

**Reficar Claim**

5.8     Since 8 March 2016 various persons including three Group subsidiaries, being (i) MIH; (ii) the Plan Company; and (iii) CB&I Colombiana S.A. (together the "**Reficar Claim Respondents**"), have been involved in arbitration proceedings entitled *Refineria de Cartagena SA. V. Chicago Bridge & Iron Company N.V., et al.* and governed by the arbitration rules of the International

Chamber of Commerce (the "**Reficar Arbitration**"). The Reficar Arbitration relates to certain disputes concerning a large engineering, procurement and construction agreement for the expansion of a refinery in Cartagena, as completed by the Group in 2015. Refineria de Cartagena (the "**Reficar Claim Plan Creditor**"), the customer on the project, alleged that the Reficar Claim Respondents (including the Plan Company) were responsible for certain cost overruns, delays and consequential damages on the construction project. The Reficar Claim Plan Creditor claimed total damages in excess of $4.5 billion against the Reficar Claim Respondents. Hearings in relation to the Reficar Arbitration were held on several dates beginning in May 2021 through July 2021. Post hearing briefs were submitted and closing arguments were held in November 2021.

5.9 The Reficar Claim Plan Creditor has been issued a letter of credit in the amount of $95,000,000 by Crédit Agricole Corporate and Investment Bank pursuant to the terms of the Exit Credit Agreement (pursuant to the Senior LC Facility) in support of the Plan Company's obligations in connection with the refinery project in Cartagena (the "**Reficar Letter of Credit**").

5.10 On or around 7 June 2023, the Reficar Claim Respondents received notice of an arbitration award being issued against them on a joint and several basis in favour of the Reficar Claim Plan Creditor, in connection with the Reficar Claim. In full, following offsetting claims and recoveries in favour of defendants, the arbitration panel granted the Reficar Claim Plan Creditor net damages of approximately $938,000,000 plus legal costs reimbursement (net of costs awarded to the defendants) of approximately $59,000,000 (the "**Reficar Claim**"). The tribunal also granted the Reficar Claim Plan Creditor interest on the damages award from 31 December 2015 (the date determined to be the liquidation of the contract) and interest on the legal costs award from the date of notice of the award (7 June 2023) at LIBOR plus 2% (until such time as LIBOR ceases to exist, and then at SOFR plus 2%) through date of payment of the award. On 8 June 2023, the Plan Company and MIH filed a petition to vacate (set aside) the award in the Southern District of New York asserting that the arbitration decision is based upon fundamental legal error and violation of due process related to procedural matters and the impact of various proceedings initiated by other agencies of the Colombian government. On 4 August 2023, the Reficar Claim Plan Creditor filed a motion to confirm the award. A scheduling order has been issued under which the parties will submit legal briefings on dates through 22 September 2023, after which the Plan Company anticipates that the court will schedule an oral hearing. Both the Plan Company and the Reficar Claim Plan Creditor have rights to appeal a decision of the Court of the Southern District of New York.

5.11 In the event that the defence of the Reficar Claim is not successful, it is possible that the Plan Company may be jointly and severally liable in respect of the Reficar Claim including in respect of a potential contribution claim from other of the Reficar Claim Respondents should another Reficar Claim Respondent make payment in respect of the Reficar Claim (being the "**Reficar Contribution Claims**", and such claimants being the "**Reficar Contribution Claim Plan Creditors**"). The Reficar Contribution Claim is currently contingent. The Plan Company considers it very unlikely that such contingent claims will crystallise in the near future. The Plan Company accordingly proposes to value the Reficar Contribution Claims at £1 for voting purposes.

**Contraloría Claims**

5.12 In 2017, the *Contraloría General de la República* (the "**Contraloría Claim Plan Creditor**"), an administrative agency of the Republic of Colombia, commenced an investigation against multiple parties alleging that improper cost overruns occurred in connection with the construction and modernisation of the Reficar refinery which was the subject of the Reficar Claim. The parties which were the subject of the investigation included two of the Group's subsidiaries (one of which is the Plan Company), two unrelated companies, five insurance

14

companies and twelve individuals, none of whom are associated with the Group (the "**Contraloría Claim Respondents**").

5.13    On 26 April 2021, following the conclusion of its investigation the Contraloría Claim Plan Creditor issued its opinion that the Contraloría Claim Respondents were jointly and severally responsible for cost overruns totalling approximately 2.95 trillion Colombian pesos (or an equivalent US dollar amount of approximately $718,400,000 as the date of this Practice Statement Letter) on the project (the "**Contraloría Claim**").

5.14    The Group and certain other respondents asserted that all costs were properly incurred and spent on the project and that the two relevant Group entities (including the Plan Company) were not subject to the investigatory powers of the Contraloría Claim Plan Creditor. The Plan Company sought to void the Contraloría Claim within the Colombian court system, however that claim was rejected on appeal in February 2022. The Group (and certain other Contraloría Claim Respondents) have now filed a bilateral investment treaty arbitration with the International Settlement of Investment Disputes and with separate Colombian court proceedings which are ongoing and pursuant to which the Group (and others) counterclaim against the Contraloría Claim being issued against them.

5.15    In the event that the defence of the Contraloría Claim is not successful, either through the Columbian court system or through the bilateral investment treaty arbitration proceedings, it is possible that the Plan Company may be jointly and severally liable in respect of the Contraloría Claim including in respect of a potential contribution claim from other of the Contraloría Claim Respondents should another Contraloría Claim Respondent make payment in respect of the Contraloría Claim (being the "**Contraloría Contribution Claims**" and such claimants being the "**Contraloria Contribution Claim Plan Creditors**"). The Contraloría Contribution Claim is currently contingent. The Plan Company considers it very unlikely that such contingent claims will crystallise in the near future. The Plan Company accordingly proposes to value the Contraloría Contribution Claims at £1 for voting purposes.

**New money discussions**

5.16    Further, in or around June 2023 the Group's liquidity forecasts indicated that the Group would not have sufficient liquidity to be able to maintain progress on key projects and achieve business plan projections absent new money and a reduction in the minimum liquidity covenant. The Group therefore commenced negotiations with the Ad Hoc Group and the Steering Committee. Following extensive negotiation, certain members of the Ad Hoc Group agreed to provide the funding necessary to support the Group's immediate liquidity needs. It was a condition of the provision of the Tanks Term Loan Facility and the Tanks LC Facilities:

(a)    the Group implemented a corporate reorganisation involving the transfer of the Group's U.S. domestic and international storage tanks business (the "**Tanks Business**") to an unrestricted subsidiary in the Group; and

(b)    the lenders under the Tanks Term Loan Facility benefited from security over the Tanks Business.

5.17    In order to incur the Tanks Term Loan Facility and to facilitate the granting of security over the Tanks Business, the Group required consents from the Secured Exit Credit Facility Lenders under the terms of the Secured Exit Credit Agreements. Based on discussions with the Ad Hoc Group and members of the Steering Committee, it was a condition of the Group receiving those consents that the Group undertook to migrate certain Letters of Credit issued under the Secured Exit Credit Agreements (which supported the Tanks Business) to a new letter of credit facility incurred by the Tanks Business.

5.18    The borrowing of the Tanks Term Loan Facility prior to the sanction of the Restructuring Plan was required due to the Group's expected cashflow needs and liquidity shortfall in the immediate term. The Group concluded that the Tanks Term Loan Facility was the only available route to obtain the funding on an expedited basis in the circumstances. There is no super senior basket that would have enabled the Group to procure additional liquidity within the confines of the Secured Exit Credit Facilities and there were no other available baskets that could have enabled the funding in the quantum and on the timeline required.

5.19    The Tanks Transactions were aimed at (i) reducing pressure on the Group's liquidity and working capital; (ii) reducing the risk of cross-defaults and termination of contracts which are material to the Group's operations; and (iii) reducing the risk of management of certain key operating companies in the Group being obliged to commence formal insolvency proceedings which, given the interconnected financing arrangements of the Group, would in turn precipitate further insolvency filings throughout the Group.

Tanks Transactions

5.20    On 1 September 2023 the Group commenced consent solicitation processes under the terms of the Exit Credit Agreement and the Exit Escrow LC Facility Agreement (the "**Consent Solicitations**") with the view to implementing the Tanks Transactions. The Consent Solicitations sought consent from the requisite threshold of Super Senior LC Facility Lenders, Senior LC Facility Lenders, Make-Whole Term Loan Facility Lenders and Takeback Term Loan Facility Lenders to (i) approve the Tanks Transactions and (ii) effect a migration of certain Super Senior Letters of Credit and Escrow Letters of Credit to the new letters of credit facilities to be established by the entities comprising the Tanks Business. The Group implemented the Tanks Transactions on and following 7 September 2023. The Tanks Transactions comprised the following steps (in summary):

(a)    the Group and the relevant consenting lenders entered certain amendment agreements to the Exit Credit Agreement and the Exit Escrow LC Facility Agreement to provide for, among other things, the transactions contemplated at paragraphs (b) to (g) below;

(b)    the Group undertook an internal reorganisation of the Tanks Business;

(c)    LFC designated all subsidiaries constituting the Tanks Business (the "**Tanks Entities**") as unrestricted subsidiaries for the purposes of the Secured Exit Credit Agreements, with the liens and guarantees given by or over the assets of the Tanks Entities pursuant to the Exit Credit Agreement and Exit Escrow LC Facility Agreement accordingly being released or assigned to the Collateral Agent pursuant to the terms of the amended Secured Exit Credit Facilities;

(d)    CB&I STS Delaware LLC, as well as certain other Tanks Entities executed a new facilities agreement which provided for the Tanks Credit Facilities to come into existence. Relevantly, the Tanks Credit Facilities were compromised of:

(i)    the $250,000,000 senior secured Tanks Term Loan Facility (as defined above) made available by certain members of the Ad Hoc Group, with the whole of the Tanks Term Loan Facility available to be drawn (and was fully drawn) on 8 September 2023;

(ii)    the approximately $254,000,000 senior secured Tanks Senior LC Facility (as defined above) to provide for issuance of financial and performance letters of credit, which was structured in two tranches:

a.  an initial tranche of $161,450,000, being an amount equal to the face amount of all of the outstanding Letters of Credit issued under the Exit Credit Agreement Facilities which support the Tanks Business (the "**Tanks Senior LC Facility Tranche 1**") which became effective 8 September 2023 for Super Senior LC Facility Lenders which elected to participate pursuant to the relevant Consent Solicitation (the "**Consenting Super Senior LC Facility Lenders**");

b.  a second tranche of $92,160,000, which shall be made available on the Restructuring Effective Date (the "**Tanks Senior LC Facility Tranche 2**").

(iii)  an approximately $66,000,000 escrow letter of credit facility, being the Tanks Escrow LC Facility, to provide for issuance of financial and performance letters of credit;

(e)  all Super Senior LC Facility Lenders were offered an ability to participate in the full Tanks Senior LC Facility of the $253,610,000 (i.e. the aggregate of the Tanks Senior LC Facility Tranche 1 and the Tanks Senior LC Facility Tranche 2) pro rata to their commitments under the Super Senior LC Facility pursuant to the Consent Solicitation under the Exit Credit Agreement. Those Super Senior LC Facility Lenders which elected to participate as at 8 September 2023, being the Consenting Super Senior LC Facility Lenders have partially received that pro rata share of the Tanks Senior LC Facility as a portion of the Tanks Senior LC Facility Tranche 1 commitments, and will receive the remainder of that pro rata share of the Tanks Senior LC Facility as a portion of the Tanks Senior LC Facility Tranche 2 commitments. Each Super Senior LC Facility Lender who did not elect to participate in the Tanks Senior LC Facility Tranche 1 before 8 September 2023 (the "**Non-Consenting Super Senior LC Facility Lenders**") will remain entitled to elect (up until the first business day following the proposed Plan Meeting) to take up their pro rata share of the Tanks Senior LC Facility as a portion of the Tanks Senior LC Facility Tranche 2 commitments in connection with the Restructuring Plan;

(f)  the Group entered into side letters with the Consenting Super Senior LC Facility Lenders and each of the relevant banks which issued letters of credit in connection with the same and in support of the Tanks Business (the "**Consenting Issuing Banks**") which had the effect of freezing certain commitments under the Super Senior LC Facility in the same amount that the relevant Consenting Super Senior LC Facility Lenders had agreed to participate under the Tanks Senior LC Facility, grossed up to account for non-migrating Super Senior LC Facility commitments; and

(g)  the relevant Super Senior Letters of Credit and Escrow Letters of Credit issued by Consenting Issuing Banks were migrated to the Tanks Senior LC Facility and the Tanks Escrow LC Facility.

**Transaction Support Agreement and terms of the proposed Restructuring**

Transaction Support Agreement

5.21  The negotiations between the Group, the Ad Hoc Group, the Steering Committee and the other relevant stakeholders in the Group in respect of the proposed restructuring ultimately culminated in a transaction support agreement which was entered into between (among others) the Parent, the Plan Company and the Consenting Stakeholders (as outlined and defined below) on 8 September 2023 (the "**Transaction Support Agreement**").

5.22    As at the date of this Practice Statement Letter, the Transaction Support Agreement has been entered into by:

(a)    certain members of the Group comprising the Company Parties (as defined therein);

(b)    Super Senior LC Facility Lenders holding approximately 85% of commitments under the Super Senior LC Facility;

(c)    Make-Whole Term Loan Facility Lenders holding approximately 39% of commitments under the Make-Whole Term Loan Facility;

(d)    Senior LC Facility Lenders holding approximately 69% of commitments under the Senior LC Facility;

(e)    Escrow LC Facility Lenders holding (or entitled to hold) approximately 99% of commitments under the Escrow LC Facility;

(f)    Takeback Term Loan Facility Lenders holding approximately 72% of commitments under the Takeback Term Loan Facility; and

(g)    all of the issuers of the Super Senior Letters of Credit, Senior Letters of Credit and Escrow Letters of Credit,

(each party in paragraph (a) - (g) above (as defined in the Transaction Support Agreement) being a "**Consenting Stakeholder**").

5.23    Under the terms of the Transaction Support Agreement, among other things:

(a)    the relevant members of the Group agreed to implement the Restructuring in accordance with several timing milestones; and

(b)    each of the Consenting Stakeholders has undertaken to use commercially reasonable efforts to take all actions reasonably necessary in order to support, facilitate, implement, consummate or otherwise give effect to all or any part of the Restructuring.

5.24    LFC has agreed to pay certain fees to the Secured Exit Credit Facility Lenders which have executed the Transaction Support Agreement (including through a joinder) ahead of the Restructuring Effective Date upon the Restructuring becoming effective on the Restructuring Effective Date, including:

(a)    in respect of each of the Super Senior LC Facility Lenders, Senior LC Facility Lenders and Escrow LC Facility Lenders, 2.0% of the aggregate amount of the letter of credit commitments of all Super Senior LC Facility Lenders, Senior LC Facility Lenders and Escrow LC Facility Lenders, as applicable, paid in the form of additional Takeback Term Loan Facility participations or similar instruments, subject to final determination;

(b)    in respect of the Make-Whole Term Loan Facility Lenders, 2.0% of the aggregate amount of outstanding Make-Whole Term Loan Facility, paid in the form of additional Takeback Term Loan Facility participations or similar instruments, subject to final determination; and

(c)    in respect of the Takeback Term Loan Facility Lenders, 4.0% of the aggregate amount of outstanding Takeback Term Loan Facility, payable in kind, subject to final determination,

(together the "**TSA Consent Premium**").

## 6   OVERVIEW OF THE RESTRUCTURING

### The Restructuring

6.1   In addition to the Restructuring Plan, certain other members of the Group have conducted or are in the process of conducting other processes in parallel with the Restructuring Plan in order to give effect to a wider restructuring of the Group's capital structure:

(a)   as noted above at paragraph 5.20, prior to the date of this Practice Statement Letter, the Group implemented the Tanks Transactions to facilitate the provision of additional liquidity to the Group; and

(b)   on or around the date of this Practice Statement Letter, each of MIH and LFC intend to file opening declarations pursuant to the *Wet Homologatie Onderhands Akkoord* with the Amsterdam district court in the Netherlands (the "**Amsterdam District Court**"), signalling the commencement of parallel WHOA proceedings during which MIH and LFC will each prepare proposals (the "**WHOA Proposals**", and the "**MIH WHOA Proposal**" and the "**LFC WHOA Proposal**" respectively) for certain of their creditors (the "**WHOA Creditors**"). The primary purpose of the WHOA Proposals is to ensure that the transactions effected by the Restructuring Plan are, in parallel, effected with respect to the creditors of MIH and LFC, the vast majority of which are common to the Plan Creditors. On or around 20 October 2023, the WHOA Proposals will be offered for voting to the WHOA Creditors. Further details regarding the WHOA Proposals are provided at paragraph 6.6 below; and

(c)   on our following the Restructuring Effective Date a consensual amendment and extension transaction will be effected between the Parent and the requisite holders of the Preferred Interests, the precise terms of which are yet to be agreed (the "**Preferred Interest Extension**"),

(the Tanks Transactions, the Restructuring Plan, the WHOA Proposals and the Preferred Interest Extension together comprising the "**Restructuring**").

### Purpose of the Restructuring

6.2   The primary objectives of the Restructuring are to:

(a)   restore the Plan Company and the Group to financial stability and continue the business of the Group;

(b)   avoid the Plan Company and the wider Group having to enter into insolvent liquidation, which would likely result in recoveries for Plan Creditors being materially lower than if the Restructuring Plan were approved and sanctioned, this being nil in the case of the Dispute Proceeding Plan Creditors and the Contribution Claim Plan Creditors (see further in Section 11 (*Consequences if the Restructuring Plan is not successful*) below);

(c)   implement an amendment and extension of the Group's Secured Exit Credit Agreements, thereby extending the Group's access to critical committed letter of credit facilities and removing the risk of a cash collateralisation of outstanding letters of credit in the near term;

(d)   to facilitate the provision of additional liquidity to the Group pursuant to the Tanks Transactions;

(e)     protect the position of the employees of the Plan Company and maintain commercial relationships with critical suppliers; and

(f)     provide the Dispute Proceeding Plan Creditors with the opportunity to benefit from the potential upside anticipated assuming the successful implementation of the Restructuring through their receipt of the Dispute Proceeding Plan Creditor Consideration (defined below).

6.3     Following the implementation of the Restructuring, the Plan Company expects that the new financing, combined with cash generated from its operations, will be sufficient to enable the Plan Company and the wider Group to, on a global basis, continue operating in the normal course and fulfil its commitments to its stakeholders, including customers, suppliers, joint-venture partners, business partners and employees.

**Key terms of the Restructuring**

Tanks Transactions

6.4     As noted at paragraph 5.20 above, the Tanks Transactions were effectuated on 8 September 2023 on a fully consensual basis pursuant to the terms of the Secured Exit Credit Agreements.

Restructuring Plan

6.5     The Restructuring Plan is an integral part of the wider Restructuring as, if approved by the requisite Plan Creditors and sanctioned by the English court, it will allow the Group to implement certain elements of the Restructuring which cannot be achieved on a consensual basis. The key terms of the Restructuring Plan are set out in detail at Section 10 *(Key Terms of the Restructuring Plan)* below.

Parallel WHOA Proposals

6.6     As noted at paragraph 6.1(b)above, on or around the date of this Practice Statement Letter, each of MIH and LFC (together the "**WHOA Companies**") intend to file opening declarations pursuant to the *Wet Homologatie Onderhands Akkoord* with the Amsterdam District Court, as such initiating parallel WHOA proceedings. On or around 20 October 2023, the WHOA Companies intend to offer the MIH WHOA Proposal and the LFC WHOA Proposal respectively for voting to the relevant WHOA Creditors.

6.7     The Information Agent will make information available to the relevant creditors in respect of the WHOA Proposals on the Plan Portal.

6.8     The primary purpose of the WHOA Proposals is to implement the financial restructuring of MIH and LFC (and certain of its group companies) on the terms set out in the WHOA Proposals, in a manner which is broadly consistent with the terms of the Restructuring Plan. In particular:

(a)     subject to paragraph 6.9 below, the LFC WHOA will amend the terms of the Secured Exit Credit Agreements in a manner which is consistent with the Restructuring Plan, with respect to the Secured Exit Credit Facility Lenders only; and

(b)     the MIH WHOA will:

(i)     amend the terms of the Secured Exit Credit Agreements in a manner which is consistent with the LFC WHOA, with respect to the Secured Exit Credit Facility Lenders; and

(ii)    compromise the claims of the Reficar Claim Plan Creditor and the Reficar Contribution Claim Plan Creditors as against MIH.

6.9    Upon offering the WHOA Proposals to the WHOA Creditors, a voting period will commence during which each of the WHOA Creditors can vote either in favour or against the relevant WHOA Proposal. The WHOA Companies currently expect such voting period to run up to and including 3 November 2023, after which a voting report will be made available stating the outcome of the voting process. A WHOA Proposal can be submitted to the Dutch courts for sanctioning if at least one in-the-money class of creditors consents to such WHOA Proposal. A class of creditors is considered to have consented to a WHOA Proposal if the group of creditors within that class that has voted in favour of the plan represents at least two-thirds of the total amount of claims belonging to the creditors within that class who have cast their vote.

6.10    In line with the class constitution for the Restructuring Plan, and after having taken legal advice (privilege for which is not waived), the WHOA Companies have concluded that prima facie creditors fall into the following classes:

(a)    the Super Senior LC Facility Plan Creditors;

(b)    the Make-Whole Facility Plan Creditors;

(c)    the Senior LC Facility Plan Creditors;

(d)    the Escrow LC Facility Plan Creditors;

(e)    the Takeback Facility Plan Creditors; and

(f)    for the MIH WHOA Proposal only:

(i)    the Reficar Claim Plan Creditor; and

(ii)    the Reficar Contribution Claim Plan Creditors.

6.11    No other creditors of MIH and/or LFC than those listed under paragraph 6.10 above will be subject to the parallel WHOA proceedings that the WHOA Companies intend to initiate.

6.12    The WHOA Companies intend to request the Amsterdam District Court to appoint an observer (*observator*) to monitor the preparatory process and the structuring of the WHOA Proposals, including but not limited to the provision of information to the WHOA Creditors. The appointment of such observer is supported by the parties to the Transaction Support Agreement.

6.13    **Important**: If any WHOA Creditor has comments as to the proposed class constitution of WHOA Creditors or any other concerns with regard to the WHOA Proposals and the preparation thereof, they should in the first instance contact NautaDutilh N.V., Dutch counsel to the Plan Company and the WHOA Companies, with a copy to Kirkland & Ellis, using the contact details set out at the end of this letter. In this respect, reference is made to section 383 paragraph 9 of the Dutch Bankruptcy Act (*Faillissementswet*), which provides that a ground for rejection of sanction of a WHOA Proposal may not be invoked by a WHOA Creditor if it has not raised such ground for rejection with the debtor or, if applicable, the court appointed restructuring expert, within a reasonable time after it has discovered or reasonably should have discovered the possible existence of that ground for rejection.

## 7        PURPOSE OF THE RESTRUCTURING PLAN

7.1      The Restructuring Plan is being proposed to the Plan Creditors in order to restructure the Group's existing indebtedness. The primary aims of the Restructuring Plan are to facilitate an amendment and extension of the Group's primary financial indebtedness, reduction of commitments under the Secured Exit Credit Agreements and a compromise of unsecured liabilities that would otherwise prevent the Group and the Plan Company from continuing to operate as a going concern.

7.2      The Restructuring Plan will:

(a)      with effect from the Restructuring Effective Date, authorise the Plan Company to implement the Restructuring in accordance with the Restructuring Plan;

(b)      grant authority to the Plan Company to execute the documents required to implement the transactions contemplated by the Restructuring Plan to which the Plan Creditors are party in the capacity as Plan Creditors, on behalf of the Plan Creditors, including (without limitation):

(i)      an amended and restated Exit Credit Agreement which implements the amendments contemplated by the A&E Transaction (as it relates to the Exit Credit Agreement Facilities), the Migrated Super Senior Letter of Credit Commitment Tranche 1 Reduction (as defined below) and the Migrated Super Senior Letter of Credit Commitment Tranche 2 Reduction (as defined below);

(ii)     any documents required to effectuate the relevant lenders taking up commitments in the Tanks Senior LC Facility Tranche 2;

(iii)    an amended and restated Exit Escrow LC Facility Agreement which implements the amendments contemplated by the A&E Transaction (as defined below) (as it relates to the Escrow LC Facility);

(iv)     a deed of release giving effect to the releases contemplated at paragraphs 10.1(e), (f) and (g) below, and

(v)      any other document which the parties to the Transaction Support Agreement deem necessary to implement the Restructuring,

(together, the "**Implementation Documents**");

(c)      implement the transactions contemplated by the Restructuring Plan, as described at Section 10 *(Key Terms of the Restructuring Plan)* below; and

(d)      set out the order in which the steps required to implement the Restructuring will take place.

7.3      The Implementation Documents will be attached to the Explanatory Statement.

7.4      Further details of the Restructuring Plan will be set out in the Explanatory Statement to be provided in connection with the Restructuring Plan, which, provided that the Court gives its permission to convene the Plan Meetings, will be made available to Plan Creditors shortly after the Convening Hearing.

**8        INTERESTS SUBJECT TO THE RESTRUCTURING PLAN**

8.1      The Restructuring Plan is being proposed to the Plan Creditors in order to implement certain aspects of the Restructuring which are unable to be implemented on a fully consensual basis.

8.2      The Plan Company has a number of different sources of indebtedness, some (but not all) of which will be compromised under the Restructuring Plan. The interests to be compromised by the Restructuring Plan are set out below.

**Secured Exit Credit Agreements**

8.3      The Restructuring Plan will bind all Secured Exit Credit Facility Lenders under the Secured Exit Credit Agreements in relation to the amendments to the Secured Exit Credit Agreements which are subject of the Restructuring Plan, as described at Section 10 *(Key Terms of the Restructuring Plan)* below.

**Dispute Proceeding Plan Creditors**

8.4      The claims of the Reficar Claim Plan Creditor in respect of the Reficar Claim and the Contraloría Claim Plan Creditor in respect of the Contraloría Claim (together the "**Dispute Proceeding Plan Creditors**") will be compromised and discharged in full pursuant to the Restructuring Plan in exchange for the relevant Dispute Proceeding Plan Creditor Consideration.

8.5      The Reficar Claim Plan Creditor has the benefit of the Reficar Letter of Credit, which (upon being drawn) will result in a payment of $95,000,000 to the Reficar Claim Plan Creditor by the issuing bank without admission of liability in respect of any such claim alleged by it. The value of the Reficar Claim will accordingly be assessed by the Plan Company for the purposes of the Plan for a figure which is $95,000,000 less than the claim against the Plan Company as at 30 June 2023.

**Contribution Claim Plan Creditors**

8.6      The claims of the Reficar Contribution Claim Plan Creditors in respect of the Reficar Contribution Claims and the Contraloría Contribution Claim Plan Creditors in respect of the Contraloría Contribution Claims (together the "**Contribution Claim Plan Creditors**") will be compromised and discharged in full pursuant to the Restructuring Plan in exchange for £100,000 in aggregate to all Contribution Claim Plan Creditors.

**9        ARRANGEMENTS THAT ARE NOT SUBJECT TO THE RESTRUCTURING PLAN**

9.1      There are certain liabilities of the Group that are not the subject of the Restructuring Plan:

**Hedging Agreements**

9.2      The Plan Company does not intend to compromise the guarantee claims in respect of the Hedging Agreements. The Plan Company believes that compromising the claims of the Hedging Counterparties is not in its or its stakeholders' best interests and risks compromising the Restructuring and the overall long-term success of the Group.

**Surety Arrangements**

9.3      Any contingent liability of the Plan Company in connection with the Surety Arrangements is not proposed to be compromised by the Restructuring Plan. The Surety Arrangements provide critical collateral support to the Group which is required to enable the Group to participate in a

number of its key commercial relationships. The Plan Company believes that compromising the claims of the Surety Arrangements is not in its or its stakeholders' best interests and risks compromising the Restructuring and the overall long-term success of the Group.

**Tanks Credit Facilities**

9.4     The Tanks Credit Facilities will not be subject to the Restructuring Plan because (i) the Plan Company is not a party to the Tanks Credit Facilities; and (ii) each of the Tanks Term Loan Facility Lenders, Tanks Escrow LC Facility Lenders, and Tanks Senior LC Facility Lenders (the latter in respect of the Tanks Senior LC Facility Tranche 1 only) have already agreed to provide any necessary consents required to effect the Restructuring, including through their commitments in the Transaction Support Agreement.

**Trade Creditors**

9.5     The Plan Company does not intend to compromise the claims of Trade Creditors which fall within the following categories:

(a)     Trade Creditors who either (i) provide services to the Plan Company would be difficult to source from an alternative supplier and, if the Trade Creditor terminated its services, it is likely to cause significant operational disruption to the Plan Company, or (ii) provide services to both the Plan Company and the Group which would be difficult to source from an alternative supplier and, if the Trade Creditor terminated its services, it would likely cause significant operational disruption to the Plan Company and/or the Group (together the "**Critical Trade Creditors**"); and

(b)     certain other minor Trade Creditors who provide non-critical services to both the Plan Company and the Group (the "**Non-Critical Trade Creditors**").

(c)     The Plan Company has identified 68 Critical Trade Creditors, as at 30 June 2023, whose claims will not be compromised by the Plan. As at 30 June 2023, the Plan Company had a liability of $ 26,000,810 owed to the Critical Trade Creditors.

(d)     The liabilities of Critical Trade Creditors have been excluded for one or more of the following reasons:

(i)     the services provided by these Critical Trade Creditors would be difficult to source from an alternative supplier; and/or

(ii)     if a Critical Trade Creditor terminated its services, in particular as a result of a compromise or discharge by the Plan Company in respect of such Trade Creditors' claims, it would be likely to cause other Trade Creditors (both critical and non-critical) to terminate their services and relationships with the Plan Company and as a result would have significant operational and business disruption to the Plan Company and the Group as a whole.

9.6     The Plan Company believes that compromising the claims of the Critical Trade Creditors is not in its or its stakeholders' best interests and risks compromising the Restructuring and the overall long-term success of the Group.

9.7     The Plan Company has identified 28 Non-Critical Trade Creditors, as at 30 June 2023, whose claims will not be compromised by the Plan. As at 30 June 2023, the Plan Company had a liability of $624,786.93 owed to the Non-Critical Trade Creditors.

9.8     The liabilities of Non-Critical Trade Creditors have been excluded as, given the small size of the claims relative to claims of other unsecured creditors, the Plan Company considers that the benefits to compromising such liabilities would be outweighed by the operational disruption that would be caused to the Plan Company and/or the Group by virtue of compromising the claims of some trade creditors but not others. The Plan Company believes that compromising the claims of the Non-Critical Trade Creditors is not in its or its stakeholders' best interests for the reasons outlined at paragraph (ii) above.

**Intercompany Indebtedness**

9.9     The Plan Company has identified eighteen Intercompany Creditors whose claims will not be compromised pursuant to the Restructuring Plan:

(a)     Intercompany Indebtedness amounting to $56,578,981 and owing to twelve Intercompany Creditors which are obligors under the Secured Exit Credit Facilities, and each of which has granted security interests in respect of the Secured Property. Each of these entities has further acceded to the Exit Intercreditor Agreement. All of these debts have been pledged by the relevant Group entities in favour of the Collateral Agent on behalf of the Secured Exit Credit Facility Lenders pursuant to a pledge and security agreement. The Plan Company accordingly considers that in the Relevant Alternative (as defined below) the value associated with such intercompany receivables (if any) would ultimately be distributed to the Secured Exit Credit Facility Lenders (subject to any "prescribed part" deductions or similar legal mechanisms under the laws of a guarantor jurisdiction outside of England), and that there is accordingly no material benefit to compromising these liabilities; and

(b)     Intercompany Indebtedness amounting to $14,401,554 and owing to six Intercompany Creditors which are not obligors to the Secured Exit Credit Facilities. Each of these entities has consensually agreed to enter arrangements outside the terms of the Plan which will release the value of claims to zero.

**Pension Plans**

9.10    The Plan Company believes that compromising any outstanding liabilities in respect of the Pension Plans is not in its or its stakeholders' best interests and risks compromising the overall long-term success of the Group.

**Administrative agents and Issuers**

9.11    The Plan Company does not intend to compromise the claims and liabilities owed to administrative agents (the LC Administrative Agent (as defined in the Secured Exit Credit Facilities Agreement) and term loan administrative agents), collateral agents, escrow agents and Issuers under or in connection with the Secured Exit Credit Agreements. If consents of those agents or Issuers to the implementation of the Restructuring are required, such consents will be provided outside of the Plan.

**Other Group liabilities**

9.12    The following Group liabilities have been excluded because the Plan Company is either not a party or has no liability under the arrangements:

(a)     Bilateral liabilities have been excluded primarily because the Plan Company is not party to these arrangements. The bilateral letter of credit facility arrangements and the surety bond arrangements provide critical collateral support to the Group which is required to enable the Group to participate in a number of its key commercial

relationships. The Plan Company believes that compromising the claims of the Bilateral Facility Lenders is not in its or its stakeholders' best interests and risks compromising the Restructuring and the overall long-term success of the Group.

(b)     The liabilities arising to members of the Group as a result of the Amazon Facility have been excluded because the Plan Company has no liability under this arrangement. In addition, the Amazon Facility is secured over a specific vessel and sit outside the Exit Intercreditor Agreement.

(c)     The liabilities arising to members of the Group as a result of the Preferred Interests are not subject to the Restructuring Plan because the Plan Company has no liability under these arrangements.

## 10      KEY TERMS OF THE RESTRUCTURING PLAN

### Overview of the Restructuring Plan

10.1    The Restructuring Plan provides for, in summary and among other things:

(a)     each of the Secured Exit Credit Facility Lenders to agree to certain amendments and extensions to the terms of the Exit Credit Agreement and the Exit Escrow LC Facility Agreement, as detailed below (the "**A&E Transaction**");

(b)     a reduction of the Super Senior LC Facility Lenders' commitments under the Super Senior LC Facility such that the Consenting Super Senior LC Facility Lenders' commitments in the Super Senior LC Facility will be reduced dollar-for-dollar by the amount of its commitment under the Tanks Senior LC Facility Tranche 1 (the "**Migrated Super Senior Letter of Credit Commitment Tranche 1 Reduction**");

(c)     the Non-Consenting Super Senior LC Facility Lenders will have the option to take up their pro rata share of the Tanks Senior LC Facility as a portion of the Tanks Senior LC Facility Tranche 2 commitments through the Restructuring Plan. Such pro rata entitlement will be equal to their pro rata share of the full Tanks Senior LC Facility of the $253,610,000 (i.e. the aggregate of the Tanks Senior LC Facility Tranche 1 and the Tanks Senior LC Facility Tranche 2). If Non-Consenting Super Senior LC Facility Lenders do not elect to take up their pro rata share, such unallocated share will be offered to each Consenting Super Senior LC Facility Lender;

(d)     a reduction of the Super Senior LC Facility Lenders' commitments under the Super Senior LC Facility such that those Super Senior LC Facility Lenders who have been allocated commitments in the Tanks Senior LC Facility Tranche 2 shall have their commitments in the Super Senior LC Facility reduced dollar-for-dollar by the amount of its commitment under the Tanks Senior LC Facility Tranche 2 in the event that not all of the Non-Consenting Super Senior LC Facility Lenders elect to participate in the Tanks Senior LC Facility Tranche 2 (the "**Migrated Super Senior Letter of Credit Commitment Tranche 2 Reduction**");

(e)     each of the Dispute Proceeding Plan Creditors' claims will be released in exchange for a right to receive the Dispute Proceeding Plan Creditor Consideration, as further described in paragraph 10.8;

(f)     each of the Contribution Claim Plan Creditors' claims will be released in exchange for a right to receive the Contribution Claim Plan Creditor Consideration; and

(g)     upon the completion of the Restructuring, among others, the Plan Company, its affiliates and their respective officers, directors and advisors will be given full and final releases in respect of the negotiation and implementation of the Restructuring.

**Treatment of Plan Creditors**

10.2    A table summarising the above terms of the Restructuring Plan and treatment of the creditors is set out below:

| Plan Creditor | Outstanding amount | Treatment under the Restructuring Plan |
|---|---|---|
| Super Senior LC Facility Lenders | $651,000,000 | Subject to the A&E Transaction (described at paragraph 10.3 below).<br><br>Offer to participate in the Tanks Senior LC Facility Tranche 2.<br><br>Migrated Super Senior Letter of Credit Commitment Tranche 1 Reduction and Migrated Super Senior Letter of Credit Commitment Tranche 2 Reduction (applicable to the Consenting Super Senior LC Facility Lenders only) (described in detail at paragraph 10.5 and paragraph 10.6 below). |
| Make-Whole Term Loan Facility Lenders | $43,000,000 | Subject to the A&E Transaction. |
| Senior LC Facility Lenders | $1,015,000,000 | Subject to the A&E Transaction. |
| Escrow LC Facility Lenders | $339,000,000 | Subject to the A&E Transaction. |
| Takeback Term Loan Facility Lenders | $508,000,000 | Subject to the A&E Transaction. |
| Dispute Proceeding Plan Creditors | $1,715,400,000 (excluding interest) | Full compromise and discharge of liabilities in return for an entitlement to receive Dispute Proceeding Plan Creditor Consideration (described in detail at paragraph 10.8 below). |
| Contribution Claims Plan Creditors | £1 | Full compromise and discharge of liabilities in return for an entitlement to receive Contribution Claim Plan Creditor Consideration. |

**A&E Transaction**

10.3    In addition to the amendments described above, the maturity date for the Super Senior LC Facility, the Make-Whole Term Loan Facility, the Senior LC Facility and the Escrow LC

Facility will be amended from 30 June 2024 to 30 June 2027, with the maturity of the Takeback Term Loan Facility being extended from 30 June 2025 to 31 December 2027.

10.4    Further, the Secured Exit Credit Agreements will be amended as follows pursuant to the A&E Transaction, with such amendments being binding upon each Secured Exit Credit Facility Lender:

(a)    *Minimum liquidity covenant*: the minimum liquidity covenant under the Secured Exit Credit Facilities will be modified in accordance with an agreed-upon schedule which will be set out in the Explanatory Statement.

(b)    *Asset Sale Proceeds Waterfall*: The Secured Exit Credit Agreements will be amended to ensure, among other things and in summary: (i) the first $50,000,000 of proceeds of certain asset sales shall not be subject to mandatory cash collateralization under certain conditions, (ii) certain assets sales which do not relate to the Tanks Business will result in a cash collateralisation of the letters of credit (firstly, under the Super Senior LC Facility and secondly under the Senior Letter of Credit Facility) issued under the Exit Credit Agreement with 50% of net cash proceeds from the relevant asset sale not reinvested or committed for reinvestment within 12 months (subject to a 180 day extension if there is a binding commitment for reinvestment within the 12 month period), and (iii) for certain assets sales which relate to the Tanks Business, certain restrictions on engaging in such sales and a establishing a prepayment waterfall in respect of the Tanks Credit Facilities, the Secured Exit Credit Agreements and issued letters of credit.

(c)    *Restricted Payments*: Certain restricted payments under the Secured Exit Credit Agreements in an amount not exceeding 50% of the aggregate amount of cash raised through equity issuances made after the Restructuring Effective Date shall be permitted in certain circumstances.

(d)    *Middle East Collateral*: A new lien basket will be created to support certain performance guarantees in KSA, Oman, Kuwait, Qatar and UAE secured by cash, bank accounts, and accounts receivable of the Plan Company.

(e)    *Permitted Incremental Indebtedness*: Permissions will be introduced in the Secured Exit Credit Agreements which allow the Plan Company (i) to use certain equity proceeds to cash collateralise incremental letters of credit facility in certain circumstances and (ii) to incur incremental indebtedness in the form of a "side-car" credit facility subject to certain requirements.

(f)    *Fixed Charge Cover Ratio*: The fixed charge cover ratio will be amended on certain terms which will be set out in the Explanatory Statement.

(g)    *Guarantor Threshold*: Subsidiaries formed in India shall be excluded from the security or guarantee requirement under the Secured Exit Credit Agreements. Definition of "Material Wholly-Owned Subsidiary" will be amended for the purposes of guarantor coverage test by increasing the current $35,000,000 threshold to $50,000,000.

(h)    *Quarterly Reports*: Management will provide reports regarding customary financial information regarding CB&I STS Holdings LLC and its direct and indirect subsidiaries on a consolidated basis to the Secured Exit Credit Facility Lenders on a quarterly basis, in addition to the reporting already required under the Secured Exit Credit Facilities.

(i)    *Reficar Letter of Credit Draw*: to provide that in the event that the Reficar Letter of Credit is drawn by the beneficiary thereof, which is funded by the Senior LC Facility

Lenders on a pro rata basis in accordance with the Exit Credit Agreement terms and not reimbursed by the relevant Group entity, such reimbursement obligation of the Group in respect of such drawn amounts shall be deemed to be a borrowing of term loans by the Group and shall be pari passu in terms of payment and priority with the reimbursement obligations in respect of the amounts drawn under the Super Senior Letters of Credit. In such case, Senior LC Facility commitments will be automatically reduced by the corresponding amount.

(j)     *Mutual Releases by the Parties*: On the Restructuring Effective Date certain members of the Group and the Consenting Stakeholders shall receive releases agreement and releases will be granted under the Restructuring Plan.

**Migrated Super Senior Letter of Credit Commitment Tranche 1 Reduction**

10.5    As noted at paragraph 10.1(b) above, it is proposed that the Restructuring Plan will authorise the Migrated Super Senior Letter of Credit Commitment Tranche 1 Reduction under the terms of the Exit Credit Agreement and, if necessary, to effect a reduction of the Super Senior LC Facility Lenders' commitments under the Super Senior LC Facility such that the Consenting Super Senior LC Facility Lenders' commitments in the Super Senior LC Facility will be reduced dollar-for-dollar by the amount of its commitment to the Tanks Senior LC Facility that migrated prior to the Restructuring Plan, being its Tanks Senior LC Facility Tranche 1 commitment. Such a reduction of the commitments of the Super Senior LC Facility Lenders under the terms of the Exit Credit Agreement requires the consent of all Super Senior LC Facility Lenders. The consent of all Super Senior LC Facility Lenders was not obtained pursuant to the relevant Consent Solicitation. The Restructuring Plan will accordingly amend the Exit Credit Agreement to provide for a reduction of commitments for the Consenting Super Senior LC Facility Lenders equal to such lender's commitments under the Tanks Senior LC Facility Tranche 1 that the relevant lender consented to pursuant to the relevant Consent Solicitation.

**Migrated Super Senior Letter of Credit Commitment Tranche 2 Reduction**

10.6    As noted at paragraph 5.20(d) and 10.1(d) above, on the Restructuring Effective Date the Tanks Senior LC Facility Tranche 2 will be effected pursuant to the Restructuring Plan. Super Senior LC Facility Lenders which elect to participate in the Tanks Senior LC Facility Tranche 2 will receive new commitments in the Tanks Senior LC Facility. A reduction of such commitments under the Super Senior Letter of Credit Facility will then occur in the manner described at paragraph 10.5 above (being the Migrated Super Senior Letter of Credit Commitment Tranche 2 Reduction).

**Dispute Proceeding Plan Creditor Consideration**

10.7    Under the terms of the Restructuring Plan, the rights of the Dispute Proceeding Plan Creditors will be compromised as follows:

(a)     the Reficar Claim held by the Reficar Claim Plan Creditor and the Contraloría Claim held by the Contraloría Claim Plan Creditor (together the "**Dispute Proceeding Plan Creditor Claims**") will be released in full on the Restructuring Effective Date; and

(b)     in consideration for compromising the Dispute Proceeding Plan Creditor Claims in full, each Dispute Proceeding Plan Creditor will be entitled to receive the Dispute Proceeding Plan Creditor Consideration (defined below).

10.8    The Restructuring Plan will include an entitlement for the Dispute Proceeding Plan Creditors to receive a variable contingent cash amount pro rata between them based on the value of their

claims against the Plan Company (including accrued interest) (the "**Dispute Proceeding Plan Creditor Consideration**"). Such variable contingent cash amount will be calculated yearly based upon the annual performance of the Group in respect of the financial years ending 2023 and 2024 based on the currently projected EBITDA detailed in its most recent business plan which is $154,000,000 for 2023 and $318,000,000 for 2024 (the "**Target EBITDA**").

10.9    If the Group exceeds the Target EBITDA for that financial year, a contingent payment will accrue in respect of that financial year of an amount equal to 2% of the excess above the Target EBITDA with a maximum payment to all Dispute Proceeding Plan Creditors in aggregate per annum of $2,000,000 Such contingent amounts, as applicable, will accumulate each year for 2023 and 2024 but not be payable until following the latest maturity under the Secured Exit Credit Agreements.

10.10   For example, if the Group's Target EBITDA for FY23 was $100,000,000, but it actually earned $150,000,000, that would entitle the Dispute Proceeding Plan Creditors in aggregate to $1,000,000 for the financial year 2023 (being $50,000,000 (the Target EBITDA excess) x 0.02 = $1,000,000), split pro rata between each of the Dispute Proceeding Plan Creditors.

10.11   There will be no minimum payment amount. The maximum amount in each financial year to be paid by the Plan Company to the Dispute Proceeding Plan Creditors in aggregate is $2,000,000.

10.12   Nothing in this Plan shall affect the rights of the Dispute Proceeding Plan Creditors under the *Third Parties (Rights against Insurers) Act 2010* (UK) against an insurer in respect of a liability under a contract of insurance.

**Contribution Claim Plan Creditor Consideration**

10.13   Under the terms of the Restructuring Plan, the rights of the Contribution Claim Plan Creditors will be compromised as follows:

(a)    the Reficar Contribution Claims held by the Reficar Contribution Claim Plan Creditors and the Contraloría Contribution Claims held by the Contraloría Contribution Claim Plan Creditors (together the "**Contribution Claim Plan Creditor Claims**") will be released in full on the Restructuring Effective Date; and

(b)    in consideration for compromising the Contribution Claim Plan Creditor Claims in full, each Contribution Claim Plan Creditor will be entitled to receive the Contribution Claim Plan Creditor Consideration (defined below).

10.14   The Restructuring Plan will include an entitlement for the Contribution Claim Plan Creditors to receive an amount of £100,000 in aggregate to all Contribution Claim Plan Creditors (the "**Contribution Claim Plan Creditor Consideration**").

**Final documentation for the Restructuring Plan**

10.15   The documentation reflecting the matters provided for above will be circulated to the Plan Creditors with the Explanatory Statement which will accompany the Restructuring Plan.

**Effectiveness and Process**

10.16   The Restructuring Plan will only become effective and legally binding on the Plan Company and the Plan Creditors, in accordance with their terms, following (among other items):

(a)    the sanction of the Restructuring Plan by the Court at the Sanction Hearing;

(b)     delivery of a copy of the order sanctioning the Restructuring Plan to the Registrar of Companies for England and Wales; and

(c)     sanction of the WHOA Proposals by the Amsterdam District Court.

**Sources of Information**

10.17   Further details of the Restructuring Plan will be set out in the Explanatory Statement. For details on dissemination of the Explanatory Statement and other related material, please refer to paragraphs 18.2 to 18.5 (*Publication of Plan Documentation*) below.

10.18   Provided the Court gives its permission to the Plan Company to convene the Plan Meetings, the Plan Company will notify the Plan Creditors in accordance with the directions of the Court of the time, date and venue of the Plan Meetings, set out how any Plan Creditors may vote at the Plan Meetings and provide further details of the terms of the Restructuring Plan via the Information Agent and the Plan Portal and will communicate any change in the same manner.

10.19   Any further details regarding the Restructuring Plan and the Convening Hearing or Sanction Hearing dates will be made available on the Plan Portal.

*Enquiries*

10.20   If you have any questions in relation to this Practice Statement Letter or the Restructuring Plan, please refer to Section 19 (*Enquiries and Further Information*) for contact details.

10.21   If you have any questions in relation to the references made to the WHOA Proposals in this Practice Statement Letter, please refer to Section 19 (*Enquiries and Further Information*) for contact details.

**11      CONSEQUENCES IF THE RESTRUCTURING PLAN IS NOT SUCCESSFUL**

***What happens if the Restructuring Plan is not sanctioned?***

11.1    In light of the conditions affecting the Group, it is the view of the Board of the Plan Company (the "**Board**") that if the Group is unable to implement the Restructuring, the Plan Company will be unable to meet its outstanding and upcoming payment obligations to its creditors and the Group would not have sufficient liquidity to support the Plan Company in order for it to continue as a going concern.

11.2    If the Restructuring is not implemented, given the Plan Company's liquidity position and the maturity profile of the Secured Exit Credit Agreements, there would be insufficient time to seek, and significant uncertainty as regards the Plan Company's ability to obtain, the requisite level of creditor support to implement any alternative transaction.

11.3    In order to assist each of the Plan Company, LFC and MIH with their contingency planning, Grant Thornton UK LLP ("**Grant Thornton**") was engaged by each of the Plan Company, LFC and MIH to:

(a)     assist the Plan Company (along with its financial and legal advisors) to identify the scenario/s that are likely in the event that the Restructuring Plan, the WHOA Proposals and the Restructuring were unsuccessful; and

(b)     prepare a report estimating the financial return to the Plan Creditors in such scenario(s).

11.4    The Board of the Plan Company have concluded that the only viable option which could be delivered to enable the Plan Company and the wider Group to continue operating in the manner outlined is the Restructuring Plan and the Restructuring as described in this Practice Statement Letter. If the Restructuring, comprising inter alia the Restructuring Plan and the WHOA Proposals, is not implemented, the Board of the Plan Company consider that the Plan Company would have no choice but to enter into insolvency proceedings across multiple jurisdictions including – in respect of the Plan Company – in England (the "**Relevant Alternative**"). The Board of the Plan Company have concluded, with the benefit of Grant Thornton's expertise, that the returns to the Plan Creditors in the Relevant Alternative would be materially worse than the return available to Plan Creditors through the Restructuring.

### *What happens if one or more of the WHOA Proposals is not sanctioned?*

11.5    As noted above, the Restructuring Plan and the transactions contemplated by it will only become effective following, among other items, sanction of the WHOA Proposals by the Amsterdam District Court. If the Restructuring Plan is sanctioned by the English Court but one or more of the WHOA Proposals are not sanctioned by the Amsterdam District Court, the conditions to the Restructuring Plan will not be able to be fully satisfied, and the Restructuring will not be effected.

11.6    The Board of the Plan Company therefore believes (based on advice from Grant Thornton and its other professional advisors) that if the WHOA Proposals are not sanctioned, even in circumstances where the Restructuring Plan is sanctioned, the Plan Company would have no choice but to enter into administration, absent a prompt and significant liquidity injection.

11.7    Since the Plan Company, LFC and MIH are each key operating, financial or guarantor entities for the Group, if one or all of them are placed into insolvency proceedings in any jurisdiction this would likely result in the Group as a whole ceasing to be able to operate as a going concern and the subsequent insolvent liquidation of the Group.

## 12    RECOMMENDATION OF THE BOARD

The Board of the Plan Company, on the basis of the professional advice they have received (privilege for which is not waived), consider that the entry into the arrangements contemplated by the Restructuring Plan is in the best interests of the Plan Creditors. In light of the above, the Board seek your support for the Restructuring Plan and recommend that the relevant Plan Creditors vote in favour of the Restructuring Plan at the Plan Meetings.

## 13    PROPOSED CLASS CONSTITUTION OF PLAN CREDITORS

13.1    In accordance with the Practice Statement, it is the responsibility of the Plan Company to determine whether more than one meeting of creditors is required by their respective Restructuring Plan and, if so, to ensure that those meetings are properly constituted.

### Applicable tests for determining class constitution

13.2    A summary of the tests applied by the Court for class constitution for analogous schemes of arrangement under Part 26 of the Companies Act 2006 ("**scheme**") is set out below. It has been confirmed that the same considerations will apply in determining class constitution for a restructuring plan under Part 26A of the Companies Act 2006:

(a)    Where creditors or members affected by a scheme have rights which are so dissimilar, or would be affected so differently by the scheme, as to make it impossible for them to consult together with a view to their common interest, they must be divided into

separate classes, and a separate meeting must be held for each class of creditor and member.

(b)     It is the legal rights of creditors and members, and not their separate commercial or other interests, which determine whether they form a single class or separate classes. Conflicting interests are matters that may properly be taken into account at the sanction stage, but do not go to class composition.

(c)     The essential requirement is that the class should be comprised only of persons whose rights in terms of their existing rights and the rights offered in the replacement, in each case against the company, are sufficiently similar to enable them to properly consult and identify their true interests together.

(d)     It is also necessary to consider whether the rights of those who are to be affected by the scheme proposed are such that the scheme can be seen as a single arrangement; or ought the scheme to be regarded, on a true analysis, as a number of linked arrangements.

(e)     It is not the case that different treatments under a scheme (e.g. in the case of vested or contingent rights, or rights under matured or current policies) necessarily mean that the rights are so dissimilar that persons must be put in different classes.

13.3    Where rights are "sufficiently similar" to the rights of others that they can properly consult together, then they should be required to do so.

**The present case**

13.4    The Plan Company has considered:

(a)     the current rights of the Plan Creditors against the Plan Company and the rights which will be conferred by the Restructuring Plan;

(b)     whether:

(i)      the rights of the Plan Creditors proposed are such that the Restructuring Plan can each be seen as a single arrangement; or

(ii)     the Restructuring Plan ought to be regarded, on a true analysis, as a number of linked arrangements; and

(iii)    which Plan Creditors' rights are "sufficiently similar" to the rights of other Plan Creditors that they can properly consult together.

*The Plan Company*

13.5    Having considered the above and taken legal advice (privilege for which is not waived), the Plan Company has concluded that the Plan Creditors fall into the following classes:

(a)     the Super Senior LC Facility Plan Creditors;

(b)     the Make-Whole Facility Plan Creditors;

(c)     the Senior LC Facility Plan Creditors;

(d)     the Escrow LC Facility Plan Creditors;

(e)     the Takeback Facility Plan Creditors;

(f)     the Dispute Proceeding Plan Creditors; and

(g)     the Contribution Claim Plan Creditors.

13.6    The Plan Company has reached this conclusion on the following bases:

<u>Secured Exit Credit Plan Creditor</u>

13.7    The Secured Exit Credit Facility Lenders have the benefit of a common security package, being the Secured Property. As noted at paragraph 4.23 above, the effect of the ranking provisions in the Exit Credit Agreement, Exit Escrow LC Facility Agreement, Exit Collateral Agency Agreement and the Exit Intercreditor Agreement are that the Secured Exit Credit Facility Lenders' rights against the Secured Property upon an insolvency of the Group and the Plan Company will rank in the following order:

(a)     firstly, pari passu between the Super Senior LC Facility Plan Creditors;[1]

(b)     secondly, pari passu between the Make-Whole Facility Plan Creditors;

(c)     thirdly, pari passu between the Senior LC Facility Plan Creditors and Escrow LC Facility Plan Creditors; and

(d)     fourthly, the Takeback Facility Plan Creditors.

13.8    Subject to paragraph 13.9 below, each Secured Exit Credit Facility Lender within a category detailed at paragraph 13.7 above accordingly has the same rights against the Plan Company and the Secured Property as does each other member of that category of Secured Exit Credit Facility Lender. For this reason, the Plan Company considers that the rights of members of categories of Secured Exit Credit Facility Lender as between other members of the same category are each the same, or not so dissimilar as to make it impossible for them to consult with members of that group with a view to their common interest.

13.9    It is considered that the Super Senior LC Facility Plan Creditors are sufficiently similar that they can consult together in their common interest. The Plan Company places particular reliance on the following matters:

(a)     all of the Super Senior LC Facility Lenders were given the right to participate in the Tanks Senior LC Facility Tranche 1;

(b)     each Super Senior LC Facility Lender that did not elect to participate in the Tanks Senior LC Facility Tranche 1 will nevertheless be entitled to elect through the Restructuring Plan/WHOA to take up their pro rata share of the Tanks Senior LC Facility through Tanks Senior LC Facility Tranche 2, which shall become effective on the Restructuring Effective Date when the Tanks Senior LC Facility Tranche 2 becomes effective; and

(c)     if a Non-Consenting Super Senior LC Facility Lender elects not to take up its pro rata entitlement to the Tanks Senior LC Facility, each Consenting Super Senior LC Facility Lender will be offered an ability (on a pro rata basis as between them) to take up such

---

[1]     The Hedging Counterparties also rank in this category, however their rights and interests are not proposed to be amended by the Plan. The Plan Company considers that the Hedging Counterparties should accordingly not form part of this class.

Non-Consenting Super Senior LC Facility Lender's entitlement to participate in the Tanks Senior LC Facility (the "**Over-Subscription Right**").

13.10   Each Consenting Super Senior LC Facility Lender will have the benefit of an Over-Subscription Right. The Plan Company considers this difference is commercially necessary in order to calculate the relevant lender commitments ahead of the Restructuring Effective Date, is commercially justified as it encourages lenders to participate early in the process, and in any event does not make it impossible for them to consult with a view to their common interests.

13.11   As noted at paragraph 5.24 above, LFC has agreed to pay a TSA Consent Premium to certain Secured Exit Credit Facility Lenders which have executed the Transaction Support Agreement (including through a joinder) ahead of the Restructuring Effective Date. The Plan Company (having taken legal advice in respect of which privilege is not waived) believe that no class issues arise as a result of a Secured Exit Credit Facility Lender entering into the Transaction Support Agreement, and accordingly qualifying to receive the TSA Consent Premium, as the ability to accede to the Transaction Support Agreement, and therefore receive the TSA Consent Premium, was made available to all Secured Exit Credit Facility Lenders and is an immaterial amount relative to the commitments of Secured Exit Credit Facility Lenders to be amended by the Restructuring Plan.

13.12   Certain fees were paid and/or will be payable to the lenders to the Tanks Term Loan Facility, including:

(a)   on the closing date of the Tanks Credit Facilities, each Tanks Term Loan Facility Lender which had committed to participate in the Tanks Term Loan Facility as of that date received equity representing (i) 10% of all shares of common equity of the Parent outstanding as of the closing date and (ii) 10% of the outstanding amount of shares of preferred equity of the Parent as of the closing date; and

(b)   an exit premium payable upon the date on which the Tanks Term Loan Facilities are prepaid, repaid, required to be repaid or accelerated in favour of each Tanks Term Loan Facility Lender as at the closing date, in an amount equal to 12.5% of the aggregate principal amount of the outstanding Tanks Term Loans held by each such Tanks Term Loan Facility Lender.

13.13   Those fees were paid to the lenders under the Tanks Term Loan Facility in exchange for a commercial service (being the provision of new money financing to the Group during a period of significant stress and uncertainty). The Plan Company does not believe that, for those Secured Exit Credit Facility Lenders who are also lenders under the Tanks Term Loan Facility, their interest in the Tanks Term Loan Facility will be a material factor for such lenders when evaluating the Restructuring Plan. This is because the Tanks Credit Facilities are of a non-material quantum when compared to (i) the aggregate claims of the those Secured Exit Credit Facility Lenders who are also lenders under the Tanks Term Loan Facility against the Plan Company on an absolute basis, and (ii) when considering the consequences of the failure of the Restructuring Plan (as described above) and the impact that this may have on the recoveries of relevant lender with respect to their claims against the Plan Company. Therefore, when evaluating the Restructuring Plan, a Secured Exit Credit Facility Lender who is also a lender under the Tanks Term Loan Facility is unlikely to be materially influenced by the impact of the Restructuring Plan with respect to its participation in the Tanks Term Loan Facility.

13.14   The Plan Company is aware that a number of the Secured Exit Credit Facility Lender are also members of the Ad Hoc Group and members of the Steering Committee and will have certain professional fees of their advisers met by the Group in respect of the negotiation and documentation of the Restructuring. The payment of these professional fees will occur independently from the process of the Restructuring Plan and will not be contingent upon the

sanction of the Restructuring Plan. As such, the Plan Company has been advised and believe that these Plan Creditors are not required to be placed in a separate class from those Secured Exit Credit Facility Lenders that are not part of the Ad Hoc Group or the Steering Committee. In addition, the Plan Company (having taken legal advice, privilege for which is not waived) believe that no class issues arise as a result of a Plan Creditor entering into the Transaction Support Agreement, as the ability to accede to the Transaction Support Agreement, and therefore receive the TSA Consent Premium, was made available to all members of each category of Secured Exit Credit Facility Lender and is an immaterial amount relative to the amount of each Secured Exit Credit Facility Lender's claim to be affected by the Restructuring Plan.

13.15   The Plan Company considers that each category of Secured Exit Credit Facility Lender has different rights against the Plan Company in the Relevant Alternative in respect of their claims which are subject to the Restructuring Plan when compared to each other class of Secured Exit Credit Facility Lender, namely, the level of recoveries received in respect of an enforcement of their respective security interests to recover their assessment claims. The recoveries of the Secured Exit Credit Facility Lenders across different categories would also be substantially different from each other.

13.16   For these reasons, the Plan Company considers that the rights of:

(a)     the Super Senior LC Facility Plan Creditors;

(b)     the Make-Whole Facility Plan Creditors;

(c)     the Senior LC Facility Plan Creditors;

(d)     the Escrow LC Facility Plan Creditors; and

(e)     the Takeback Facility Plan Creditors,

as between each other category of Secured Exit Credit Facility Lender are sufficiently dissimilar so as to make it impossible for them to consult with members of another category of Secured Exit Credit Facility Lender with a view to their common interest.

Dispute Proceeding Plan Creditors

13.17   Each of the Reficar Claim Plan Creditor and the Contraloría Claim Plan Creditor would have the same rights against the Plan Company in the Relevant Alternative in respect of their claims which are subject to the Restructuring Plan, namely, a right to claim in the liquidation of the Plan Company for any sums owing to them. Each such claim would be treated in the same way and would rank pari passu for payment from the Plan Company's unencumbered assets. Accordingly, the existing rights of each Dispute Proceeding Plan Creditor against the Plan Company in respect of the claims which are subject to the Restructuring Plan are the same.

13.18   Notwithstanding that each of the Dispute Proceeding Plan Creditors' claims relate to separate proceedings, have been made against different entities within the Group in addition to the Plan Company, remain subject to ongoing dispute and have different jurisdictional considerations the Plan Company considers that any differences in such claims do not give rise to any difference of rights in the Relevant Alternative so as to make it appropriate or necessary for any of the Dispute Proceeding Plan Creditors, either individually or cumulatively, to be placed in a separate class for the purposes of voting on the Restructuring Plan. Each of the Dispute Proceeding Plan Creditors would receive nil in the Relevant Alternative.

13.19   As set out in Section 10 (*Key terms of the Restructuring*) above, in relation to treatment under the Restructuring Plan, the Dispute Proceeding Plan Creditors are all being treated in the same way and will receive the same rights under the Restructuring Plan.

13.20   Since the Dispute Proceeding Plan Creditors have the same existing rights against the Plan Company and will be treated in the same way, it is therefore proposed that the Dispute Proceeding Plan Creditors together constitute a single class and that they vote on the Restructuring Plan at a single meeting.

Contribution Claim Plan Creditors

13.21   Each of the Contribution Claim Plan Creditors would have the same right against the Plan Company in the Relevant Alternative in respect of their claims which are subject to the Restructuring Plan, namely, a right to claim in the liquidation of the Plan Company for any contingent claims which they may have against the Plan Company. Each such claim would be treated in the same way and would rank pari passu for payment from the Plan Company's unencumbered assets. However, their claims would be super-subordinated by virtue of the rule against double proof (which, in summary, would prevent any return to the Contribution Claim Plan Creditors until such time as the relevant principal debt was paid in full).

13.22   Notwithstanding that each of the Contribution Claim Plan Creditors' claims relate to separate proceedings, have been made against different entities within the Group in addition to the Plan Company, remain subject to ongoing dispute and have different jurisdictional considerations the Plan Company considers that any differences in such claims do not give rise to any difference of rights in the Relevant Alternative so as to make it appropriate or necessary for any of the Contribution Claim Plan Creditors, either individually or cumulatively, to be placed in a separate class for the purposes of voting on the Restructuring Plan. Each of the Contribution Claim Plan Creditors would receive nil returns in the Relevant Alternative.

13.23   As set out in Section 10 (*Key terms of the Restructuring*) above, in relation to treatment under the Restructuring Plan, the Contribution Claim Plan Creditors are all being treated in the same way and will receive the same rights under the Restructuring Plan.

13.24   Since the Contribution Claim Plan Creditors have the same existing rights against the Plan Company and will be treated in the same way, it is therefore proposed that the Contribution Claim Plan Creditors together constitute a single class and that they vote on the Restructuring Plan at a single meeting.

13.25   For these reasons, the Plan Company considers that the rights of:

(a)     the Super Senior LC Facility Plan Creditors;

(b)     the Make-Whole Facility Plan Creditors;

(c)     the Senior LC Facility Plan Creditors;

(d)     the Escrow LC Facility Plan Creditors;

(e)     the Takeback Facility Plan Creditors;

(f)     the Dispute Proceeding Plan Creditors; and

(g)     the Contribution Claim Plan Creditors,

as between other members of the same group are each the same, or not so dissimilar as to make it impossible for them to consult with the other members of the group with a view to their common interest.

***Important: if any Plan Creditor has comments as to the proposed class constitution of Plan Creditors, or any other concerns which they consider should be raised with the Court, they should in the first instance contact Kirkland & Ellis, using the contact details set out at the end of this letter.***

## 14      EFFECTIVENESS OF THE RESTRUCTURING PLAN AND THE RESTRUCTURING

14.1    If the Restructuring Plan becomes effective as detailed in Section 2 (*What is a Restructuring Plan?*) above, it will affect all Plan Creditors.

14.2    All Plan Creditors (including those who did not vote in favour of the Restructuring Plan or those who did not vote at all) will be bound by the terms of the Restructuring Plan as a matter of English law, irrespective of the jurisdiction in which a Plan Creditor resides or has their seat, along with the Plan Company.

## 15      JURISDICTION

15.1    The Plan Company considers that the Court has jurisdiction to sanction the Restructuring Plan for the following reasons.

**Plan Company liable to be wound up under the Insolvency Act 1986**

15.2    Section 901A of the Companies Act 2006 applies to a "company" which means any company liable to be wound up under the Insolvency Act 1986. The Plan Company considers that the Court has jurisdiction in relation to the Restructuring Plan in that the Plan Company is incorporated under the laws of England and Wales and is liable to be wound up under the Insolvency Act 1986.

**Financial difficulties**

15.3    To invoke the Court's jurisdiction, it must be shown that the applicant company has encountered or is likely to encounter financial difficulties that are affecting or will or may affect its ability to carry on business as a going concern. The Plan Company has encountered significant financial difficulties, described above in Section 5 *(Background to the Group's financial difficulties)*, which are affecting their (and the Group's) ability to carry on business as a going concern.

**Compromise or arrangement**

15.4    It is necessary for the proposals under the Restructuring Plan to be a "compromise" or "arrangement" between the Plan Company and the Plan Creditors or any class of the Plan Company's creditors. The Restructuring Plan contains the requisite elements of "give and take" in order to constitute an "arrangement" for these purposes. Further, there is no requirement for the Plan Company to provide for any "give and take" to a class of creditors which is "out of the money" in the relevant alternative.

**Purpose**

15.5    As explained above, the purpose of the Restructuring Plan is to eliminate, reduce or mitigate the effect of the Plan Company's financial distress. Compromising the existing claims of the

Plan Creditors against the Plan Company in the manner proposed, and implementing the Restructuring as a whole, will address the financial difficulties encountered by the Plan Company and enable their business to continue as a going concern.

**Deed of Contribution**

15.6    On 7 September 2023, the Plan Company entered into a deed of contribution in favour of LFC (the "**Deed of Contribution**"), pursuant to which the Plan Company will agree to pay to LFC, by way of contribution, an amount that is equal to the Plan Company's share of the amount of such obligation that has been paid by LFC under the Secured Exit Credit Agreements, calculated on the basis that the relevant obligation will be split in equal proportions between the Plan Company and LFC on a joint and several basis as primary obligors. The Deed of Contribution results in LFC and the Plan Company having rights of contribution against each other as primary obligors in respect of the Secured Exit Credit Agreements, and the Plan Company and the other obligors to the Secured Exit Credit Agreements having rights of contribution against each other pursuant to the Secured Exit Credit Agreements.

15.7    The Plan Company therefore considers that it has jurisdiction to propose the arrangement and compromise in respect of the Secured Exit Credit Agreements set out under the Restructuring Plan as it relates to the Secured Exit Credit Facility Lenders.

**Jurisdiction**

15.8    Given the matters described above, the Plan Company considers that the English Court has jurisdiction to sanction the arrangement and compromise in respect of the claims and liabilities set out in the Restructuring Plan (provided the requisite statutory requirements are satisfied).

## 16    RECOGNITION AND EFFECTIVENESS

16.1    The Restructuring Plan will be effective as a matter of English law to vary the claims and liabilities of the Plan Creditors subject to the Restructuring Plan.

16.2    In parallel with the Restructuring Plan, the Plan Company expects to file an application for recognition of the Restructuring Plan in the United States under Chapter 15, Title 11 of the United States Bankruptcy Code. If the Restructuring Plan is approved by the Plan Creditors and sanctioned by the Court, the Plan Company expects that the Restructuring Plan and its effects will be recognised in the United States shortly after the Sanction Hearing.

16.3    The Plan Company will publish notice of the Chapter 15 filing on the Plan Portal.

16.4    Further, the Plan Company expects to obtain an opinion from an independent expert that the effects of the Restructuring Plan are likely to be recognised, and given effect to, in Panama, a jurisdiction in which the guarantors to the Secured Exit Credit Agreements hold material assets.

## 17    CREDITOR ISSUES

17.1    This letter is intended to provide Plan Creditors with sufficient information regarding the Restructuring Plan and the proposals for convening the Plan Meetings of the Plan Creditors, so that, should they wish to raise:

(a)    any issues which may arise as to the constitution of the Plan Meetings, or which otherwise affect the conduct of those Plan Meetings;

(b)    any issues as to the existence of the Court's jurisdiction to sanction the Restructuring Plan; or

(c)     any other issue not going to the merits or fairness of the Restructuring Plan, but which might lead the Court to refuse to sanction the Restructuring Plan,

(together, "**Creditor Issues**"), they may attend and be represented before the Court at the Convening Hearing. Details of the Convening Hearing are set out in paragraph 18.1 (*Convening Hearing*) of this letter.

17.2     Plan Creditors are also able to raise other issues at the Convening Hearing but, consistent with the Court's usual approach, certain issues are likely only to be considered by the Court at the Sanction Hearing in due course if the Restructuring Plan is approved by the requisite majorities of the classes of Plan Creditors voting at the Plan Meetings. Please refer to paragraphs 18.1(c) (*Matters to be addressed*) and 18.7(c) (*Matters to be addressed*) for detail on the division of content between the Convening Hearing and the Sanction Hearing.

17.3     Plan Creditors should consider taking advice from their professional advisors if they have any concerns in relation to the matters set out in this letter.

17.4     Plan Creditors should be aware that, under the terms of the Practice Statement, the Court has indicated that Creditor Issues should be raised at the Convening Hearing. If Plan Creditors fail to raise these matters at the Convening Hearing, whilst they will still be able to appear and raise objections at the Sanction Hearing, the Court at the Sanction Hearing will expect those Plan Creditors to provide good reason why they did not raise any Creditor Issues at an earlier stage.

17.5     Plan Creditors are therefore requested to raise any Creditor Issues they have at the Convening Hearing.

**18      NEXT STEPS**

18.1     **Convening Hearing**

The Plan Company intends to apply to the Court for an order granting the Plan Company certain directions in relation to the Restructuring Plan, including permission to convene the Plan Meetings of the Plan Creditors and to circulate the Explanatory Statement.

(a)     *Time and place*

The Convening Hearing is currently anticipated to be held on **28 September 2023**. The Plan Company's applications at the Convening Hearing will be heard by a High Court Judge of the Chancery Division, Companies Court of the High Court of Justice of England and Wales at the Rolls Buildings Courts, 7 Rolls Buildings, Fetter Lane, London EC4A 1NL.

(b)     *Attendance*

Plan Creditors are entitled to attend the Convening Hearing in person or through counsel and to make representations at the Convening Hearing, although they are not obliged to do so. Plan Creditors who wish to attend the Convening Hearing in person or through counsel should contact Kirkland & Ellis (using the contact details in paragraph 19.1 (*Contact details*) below) to obtain instructions for attending the Convening Hearing.

Plan Creditors wishing to attend the Convening Hearing remotely are invited to contact Kirkland & Ellis (using the contact details in paragraph 19.1 (*Contact details*) below) at least two business days in advance. This will ensure that the access details of the Convening Hearing are provided to you and your advisors as soon as they are available.

Access details of the Convening Hearing will be available on the Plan Portal. Alternatively, Plan Creditors can contact the Court directly.

(c)   *Matters to be addressed*

At the Convening Hearing the Court will consider whether or not to make an order convening the Plan Meetings of the Plan Creditors. In so doing, the Court will consider:

(i)    the purpose and effects of the Restructuring Plan and the Restructuring (as to which, see Sections 7 *(Purpose of the Restructuring Plan)*, 8 *(Interests subject to the Restructuring Plan)* and 10 *(Key Terms of the Restructuring Plan)* above);

(ii)   the relevant comparator to the respective Restructuring Plan;

(iii)  whether it has jurisdiction to convene the Plan Meetings (see Section 15 (*Jurisdiction*));

(iv)   class composition (see Section 13 (*Proposed Class Constitution of Plan Creditors*) (the Court will consider whether more than one Plan Meeting is required, and if so, what is the appropriate composition of those Plan Meetings); and

(v)    any considerations that might preclude the Court from exercising its sanction discretion at the Sanction Hearing.

The Plan Company will also draw to the Court's attention to:

(i)    any Creditor Issues (see Section 17 (*Creditor Issues*)); and

(ii)   any (other) issues raised by any Plan Creditor in response to this letter.

(d)   *Comments or objections*

If you disagree with the Plan Company's proposals regarding the convening of the Plan Meetings outlined above (including the proposed composition of the voting classes of Plan Creditors in respect of the Restructuring Plan) or wish to raise any other issue in relation to the jurisdiction of the Court, the constitution of the Plan Meetings or any other matters that otherwise affect the conduct of the Plan Meetings, or disagree with the Plan Company's conclusion that the Court has jurisdiction to sanction the Restructuring Plan, you should write to Kirkland & Ellis as soon as practicable using the contact details listed in paragraph 19.1 (*Contact details*) below setting out your concern and may (but are not obliged to) attend and be represented before the Court at the Convening Hearing.

If the Restructuring Plan is approved at the Plan Meetings, it may still be possible for Plan Creditors to raise certain objections on the question of class and jurisdiction (as well as other matters) at the subsequent Sanction Hearing. However, in that event, the Court is likely to expect Plan Creditors to show good reason why they did not object to the constitution of the classes of Plan Creditors at an earlier stage.

**Publication of Plan Documentation**

18.2   Following the Convening Hearing, provided that the Court grants the order for the Plan Company to convene the Plan Meetings, the Plan Company will:

41

(a)     convene the Plan Meetings of the Plan Creditors by notifying them in accordance with the directions of the Court of the time and date of and means of attending the Plan Meetings; and

(b)     make available to Plan Creditors the following important documents relating to the Restructuring Plan:

(i)     the Explanatory Statement;

(ii)    the Restructuring Plan document;

(iii)   the notices convening the relevant Plan Meetings;

(iv)    a voting and proxy form that the Plan Creditors will need to complete in order to vote at or appoint a proxy to attend and vote on their behalf at the Plan Meetings; and

(v)     the principal agreements and other related documents that will document the terms of the Restructuring,

(together the "**Plan Documentation**").

18.3   Plan Creditors will receive the Plan Documentation by email from the Information Agent and be able to view and download the Plan Documentation in electronic format via the Plan Portal (that will be made available to access for Plan Creditors) and a notice in this regard will be circulated to Plan Creditors via the Information Agent on or about 28 September 2023. In addition, a notice directing Plan Creditors to the copies of the Plan Documentation will be available on the Plan Portal.

18.4   Any of the Plan Documentation provided to Plan Creditors on the Plan Portal can also be provided in hard copy free of charge if so requested by a Plan Creditor. Any such request should be made to Kirkland & Ellis at the contact details set out in paragraph 19.1 (*Contact details*) below.

18.5   The Information Agent has been engaged to assist with, among other things, the distribution of Plan Documentation and tabulation in respect of votes of the Plan Creditors at the Plan Meetings. The Plan Company (or the Information Agent on their behalf) will provide any further updates on this to Plan Creditors as and when applicable.

18.6   **Restructuring Plan Meetings**

The Plan Company currently expects that the Plan Meetings of the Plan Creditors in respect of the Restructuring Plan will be held on 6 November 2023. The date and time at which the claims of Plan Creditors under the Restructuring Plan and the resulting entitlements of Plan Creditors under the Restructuring Plan shall be determined by the Plan Company will occur at 12:00 p.m. (London time) on 1 November or, if the date of the Plan Meetings changes, 12:00 p.m. (London time) on the date which is one business day before the Plan Meetings.

Further details with respect to the Plan Meetings will be provided in the Plan Documentation.

18.7   **Sanction Hearing**

Following the Plan Meetings of the Plan Creditors, provided that the requisite majorities of the Plan Creditors vote in favour of the Restructuring Plan, the Plan Company intend to apply at

the Sanction Hearing, currently expected to be held on **10 November 2023**, for an order sanctioning the Restructuring Plan.

(a)   *Timing and location*

The Plan Company will notify Plan Creditors of the precise time of the Sanction Hearing via the Information Agent and the Plan Portal and will communicate any change to the date of the Sanction Hearing in the same manner.

(b)   *Attendance*

Plan Creditors are entitled to attend the Sanction Hearing in person or through counsel and to make representations and raise objections at the Sanction Hearing, although they are not obliged to do so. Plan Creditors who wish to attend the Sanction Hearing in person or through counsel should contact the Information Agent (using the contact details below) to obtain instructions for attending the Sanction Hearing.

Plan Creditors wishing to attend the Sanction Hearing remotely are invited to contact the Information Agent using the contact details listed below at least two days in advance. This will ensure that the access details of the hearing are provided to you and your advisors as soon as they are available. Access details of the hearing will be available on the Plan Portal. Alternatively, Plan Creditors can contact the Court directly.

(c)   *Matters to be addressed*

At the Sanction Hearing the Court will consider whether or not to make an order sanctioning the Restructuring Plan. In so doing, the Court will consider whether:

(i)   the provisions of the statute have been complied with. This will include questions of class composition, whether the statutory majorities were obtained, and whether an adequate explanatory statement was distributed to the creditors;

(ii)   the classes of Plan Creditors were fairly represented by those who attended the Plan Meetings, and the statutory majority were acting bona fide and not coercing the minority in order to promote interests adverse to those of the class they purpose to represent;

(iii)   each Restructuring Plan is a fair Restructuring Plan which a creditor could reasonably approve. Importantly it must be appreciated that the Court is not concerned to decide whether the Restructuring Plan is the only fair Restructuring Plan or even the "best" Restructuring Plan; and

(iv)   there is any "blot" or defect in the Restructuring Plan that would, for example, make it unlawful or in any other way inoperable.

The Plan Company will also draw the Court's attention to:

(i)   objections on the question of class and jurisdiction; however, as noted in paragraph 18.1 (*Convening Hearing*) above, the Court is likely to expect Plan Creditors to show good reason why they did not object to the constitution of the classes of Plan Creditors at an earlier stage; and

(ii)     other matters pertaining to the points set out above, including, for example, whether a Plan Creditor has indicated it has not had adequate notice of the Plan Meetings.

(d)     *Comments or objections*

If you have any comments or objections relating to the matters to be dealt with at the Sanction Hearing, as detailed in paragraph 18.7(c) (*Matters to be addressed*) above, you should write to Kirkland & Ellis as soon as practicable using the contact details listed in paragraph 19.1 (*Contact details*) below setting out your concern and may (but are not obliged to) attend and be represented before the Court at the Sanction Hearing.

## 19     ENQUIRIES AND FURTHER INFORMATION

### 19.1   Contact details

If you have any questions in relation to this letter, the Restructuring Plan or the Restructuring, please contact Kirkland & Ellis (noting the statements in paragraph 19.4 (*Legal advice*)) using the contact details below:

**English Legal Advisors to the Plan Company**

Kirkland & Ellis International LLP
30 St Mary Axe
London
EC3A 8AF
Attention: Kon Asimacopoulos / Hannah Crawford
Email: MDR_ProjectLego_KE_Core@kirkland.com

**Dutch Legal Advisors to the Group**

Nauta Dutilh
N.V.
Beethovenstraat 400
1082 PR Amsterdam
The Netherlands
Attention: Marc Orval / Teun Struycken
Email: 2projectdiscovery@nautadutilh.com

**Information Agent**

Kroll Issuer Services Limited
The Shard
32 London Bridge Street
London
SE1 9SG
United Kingdom
Attention: Illia Vyshenskyi
Telephone: + 44 20 7704 0880
Email: mcdermott@is.kroll.com
Website: https://deals.is.kroll.com/mcdermott

### 19.2   Plan Portal

(a)     The Information Agent has set up the Plan Portal to disseminate information and communications about the Restructuring Plan and to facilitate the implementation of the Restructuring Plan. Plan Creditors may download documents relating to the Restructuring Plan from the Plan Portal that will be made available to Plan Creditors and which Plan Creditors will be invited to access shortly.

(b)     If a Plan Creditor has not received an invitation to access the Plan Portal or encounters any technical difficulties accessing any Plan Documentation via the Plan Portal, please contact the Information Agent using the details set out at paragraph 19.1 (*Contact details*) above.

19.3   **Physical copies available for inspection**

Physical copies of the Plan Documentation will be available from Kirkland & Ellis at the address listed at paragraph 19.1 (*Contact details*) above.

19.4   **Legal advice**

Kirkland & Ellis, as legal advisors to the Plan Company rather than the Plan Creditors, will be unable to offer legal advice to Plan Creditors relating to the Restructuring Plan.

20     **REQUEST FOR SUPPORT**

For the reasons set out above, the Board of the Plan Company considers that the Restructuring Plan is in the best interests of the Plan Company and of the Plan Creditors and recommends that the Plan Creditors vote in favour of the Restructuring Plan at the relevant Plan Meetings.

Yours faithfully

DocuSigned by:

*Ashok Joshi*

D8C08D3652D3442...

Authorised signatory of

**CB&I UK Limited**

**APPENDIX 1**

**DEFINITIONS**

"**A&E Transaction**" has the meaning set out at paragraph 10.1(a).

"**Ad Hoc Group**" has the meaning set out at paragraph 5.7.

"**Amazon Facility**" has the meaning set out at paragraph 4.36.

"**Amsterdam District Court**" has the meaning set out at paragraph 6.1(b).

"**Bilateral Facilities**" has the meaning set out at paragraph 4.28.

"**Bilateral Facility Lenders**" has the meaning set out at paragraph 4.28.

"**Bilateral Letters of Credit**" has the meaning set out at paragraph 4.40.

"**Board**" has the meaning set out in paragraph 11.1

"**Chapter 11 Process**" has the meaning set out at paragraph 4.8.

"**Collateral Agent**" has the meaning set out at paragraph 4.22(a).

"**Consent Solicitations**" has the meaning set out at paragraph 5.20.

"**Consenting Issuing Banks**" has the meaning set out at paragraph 5.20(f).

"**Consenting Stakeholder**" has the meaning set out at paragraph 5.22.

"**Consenting Super Senior LC Facility Lenders**" has the meaning set out at paragraph 5.20(d)(ii)a.

"**Contraloría Claim**" has the meaning set out at paragraph 5.13.

"**Contraloría Claim Plan Creditor**" has the meaning set out at paragraph 5.12.

"**Contraloría Claim Respondents**" has the meaning set out at paragraph 5.12.

"**Contraloría Contribution Claim Plan Creditors**" has the meaning set out at paragraph 5.15.

"**Contraloría Contribution Claims**" has the meaning set out at paragraph 5.15.

"**Contribution Claim Plan Creditor Claims**" has the meaning set out at paragraph 10.13(a).

"**Contribution Claim Plan Creditor Consideration**" has the meaning set out at paragraph 10.14.

"**Contribution Claim Plan Creditors**" has the meaning set out at paragraph 8.6.

"**Convening Hearing**" has the meaning set out at paragraph 1.3(c).

"**Court**" has the meaning given in 1.1.

"**Creditor Issues**" has the meaning set out at paragraph 17.1.

"**Critical Trade Creditors**" has the meaning set out at paragraph 9.5(a).

"**Deed of Contribution**" has the meaning set out in 15.6.

"**Dispute Proceeding Plan Creditor**" has the meaning set out at paragraph 8.4.

"**Dispute Proceeding Plan Creditor Claims**" has the meaning set out at paragraph 10.7(a).

"**Dispute Proceeding Plan Creditor Consideration**" has the meaning set out at paragraph 10.8.

"**Dissenting Class**" has the meaning set out at paragraph 2.4(b).

"**Escrow Account**" has the meaning set out at paragraph 4.16.

"**Escrow LC Facility**" has the meaning set out at paragraph 4.15.

"**Escrow LC Facility Lenders**" has the meaning set out at paragraph 3.1(d)

"**Escrow LC Facility Plan Creditors**" has the meaning set out at paragraph 3.1(d)

"**Escrow Letters of Credit**" has the meaning set out at paragraph 4.40.

"**Exit Collateral Agency Agreement**" has the meaning set out at paragraph 4.22(b).

"**Exit Credit Agreement**" has the meaning set out at paragraph 4.11.

"**Exit Credit Agreement Facilities**" has the meaning set out at paragraph 4.14(a).

"**Exit Credit Agreement Facilities Lenders**" has the meaning set out at paragraph 4.14(c).

"**Exit Escrow LC Facility Agreement**" has the meaning set out at paragraph 4.15.

"**Exit Intercreditor Agreement**" has the meaning set out at paragraph 4.22(c).

"**Exit LC Facilities**" has the meaning set out at paragraph 4.14(b).

"**Exit LC Lenders**" has the meaning set out at paragraph 4.14(d).

"**Explanatory Statement**" has the meaning set out at paragraph 1.4.

"**Grant Thornton**" has the meaning set out at paragraph 11.3.

"**Group**" has the meaning set out at paragraph 4.3.

"**Hedging Agreements**" has the meaning set out at paragraph 4.25.

"**Hedging Counterparties**" has the meaning set out at paragraph 4.25.

"**Implementation Documents**" has the meaning set out at paragraph 7.2.

"**Information Agent**" has the meaning set out at paragraph 1.4(a).

"**Intercompany Creditors**" has the meaning set out at paragraph 4.47.

"**Intercompany Indebtedness**" has the meaning set out at paragraph 4.47.

"**Letter of Credit Issuer**" has the meaning set out at paragraph 4.40.

"**Letters of Credit**" has the meaning set out at paragraph 4.40.

"**LFC**" has the meaning set out at paragraph 4.11.

"**LFC WHOA Proposal**" has the meaning set out at paragraph 6.1(b)

"**Make-Whole Facility Plan Creditors**" has the meaning set out at paragraph 3.1(b).

"**Make-Whole Term Loan Facility**" has the meaning set out at paragraph 4.13(b).

"**Make-Whole Term Loan Facility Lenders**" has the meaning set out at paragraph 3.1(b).

"**Migrated Super Senior Letter of Credit Commitment Tranche 1 Reduction**" has the meaning set out at paragraph 10.1(b).

"**Migrated Super Senior Letter of Credit Commitment Tranche 2 Reduction**" has the meaning set out at paragraph 10.1(d).

"**MIH**" has the meaning set out at paragraph 4.11.

"**MIH WHOA Proposal**" has the meaning set out at paragraph 6.1(b)

"**Non-Consenting Super Senior LC Facility Lenders**" has the meaning set out at paragraph 5.20(e).

"**Non-Critical Trade Creditors**" has the meaning set out at paragraph 9.5(b).

"**OPEC**" has the meaning set out at paragraph5.3.

"**Over-Subscription Right**" has the meaning set out at paragraph 13.9(c).

"**Parent**" has the meaning set out at paragraph 4.2.

"**Pension Plans**" has the meaning set out in paragraph 4.48.

"**Plan**" has the meaning set out in paragraph 1.1.

"**Plan Creditor**" has the meaning set out at paragraph 1.1.

"**Plan Documentation**" has the meaning set out at paragraph 18.2.

"**Plan Meetings**" has the meaning set out at paragraph 1.3(c).

"**Plan Portal**" has the meaning set out at paragraph 1.4(b).

"**Practice Statement**" has the meaning set out in 1.1.

"**Preferred Interest Extension**" has the meaning set out at paragraph 6.1(c).

"**Preferred Interests**" has the meaning set out at paragraph 4.38.

"**Reficar Arbitration**" has the meaning set out at paragraph 5.8.

"**Reficar Claim**" has the meaning set out at paragraph 5.10.

"**Reficar Claim Plan Creditor**" has the meaning set out at paragraph 5.8.

"**Reficar Claim Respondents**" has the meaning set out at paragraph 5.8.

"**Reficar Contribution Claim Plan Creditors**" has the meaning set out at paragraph 5.11.

"**Reficar Contribution Claims**" has the meaning set out at paragraph 5.11.

"**Reficar Letter of Credit**" has the meaning set out at paragraph 5.9.

"**Relevant Alternative**" has the meaning set out at paragraph 11.4.

"**Restructuring**" has the meaning set out at paragraph 6.1.

"**Restructuring Effective Date**" has the meaning set out at paragraph 4.31.

"**Restructuring Plan**" has the meaning set out at paragraph 1.1.

"**Sanction Hearing**" has the meaning set out at paragraph 2.4(c).

"**scheme**" has the meaning set out at paragraph 13.2.

"**Secured Exit Credit Agreements**" has the meaning set out at paragraph 4.17.

"**Secured Exit Credit Facilities**" has the meaning set out at paragraph 4.17.

"**Secured Exit Credit Facility Lenders**" has the meaning set out at paragraph 4.17.

"**Secured Parties**" has the meaning set out at paragraph 4.23.

"**Secured Property**" has the meaning set out at paragraph 4.22(a).

"**Senior LC Facility**" has the meaning set out at paragraph 4.13(c).

"**Senior LC Facility Lenders**" has the meaning set out at paragraph 3.1(c).

"**Senior LC Facility Plan Creditors**" has the meaning set out at paragraph 3.1(c).

"**Senior Letters of Credit**" has the meaning set out at paragraph 4.40.

"**Steering Committee**" has the meaning set out at paragraph 5.7.

"**Super Senior LC Facility**" has the meaning set out at paragraph 4.13(a).

"**Super Senior LC Facility Lenders**" has the meaning set out at paragraph 3.1(a).

"**Super Senior LC Facility Plan Creditors**" has the meaning set out at paragraph 3.1(a).

"**Super Senior Letters of Credit**" has the meaning set out at paragraph 4.40.

"**Surety Arrangements**" has the meaning set out at paragraph 4.30.

"**Takeback Facility Plan Creditors**" has the meaning set out at paragraph 3.1(e).

"**Takeback Term Loan Facility**" has the meaning set out at paragraph 4.13(d).

"**Takeback Term Loan Facility Lenders**" has the meaning set out at paragraph 3.1(e).

"**Tanks Business**" has the meaning set out at paragraph 5.16(a).

"**Tanks Credit Facilities**" has the meaning set out at paragraph 4.35

"**Tanks Entities**" has the meaning set out at paragraph 5.20(c).

"**Tanks Escrow LC Facility"** has the meaning set out at paragraph 4.34.

"**Tanks Escrow LC Facility Lenders"** has the meaning set out at paragraph 4.34.

"**Tanks LC Facilities**" has the meaning set out at paragraph 4.34.

"**Tanks Senior LC Facility**" has the meaning set out at paragraph 4.34

"**Tanks Senior LC Facility Lenders**" has the meaning set out at paragraph 4.34.

"**Tanks Senior LC Facility Tranche 1**" has the meaning set out in paragraph 5.20(d)(ii)a

"**Tanks Senior LC Facility Tranche 2**" has the meaning set out in paragraph 5.20(d)(ii)b.

"**Tanks Term Loan Facility**" has the meaning set out at paragraph 4.31.

"**Tanks Term Loan Facility Lenders**" has the meaning set out at paragraph 4.31.

"**Tanks Transactions**" has the meaning set out at paragraph 4.32.

"**Target EBITDA**" has the meaning set out at paragraph 10.8.

"**Trade Creditors**" has the meaning set out at paragraph 4.45.

"**Trade Liabilities**" has the meaning set out at paragraph 4.45.

"**Transaction Support Agreement**" has the meaning set out at paragraph 5.21.

"**TSA Consent Premium**" has the meaning set out at paragraph 5.24.

"**WHOA Companies**" has the meaning set out at paragraph 6.6.

"**WHOA Creditors**" has the meaning set out at paragraph 6.1(b)

"**WHOA Proposals**" has the meaning set out at paragraph 6.1(b)

# APPENDIX 2

## SIMPLIFIED STRUCTURE CHART



AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

Southern District of New York ▾

| | |
|---|---|
| In re Application of Refinería de Cartagena S.A.S. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. |
| for an Order Directing Discovery from MASON MANAGEMENT, LLC Pursuant to 28 U.S.C.§1782 | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                Mason Capital Management, LLC

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

See Attachment A

| Place: KING & SPALDING 1185 Avenue of the Americas 34th Floor, New York, NY 10036-2601 | Date and Time: |
|---|---|
| The deposition will be recorded by this method:   Stenographic means | |

❒ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

       The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

         *CLERK OF COURT*

                                OR

       *Signature of Clerk or Deputy Clerk*                 *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____ , who issues or requests this subpoena, are:

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

SCHEDULE A – DEPOSITIONS

**ATTACHMENT A**

**<u>Definitions</u>**

1. **"Ad Hoc Group"** has the meaning set out at paragraph 5.7 of the PSL.

2. **"Arbitration Award"** has the meaning set out at paragraph 5.10 of the PSL.

3. **"CB&I N.V."** shall mean McDermott International Holdings B.V., f/k/a Comet II B.V., f/k/a Chicago Bridge & Iron Company N.V., and includes any employees, agents, representatives, or other persons acting on behalf of CB&I N.V.

4. **"CB&I UK"** shall mean CB&I UK Limited, and includes any employees, agents, representatives, or other persons acting on behalf of CB&I UK.

5. **"Grant Thornton"** has the meaning set out at paragraph 11.3 of the PSL.

6. **"Group"** has the meaning set out at paragraph 4.3 of the PSL.

7. **"Initial Public Offering"** refers to the potential initial public offering (IPO) contemplated by McDermott as reported in the Reorg Research, Inc. article dated July 10, 2022, which is attached hereto as **Appendix A**, or any other potential IPO considered after June 2020.

8. "**Mason**" shall mean Mason Capital Management, L.L.C., a privately owned hedge fund manager.

9. **"McDermott"** shall mean McDermott International, Ltd., and includes any employees, agents, representatives, or other persons acting on behalf of McDermott.

10. **"PSL"** shall mean the Practice Statement Letter issued by CB&I UK dated  September 8, 2023, which is attached hereto as **Appendix B**.

11. **"Reficar"** refers to Refinería de Cartagena S.A.S., f/k/a Refinería de Cartagena S.A., and includes any employees, agents, representatives, or other persons acting on behalf of Reficar.

12. **"Relevant Alternative"** has the meaning set out at paragraph 11.4 of the PSL.

13. **"Steering Committee"** has the meaning set out at paragraph 5.7 of the PSL.

14. **"Tanks Credit Facilities"** has the meaning set out at paragraph 4.35 of the PSL.

1

SCHEDULE A – DEPOSITIONS

15.     **"Tanks Transactions"** has the meaning set out at paragraph 4.32 of the PSL.

16.     **"Transaction Support Agreement"** has the meaning set out at paragraph 5.21 of the PSL.

17.     The term **"document"** is defined to be synonymous in meaning and equal in scope to the usage of the term in Federal Rule of Civil Procedure 34(1), including without limitation, electronic or computerized data compilations.  A draft or non-identical copy of any document is a separate document within the meaning of this term.

18.     The terms **"concerning," "involving," "relating to," "referring to," "in connection with," "pertaining to," "describing," "discussing," "analyzing," "reflecting," "summarizing," "evidencing," "embodying,"** and **"constituting"** are interchangeable in meaning.

19.     The tense of any verb shall be construed to include any other tenses of the verb as necessary to bring within the scope of the request all documents that might otherwise be construed to be outside of its scope.

SCHEDULE A – DEPOSITIONS

## Instructions

1.      Unless otherwise specified, these areas of designation and inquiry cover the period from June 30, 2020 through the date and time that the deposition record is closed.

2.      The word "**including**" shall be construed without limitation wherever used herein.

3.      The use of the singular form of any word includes the plural and vice versa.

4.      The connectives "**and**" or "**or**" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the request all documents that might otherwise be construed to be outside of its scope.

5.      The terms "**concerning**," "**involving**," "**relating to**," "**referring to**," "**in connection with**," "**pertaining to**," "**describing**," "**discussing**," "**analyzing**," "**reflecting**," "**summarizing**," "**evidencing**," "**embodying**," and "**constituting**" are interchangeable in meaning.

6.      The tense of any verb shall be construed to include any other tenses of the verb as necessary to bring within the scope of the request all documents that might otherwise be construed to be outside of its scope.

SCHEDULE A – DEPOSITIONS

## **Areas of Designation and Inquiry**

1. Information concerning any valuation placed on McDermott, CB&I UK and/or CB&I N.V. by Mason or its advisors or consultants.

2. Information concerning the valuation placed on CB&I UK and/or CB&I N.V. by McDermott or its advisors or consultants, including Grant Thornton.

3. Information concerning the Transaction Support Agreement entered into on September 8, 2023 between the Group, the Ad Hoc Group, the Steering Committee, and the other relevant stakeholders.

4. Information concerning the Tanks Transactions and the Tanks Credit Facilities implemented to secure additional funding.

5. Information concerning CB&I UK's proposed Relevant Alternative and the conclusion that returns to the creditors in the Relevant Alternative would be materially worse than the return available to plan creditors through the restructuring.

6. Information concerning the impact of the Arbitration Award on Mason and the funds it advises.

7. Information relating to the correspondence within Mason (internally) or between Mason and a member of the Ad Hoc Group (or their advisors) relating to Reficar and/or the Arbitration Award.

8. Information concerning the Ad Hoc Group's role and/or involvement in the appointment of a board of directors for McDermott.

9. Information concerning the Ad Hoc Group's investments in McDermott or its subsidiaries as a secured creditor, as a holder of preferred equity and/or as a holder of common stock.

10. Information concerning any plan for McDermott to pursue an Initial Public Offering.

11. Information concerning Mason's financial or accounting treatment of performance guarantee letters of credit issued in connection with construction projects of McDermott and other similarly situated entities.

12. Information concerning the process by which Mason and/or the Ad Hoc Group determined the Relevant Alternative.

13. Information concerning all of the documents that are produced by Mason in response to Reficar's document subpoena.

# Appendix A

**Reorg**®

*2023-10-04 12:57:12*

## McDermott International

# McDermott Eyes Debt Refinancing in 2023, Mulls Potential IPO in 2024

Fri 10/07/2022 14:43 PM

McDermott International this week provided lenders with a summary of key annual benchmarks that it is targeting from the current fiscal year through 2025, according to sources.

For the current year, the company is looking to achieve EBITDA breakeven, after which it will seek to complete a debt refinancing in 2023, sources said.

McDermott International would consider a potential IPO conditional on market opportunities and company performance in 2024, and is aiming to reach 8% EBITDA margins in 2025, sources added.

The average price for the company's L+400 bps exit term loan is 52.33 as of today, slightly up from 50.64 three months ago, according to Solve Advisors.

McDermott International did not respond to a request for comment.

--Patrick Fitzgerald

This publication has been prepared by Reorg Research, Inc. or one of its affiliates (collectively, "Reorg") and is being provided to the recipient in connection with a subscription to one or more Reorg products. Recipient's use of the Reorg platform is subject to Reorg's Terms of Use or the user agreement pursuant to which the recipient has access to the platform (the "Applicable Terms"). The recipient of this publication may not redistribute or republish any portion of the information contained herein other than with Reorg's express written consent or in accordance with the Applicable Terms. The information in this publication is for general informational purposes only and should not be construed as legal, investment, accounting or other professional advice on any subject matter or as a substitute for such advice. The recipient of this publication must comply with all applicable laws, including laws regarding the purchase and sale of securities. Reorg obtains information from a wide variety of sources, which it believes to be reliable, but Reorg does not make any representation, warranty, or certification as to the materiality or public availability of the information in this publication or that such information is accurate, complete, comprehensive or fit for a particular purpose. Recipients must make their own decisions about investment strategies or securities mentioned in this publication. Reorg and its officers, directors, partners and employees expressly disclaim all liability relating to or arising from actions taken or not taken based on any or all of the information contained in this publication. © 2023 Reorg. All rights reserved. Reorg® is a registered trademark of Reorg Research, Inc.

© Copyright 2012 - 2023

# Appendix B

**THIS LETTER REQUIRES YOUR IMMEDIATE AND URGENT ATTENTION AS IT RELATES TO A RESTRUCTURING PLAN PROPOSED BY CB&I UK LIMITED, WHICH WILL BE CONSIDERED BY THE HIGH COURT OF JUSTICE OF ENGLAND AND WALES AT THE CONVENING HEARING WHICH IS EXPECTED TO TAKE PLACE ON 28 SEPTEMBER 2023.**

**AT PRESENT THE CONVENING HEARING IS ANTICIPATED TO TAKE PLACE ON 28 SEPTEMBER 2023 BUT THIS MAY BE SUBJECT TO CHANGE. THE SPECIFIC DETAILS OF THE CONVENING HEARING (INCLUDING THE DATE AND TIME) WILL BE CONFIRMED TO PLAN CREDITORS (AS DEFINED HEREIN) IN THE NOTICE OF CONVENING HEARING. THIS NOTICE WILL BE MADE AVAILABLE TO ALL PLAN CREDITORS ELIGIBLE TO VOTE ON THE PROPOSED RESTRUCTURING PLAN BY EMAIL AND ON THE PLAN PORTAL WHICH WILL BE MADE AVAILABLE TO ALL PLAN CREDITORS.**

**YOU ARE BEING CONTACTED AS WE BELIEVE THAT YOU ARE A PLAN CREDITOR OF CB&I UK LIMITED AND WILL THEREFORE BE AFFECTED UNDER THE APPLICABLE PROPOSED RESTRUCTURING PLAN.**

**CONCURRENTLY WITH THE PROPOSED RESTRUCTURING PLAN BY CB&I UK LIMITED, CERTAIN OF ITS GROUP ENTITIES, NAMELY MCDERMOTT INTERNATIONAL HOLDINGS B.V. AND LEALAND FINANCE COMPANY B.V., WILL PREPARE A PROPOSAL PURSUANT TO THE *WET HOMOLOGATIE ONDERHANDS AKKOORD* (WHOA) IN THE NETHERLANDS TO RESTRUCTURE DEBT OWED TO THE WHOA CREDITORS. WITH THE EXCEPTION OF THE CONTRALORÍA CLAIM PLAN CREDITOR AND THE CONTRALORÍA CONTRIBUTION CLAIM PLAN CREDITORS, WE BELIEVE THAT YOU ARE A WHOA CREDITOR OF MCDERMOTT INTERNATIONAL HOLDINGS B.V., AND, IF APPLICABLE, LEALAND FINANCE COMPANY B.V., AND WILL THEREFORE BE AFFECTED UNDER THE APPLICABLE WHOA PROPOSAL (REFERENCE IS MADE IN THIS RESPECT TO PARAGRAPHS 6.6 AND 6.7 OF THIS LETTER).**

**THE PLAN CREDITORS MUST RELY ON THEIR OWN EXAMINATION OF THE TERMS OF THE RESTRUCTURING PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.**

**THIS LETTER CONCERNS MATTERS WHICH MAY AFFECT YOUR LEGAL RIGHTS AND ENTITLEMENTS AND YOU SHOULD TAKE APPROPRIATE LEGAL ADVICE ON ITS CONTENTS.**

**Table of Contents**

Page

| | | |
|---|---|---|
| 1 | PURPOSE OF THIS LETTER | 1 |
| 2 | WHAT IS A RESTRUCTURING PLAN? | 2 |
| 3 | WHO IS ENTITLED TO VOTE AND WHOSE RIGHTS ARE AFFECTED BY THE RESTRUCTURING PLAN | 3 |
| 4 | BACKGROUND TO THE PLAN COMPANY AND THE GROUP | 4 |
| 5 | BACKGROUND TO THE GROUP'S FINANCIAL DIFFICULTIES | 12 |
| 6 | OVERVIEW OF THE RESTRUCTURING | 19 |
| 7 | PURPOSE OF THE RESTRUCTURING PLAN | 22 |
| 8 | INTERESTS SUBJECT TO THE RESTRUCTURING PLAN | 23 |
| 9 | ARRANGEMENTS THAT ARE NOT SUBJECT TO THE RESTRUCTURING PLAN | 23 |
| 10 | KEY TERMS OF THE RESTRUCTURING PLAN | 26 |
| 11 | CONSEQUENCES IF THE RESTRUCTURING PLAN IS NOT SUCCESSFUL | 31 |
| 12 | RECOMMENDATION OF THE BOARD | 32 |
| 13 | PROPOSED CLASS CONSTITUTION OF PLAN CREDITORS | 32 |
| 14 | EFFECTIVENESS OF THE RESTRUCTURING PLAN AND THE RESTRUCTURING | 38 |
| 15 | JURISDICTION | 38 |
| 16 | RECOGNITION AND EFFECTIVENESS | 39 |
| 17 | CREDITOR ISSUES | 39 |
| 18 | NEXT STEPS | 40 |
| 19 | ENQUIRIES AND FURTHER INFORMATION | 44 |
| 20 | REQUEST FOR SUPPORT | 45 |
| APPENDIX 1 DEFINITIONS | | 2 |
| APPENDIX 2 SIMPLIFIED STRUCTURE CHART | | 8 |

## PRACTICE STATEMENT LETTER

From:   **CB&I UK Limited** (the "**Plan Company**")

To:     The **Plan Creditors** (as defined below)

Date:   8 September 2023

**THIS LETTER CONCERNS MATTERS WHICH MAY AFFECT YOUR LEGAL RIGHTS AND ENTITLEMENTS AND YOU MAY THEREFORE WISH TO TAKE APPROPRIATE LEGAL ADVICE ON ITS CONTENTS.**

Dear Sir or Madam,

**Proposed Restructuring Plan under Part 26A of the Companies Act 2006 between the Plan Company and the Plan Creditors (as defined below)**

## 1       PURPOSE OF THIS LETTER

1.1     The Plan Company is sending you this letter in accordance with the practice statement in relation to schemes of arrangement under Parts 26 and 26A of the Companies Act 2006 issued on 26 June 2020 (the "**Practice Statement**") by the Chancellor of the High Court of Justice of England and Wales (the "**Court**"), in relation to proposed restructuring plan under Part 26A of the Companies Act 2006 between the Plan Company and certain of its creditors (as set out in Section 3 (*Who is entitled to Vote and whose rights are affected by the Restructuring Plan*) below) (the "**Plan Creditors**") (the "**Restructuring Plan**", and alternatively the "**Plan**").

1.2     You are being contacted as the Plan Company believes that you are a Plan Creditor, who is or may be entitled to vote on the Restructuring Plan. The claims of each Plan Creditor against the Plan Company, together with all related rights in respect of such claims, will be affected by the Restructuring Plan.

1.3     In accordance with the Practice Statement, the purpose of this letter is to inform you:

(a)     of the Plan Company's decision to formally promote the Restructuring Plan to implement the Restructuring (as defined below), (see further Section 6 *(Overview of the Restructuring)*);

(b)     of the background to the Restructuring Plan, the purpose which the Restructuring Plan is designed to achieve and its effect (see further Section 7 *(Purpose of the Restructuring Plan)*);

(c)     that the Plan Company intends to apply to the Court at a court hearing (the "**Convening Hearing**") expected to be held on 28 September 2023 at the Chancery Division, Companies Court of the High Court of Justice of England and Wales at the Rolls Buildings Courts, 7 Rolls Buildings, Fetter Lane, London EC4A 1NL for an order granting the Plan Company certain directions in relation to the Restructuring Plan, including permission to convene the meetings of the classes of Plan Creditors who are entitled to vote on the Restructuring Plan (the "**Plan Meetings**") for the purpose of considering and, if thought fit, approving the Restructuring Plan (see further Section 18.1 *(Convening Hearing)*);

(d)     of other matters that are to be addressed at the Convening Hearing (see further Section 18.1 *(Convening Hearing)*), including Creditor Issues (as defined below) (see Section 17 *(Creditor Issues)*);

(e)     that you are entitled to attend the Convening Hearing and the Sanction Hearing (defined below) (see further Section 18 (*Next Steps*));

(f)     of the proposed class composition of the Plan Creditors for the purposes of the Plan Meetings (see further Section 13 (*Proposed Class Constitution of Plan Creditors*));

(g)     of the reasons why the Plan Company considers the Court has jurisdiction to sanction the Restructuring Plan (see further Section 15 (*Jurisdiction*)); and

(h)     how you may make further enquiries about the Restructuring Plan (see further Section 19 (*Enquiries And Further Information*)).

1.4     This letter is being made available to Plan Creditors by way of the following:

(a)     Kroll Issuer Services Limited (the "**Information Agent**"), as information agent appointed by the Plan Company in respect of the Restructuring Plan, sending it to Plan Creditors by email; and

(b)     the Information Agent making it available on the documents portal (the "**Plan Portal**") which will be made available to Plan Creditors and which Plan Creditors will be invited to access shortly. If any Plan Creditors have not received an invitation to access the Plan Portal or have difficulty accessing the Plan Portal, please contact the Information Agent via email at mcdermott@is.kroll.com.

*The date of the Plan Meetings will be confirmed in an explanatory statement (the "Explanatory Statement") which, provided the Court gives its permission to convene the Plan Meetings, will be circulated to Plan Creditors shortly after the Court has ordered the Plan Meetings to be convened at the Convening Hearing.*

*If you have assigned, sold or otherwise transferred your interests as a Plan Creditor or intend to do so before the Plan Meetings, you should forward a copy of this letter to the person or persons to whom you have assigned, sold or otherwise transferred, or the person or persons to whom you intend to assign, sell or transfer, such interests.*

## 2     WHAT IS A RESTRUCTURING PLAN?

2.1     A restructuring plan is an English law statutory procedure under Part 26A of the Companies Act 2006 which allows a company to propose and agree a compromise or arrangement with its creditors (or classes of creditors and/or members), and for the terms of that compromise or arrangement to bind any non-consenting or opposing creditors (or classes of creditors and/or members).

2.2     A restructuring plan may be proposed by a company that has encountered, or is likely to encounter, financial difficulties that are affecting or will or may affect, its ability to carry on business as a going concern. The financial difficulties facing the Plan Company and the wider Group are described in detail at Section 5 *(Background to the Group's financial difficulties)* of this letter. A restructuring plan must have the purpose of eliminating, reducing or preventing, or mitigating the effect of any of the financial difficulties faced by the proposing company. The financial difficulties facing the Plan Company will be eliminated, reduced and/or mitigated by implementing the Restructuring Plan which will place the Plan Company and the remaining Group on a viable footing in the long-term.

2.3     If the Court is satisfied at the Convening Hearing that the proposed class or classes of plan creditors for voting purposes have been correctly constituted, the Court will order the plan meeting or meetings for the relevant classes of creditors to be convened.

2

2.4     A restructuring plan will take effect between a company and its creditors (or any class of them) and become binding on all the creditors to whom it applies if:

(a)     the restructuring plan is approved by 75% in value of the creditors (or each class of creditors and/or members) present in person or by proxy and voting at each meeting convened to consider the restructuring plan; or

(b)     in the event that the restructuring plan is not approved by a number representing at least 75% in value of any class of creditors or members of the company present in person or by proxy and voting at the relevant plan meeting (the "**Dissenting Class**"):

(i)     the Court must be satisfied that, if it were to sanction the restructuring plan, none of the members of the Dissenting Class would be any worse off than they would be under the relevant alternative to the restructuring plan; and

(ii)     a number representing at least 75% in value of a class of creditors or members present in person or by proxy and voting at the relevant plan meeting who would receive a payment, or have a genuine economic interest in the company in the relevant alternative must have approved the restructuring plan;

(c)     the restructuring plan is subsequently sanctioned by the Court at a specific hearing (the "**Sanction Hearing**"); and

(d)     a copy of the order sanctioning the restructuring plan is delivered to the Registrar of Companies for England and Wales.

2.5     If the restructuring plan becomes effective, it will bind the company and all classes of plan creditors according to its terms, including those plan creditors who did not vote on the restructuring plan or who voted against it.

2.6     The Restructuring Plan is being launched in parallel with the WHOA Proposals (as defined below). A description of the WHOA Proposals is provided at paragraphs 6.6 to 6.7 below.

## 3     WHO IS ENTITLED TO VOTE AND WHOSE RIGHTS ARE AFFECTED BY THE RESTRUCTURING PLAN

3.1     The Plan Creditors comprise each of the following persons:

(a)     the financial institutions holding commitments to participate in Super Senior Letters of Credit issued under the Super Senior LC Facility (the "**Super Senior LC Facility Lenders**" or "**Super Senior LC Facility Plan Creditors**");

(b)     the financial institutions and other parties holding term loans made available under the Make-Whole Term Loan Facility (the "**Make-Whole Term Loan Facility Lenders**" or the "**Make-Whole Facility Plan Creditors**");

(c)     the financial institutions holding commitments to participate in Senior Letters of Credit issued under the Senior LC Facility (the "**Senior LC Facility Lenders**" or "**Senior LC Facility Plan Creditor**s");

(d)     the parties identified as Participants under the Escrow LC Facility (the "**Escrow LC Facility Lenders**" or the "**Escrow LC Facility Plan Creditors**");

(e)    the financial institutions and other parties holding term loans made available under the Takeback Term Loan Facility (the "**Takeback Term Loan Facility Lender**s" or the "**Takeback Facility Plan Creditors**");

(f)    the Reficar Claim Plan Creditor (as defined in paragraph 5.8 below);

(g)    the Reficar Contribution Claim Plan Creditors (each as defined in paragraph 5.11 below);

(h)    the Contraloría Claim Plan Creditor (as defined in paragraph 5.12 below); and

(i)    the Contraloría Contribution Claim Plan Creditors (each as defined in paragraph 5.15 below).

3.2    For the avoidance of doubt, the Super Senior LC Facility Plan Creditors, Make-Whole Facility Plan Creditors, Senior LC Facility Plan Creditors, Escrow LC Facility Plan Creditors and Takeback Facility Plan Creditors include only the relevant lenders of record under each of the respective facilities.

## 4    BACKGROUND TO THE PLAN COMPANY AND THE GROUP

4.1    The Plan Company, with its registered office in 2 New Square, Bedfont Lakes Business Park, Feltham, Middlesex, United Kingdom, TW14 8HA is an English company that is involved in the construction of civil engineering projects.

4.2    CB&I Company B.V. (The Netherlands) holds 127,704,958 ordinary shares in the Plan Company, representing the entire share capital of the Plan Company. The ultimate parent of the Plan Company is McDermott International, Ltd (Bermuda) (the "**Parent**"). The shareholders of the Parent include entities managed and/or controlled by various investment funds which were financial creditors of the group as at 2020 and which received such ordinary shares as part of the Chapter 11 Process (see below at paragraph 4.9).

4.3    In conducting its business, the Plan Company makes use of the support of a group of companies that are direct or indirect subsidiaries and/or parent companies of the Plan Company, all of which are direct or indirect subsidiaries of the Parent (together, the "**Group**").

4.4    A simplified structure chart of the Group is appended to this letter at Appendix 2 *(Simplified structure chart)*.

**Business of the Plan Company**

4.5    The Plan Company is part of a Houston, Texas-based services corporate group which provides various services for traditional energy and energy transition services and is a leading provider of integrated engineering, procurement, construction and installation, front-end engineering and design, module fabrication services, and technology to offshore, subsea, power, liquefied natural gas, downstream energy projects, and upstream field developments worldwide.

4.6    The Plan Company, as part of the Group, offers comprehensive engineering and construction services from conceptual design through start up and operations. The principal activities of the Plan Company are to provide engineering, procurement and construction services to customers predominantly operating in the oil and gas and energy transition industry sector. The Plan Company designs projects for a worldwide client base. The Group's engineering services include conceptual design, economic analyses, feasibility studies, process design, front end engineering and design, detailed engineering, project engineering, modularization design and construction and fabrication engineering, installation engineering, commissioning and start up.

4

4.7     The Group in its current form is the product of a combination between the legacy McDermott corporate group and the Chicago Bridge & Iron group, a downstream provider of onshore refining, power, gasification, and gas processing technology, in May 2018. As a result of the combination, the Group is now a fully integrated, onshore-offshore corporate group.

**Previous restructuring proceedings**

4.8     Throughout the course of 2020, the Group effected a restructuring transaction which was implemented through a pre-packaged Chapter 11 process following significant cost overruns at two key construction projects as well as an unsustainable debt capital structure (the "**Chapter 11 Process**"). On 21 January 2020, various Group entities entered into a restructuring support agreement with certain of their lenders, letter of credit issuers and holders of certain senior notes due 2024 and filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas to pursue a joint pre-packaged Chapter 11 Plan of Reorganization. The relevant Group entities ultimately met all conditions precedent to emergence in accordance with its plan of reorganisation and successfully emerged from bankruptcy as a reorganized enterprise.

4.9     As part of the Chapter 11 Process and related recognition proceedings in Panama, all previously existing equity interests attributable to the Group's previous parent company were cancelled and the holders of those equity interests, including the holders of outstanding shares of common stock, were entitled to no recovery relating to those equity interests. The Group's primary equity interests were distributed to holders of the Group's primary funded indebtedness, who also received take-back debt in satisfaction of their claims. The Group also preserved approximately $2.4 billion in prepetition letters of credit, which were reinstated under several exit facilities through new commitments. All general unsecured claims were unimpaired by the Chapter 11 Process.

**Key existing financial obligations of the Group**

4.10    As at the date of this letter, the principal financial indebtedness and other liabilities of the Group are as follows:

(a)     the Exit Credit Agreement Facilities;

(b)     the Escrow LC Facility;

(c)     the Hedging Agreements;

(d)     the Bilateral Facilities;

(e)     the Surety Arrangements;

(f)     the Tanks Credit Facilities;

(g)     the Amazon Facility; and

(h)     the Preferred Interests,

(each as defined below).

<u>Exit Credit Agreement</u>

4.11    In connection with emergence from the Chapter 11 Process, on 30 June 2020, Lealand Finance Company B.V. ("**LFC**") (as borrower), McDermott International Holdings B.V. ("**MIH**") and

the Plan Company (as guarantors) (among others) entered into a New York law governed credit agreement with, among others, the Lenders (as defined therein), the Term Loan Administrative Agent (as defined therein), and the LC Administrative Agent (as defined therein) (the "**Exit Credit Agreement**").

4.12    Pursuant to the Exit Credit Agreement, the Group secured committed exit financing of over $2.4 billion in letter of credit facility capacity and emerged from the Chapter 11 Process with approximately $544,000,000 in funded debt.

4.13    The following facilities have been made available to LFC under the Exit Credit Agreement which the Plan Company (among others) guaranteed under the guaranty agreement:

(a)    a $743,000,000 super senior letter of credit facility between LFC and the Super Senior LC Facility Lenders (as defined in the Exit Credit Agreement) with a maturity of 30 June 2024 (the "**Super Senior LC Facility**"). As at 30 June 2023, $651,000,000 of letters of credit were issued under the Super Senior LC Facility;

(b)    a $44,288,255.73 term loan facility between LFC and the Make-Whole Term Lenders (as defined in the Exit Credit Agreement) with a maturity on 30 June 2024 (the "**Make-Whole Term Loan Facility**"). As at 30 June 2023, $43,000,000 was outstanding under the Make-Whole Term Loan Facility;

(c)    a $1,176,000,000 senior letter of credit facility between LFC and the Senior LC Facility Lenders (as defined in the Exit Credit Agreement) capped at $1,176,000,000 and with a maturity on 30 June 2024 (the "**Senior LC Facility**"). As at 30 June 2023, $1,015,000,000 of letters of credit were issued under the Senior LC Facility; and

(d)    a $500,000,000 in principal term loan facility between LFC and the Take-back Term Lenders (as defined in the Exit Credit Agreement) with a maturity on 30 June 2025 (the "**Takeback Term Loan Facility**"). As at 30 June 2023, $508,000,000 was outstanding (including accrued PIK interest) under the Takeback Term Loan Facility.

4.14    For the purposes of this Practice Statement Letter:

(a)    the Super Senior LC Facility, the Make-Whole Term Loan Facility, the Senior LC Facility and the Takeback Term Loan Facility shall collectively be referred to as the "**Exit Credit Agreement Facilities**";

(b)    the Super Senior LC Facility and the Senior LC Facility shall together be referred to as the "**Exit LC Facilities**";

(c)    the Super Senior LC Facility Lenders, the Make-Whole Term Loan Facility Lenders, the Senior LC Facility Lenders and the Takeback Term Loan Facility Lenders shall collectively be referred to as the "**Exit Credit Agreement Facilities Lenders**"; and

(d)    the Super Senior LC Facility Lenders and the Senior LC Facility Lenders shall together be referred to as the "**Exit LC Lenders**".

Exit Escrow LC Facility Agreement

4.15    On 31 December 2020 LFC (as borrower) and the Plan Company (as guarantor) (among others) entered into a senior secured escrow letter of credit facility agreement which provided for the issuance of up to $371,000,000 face amount of letters of credit based on a $389,550,000 of cash escrow (the "**Escrow LC Facility**") with, amongst others, the Participants (as defined therein) or their affiliates (the "**Exit Escrow LC Facility Agreement**") in order to replace an existing

6

cash secured letter of credit facility on similar terms and permit a release of the cash collateral securing the existing cash secured letter of credit facility. The Exit Escrow LC Facility Agreement has a maturity of 30 June 2024 and is governed by New York law. As at 30 June 2023, $339,000,000 was issued and outstanding under the Exit Escrow LC Facility Agreement.

4.16   In addition to the Secured Property, the Escrow LC Facility is backed by cash in an escrow account (the "**Escrow Account**") with 105% of the commitment provided by the Escrow LC Facility Lenders. The Escrow Account is not security provided by the Plan Company, rather, funds were provided by each relevant Escrow LC Facility Lender to backstop the relevant letter of credit issuer for any draws under an issued letter of credit.

4.17   For the purposes of this Practice Statement Letter the Exit Escrow LC Facility Agreement and the Exit Credit Agreement will together be referred to as the "**Secured Exit Credit Agreements**" with the facilities established thereunder as the "**Secured Exit Credit Facilities**", and the Escrow LC Facility Lenders and the Exit Credit Agreement Facilities Lenders will together be referred to as the "**Secured Exit Credit Facility Lenders**").

4.18   The Plan Company is a guarantor in respect of the Secured Exit Credit Facilities.

4.19   The Plan Company considers that the Group would be unable to continue as a going concern without the continued existence of the Secured Exit Credit Agreements (or other committed indebtedness which had a similar effect).

4.20   Under the terms of the Exit LC Facilities, the Issuers (as defined therein) are required to issue letters of credit in support of the Group's operations until 31 May 2024, subject to customary conditions, and the Exit LC Lenders are required to participate in the issued Letters of Credit (as defined below). The expiration dates of such Letters of Credit are not able to be more than 12 months after the date of issuance or auto-renewal (unless otherwise agreed by the issuer), which can be after 30 June 2024.

4.21   The maturity date of the Secured Exit Credit Facilities is 30 June 2024, other than in respect of the Takeback Term Loan Facility in respect of which the maturity is 30 June 2025. Without an extension to the maturity date of the Secured Exit Credit Agreements, on 27 March 2024 the Group would be required to cash collateralise all outstanding letters of credit which have been issued in connection with the Secured Exit Credit Agreements. This would require the Group to transfer cash in the amount of the relevant letters of credit to the issuing bank of such letters of credit for the purposes of security in the event that the relevant letter of credit is called. As at the date of this Practice Statement Letter the Group had approximately $2.005 billion as at 30 June 2023 (equivalent) in letters of credit issued pursuant to the Secured Exit Credit Agreements. If such a cash collateralisation requirement were triggered, the Group would be unable to cash collateralise each of the issued but uncalled letters of credit which had been issued in connection with the Secured Exit Credit Agreements.

4.22   In addition to the Exit Credit Agreement:

(a)   on 30 June 2020 LFC, the Parent and each other guarantor of the Secured Exit Credit Agreements (including the Plan Company) entered into a pledge and security agreement with Wilmington Trust, National Association as collateral agent, as well as certain other local law security agreements in respect of which the relevant Group entities granted security interests over substantially all of its assets (including shares and vessels) subject to certain exclusions (the "**Secured Property**") as collateral for its obligations to the Secured Parties (as defined below). The Secured Property is subject to first ranking security granted to Wilmington Trust, National Association as collateral agent acting on behalf of the Secured Parties (the "**Collateral Agent**");

(b)      on 30 June 2020 LFC and the Parent entered into a collateral agency agreement with, among others, Crédit Agricole Corporate and Investment Bank (in its capacity as LC Administrative Agent (as defined therein)), Barclays Bank PLC (in its capacity as Term Loan Administrative Agent (as defined therein)) and the Collateral Agent, (the "**Exit Collateral Agency Agreement**"); and

(c)      on 30 June 2020 LFC (as borrower) and the Plan Company (as guarantor) (among others) entered into a New York law governed intercreditor agreement with among others the Parent (as parent), and Wilmington Trust, National Association as first priority agent and second priority agent (the "**Exit Intercreditor Agreement**").

4.23    One of the key substantive effects of the Exit Credit Agreement, the Exit Escrow LC Facility Agreement (as defined below), the Exit Collateral Agency Agreement and the Exit Intercreditor Agreement is that, in summary, the Secured Property secures the claims of the following parties in the priority set out below:

(a)      firstly, pari passu between the Super Senior LC Facility Lenders and the Hedging Counterparties (defined below);

(b)      secondly, pari passu between the Make-Whole Term Loan Facility Lenders;

(c)      thirdly, pari passu between the Senior LC Facility Lenders and the Escrow LC Facility Lenders (defined below); and

(d)      fourthly, the Takeback Term Loan Facility Lenders,

(together, the "**Secured Parties**").

4.24    The Secured Exit Credit Agreements (and in particular the Super Senior LC Facility, the Senior LC Facility and the Escrow LC Facility) establish committed facilities which provide the Group with access to letters of credit which can be issued in connection with its ongoing commercial operations. Having access to additional letters of credit issued from reputable financial institutions is critical to the Group's continuing operations. The capital-intensive nature of the onshore-offshore energy services industry necessitates the Group's significant exposure to letter of credit facilities, which is currently placing significant strain on the Group's balance sheet. In order to front-end capital investment, each new project requires new letters of credit to support the Group's performance obligations under the applicable project contract. Further, given that the Group's business is substantially reliant on the confidence of its customers, the Group's significant exposure to letter of credit facilities places it in a uniquely vulnerable position. A draw of a single letter of credit by a beneficiary could encourage multiple other customers to draw on other letters of credit, triggering a 'run on the bank' scenario which would have catastrophic consequences for the financial stability of the Group and ultimately cause negative consequences to its stake holders.

Hedging Agreements

4.25    McDermott International, Ltd has entered into various hedging agreements with hedging counterparties for the purposes of hedging the Group's exposure to currency and/or interest rates (the "**Hedging Agreements**" and the "**Hedging Counterparties**"). The Hedging Agreements are guaranteed by the obligors to the Secured Exit Credit Facilities (including the Plan Company) pursuant to a guaranty agreement dated 30 June 2020.

4.26    The Plan Company has identified five Hedging Agreements with five Hedging Counterparties whose claims will not be compromised by the Plan (as detailed at paragraph 9.2 below). As at the date of this Practice Statement Letter, the Plan Company estimates, based on a fair-value

analysis, that its net mark-to-market liability of the Hedging Agreements was approximately $6,000,000 as at 30 June 2023.

4.27    Four of the Hedging Counterparties have acceded to the Exit Intercreditor Agreement and has the benefit of security interests against the Secured Property. The claims of the Hedging Counterparties rank pari passu with the Super Senior LC Facility Lenders.

Bilateral Facilities

4.28    Various members of the Group are party to various financial arrangements which provide credit support to the Group in connection with its ongoing operations. Broadly speaking, those financial arrangements involve:

    (a)    various bilateral letter of credit facility arrangements with issuing banks and associated letters of credit which have been issued to the Group's commercial counterparties by such issuing banks; and

    (b)    various surety bond arrangements with insurance organisations in respect of which a Group company is the principal and certain of the Group's commercial counterparties are the obligees,

(together the "**Bilateral Facilities**", and the providers of the same being the "**Bilateral Facility Lenders**").

4.29    The Plan Company is not a primary obligor or guarantor of any of the Bilateral Facilities.

Surety Arrangements

4.30    In addition to the Bilateral Letters of Credit, certain members of the Group have entered into guaranty and/or surety arrangements in connection with certain of the Bilateral Facilities (the "**Surety Arrangements**").

Tanks Credit Facilities

4.31    On 8 September 2023, the Group finalised a transaction with certain of its lenders pursuant to which the relevant lenders (the "**Tanks Term Loan Facility Lenders**") agreed to provide the Group with $250,000,000 of new money by way of a term loan facility (the "**Tanks Term Loan Facility**") in order to provide the Group with critical additional liquidity to bridge to completion of the Restructuring and to provide the Group with sufficient working capital to fund the Group's operations following the date on which the transaction contemplated by the Restructuring Plan and WHOA Proposals becomes effective (the "**Restructuring Effective Date**").

4.32    It was a condition of obtaining the Tanks Term Loan Facility and the Tanks LC Facility that the Group completed a structural reorganisation and ringfencing of the Group's storage tanks business. The Group accordingly completed a structural reorganisation and ringfencing of the Group's storage tanks business on or around 7 September 2023, referred to herein as the "**Tanks Transactions**". A summary of the Tanks Credit Facilities and the Tanks Transactions (as defined below) has been provided at paragraph 5.20 *(Tanks Transaction)* below.

4.33    In short, the reorganisation involved the transfer of the storage tanks business (referred to herein as the *Tanks Business*, as defined below) to an unrestricted subsidiary in the Group and the granting of a security interest in the Tanks Business to the Tanks Term Loan Facility Lenders and the Tanks Senior LC Facility Lenders (each as defined and described further below).

4.34   In connection with the reorganisation, also on 8 September 2023, certain of the Super Senior LC Facility Lenders elected (following a consent solicitation process) to take up their pro rata share of a new letter of credit facility in support of the Tanks Business (the "**Tanks Senior LC Facility Lenders**") in an amount of $161,450,000 (the "**Tanks Senior LC Facility**"). As part of the Tanks Transactions, on or around 8 September 2023, an escrow letter of credit facility in an amount of approximately $66,000,000, was made available to the CB&I STS Delaware LLC as borrower (the "**Tanks Escrow LC Facility**", and together with the Tanks Senior LC Facility, the "**Tanks LC Facilities**") by certain of the Escrow LC Facility Lenders **"Tanks Escrow LC Facility Lenders"**) to provide for the issuance of financial and performance letters of credit. The Tanks LC Facilities are required in order to support the Tanks Business which relies on the provision of letters of credit to enable its ongoing operation and success.

4.35   The Tanks Term Loan Facility and the Tanks Senior LC Facility are referred to in this Practice Statement Letter as the "**Tanks Credit Facilities**".

Amazon Facility

4.36   On 19 February 2021 McDermott (Amazon Chartering), Inc. (as borrower) (among others) entered into a $285,000,000 term loan facility agreement with, amongst others, ABN Amro Bank N.V in its capacity as facility agent and certain lenders thereto (the "**Amazon Facility**"). The Amazon Facility has a maturity of 31 December 2033 and is governed by New York law. As at 30 June 2023, the aggregate amount outstanding under the Amazon Facility is $228,000,000.

4.37   The Plan Company is not a primary obligor or guarantor of the Amazon Facility.

Preferred Interests

4.38   On 18 November 2020 the Parent issued to the Escrow LC Facility Lenders an aggregate liquidation preference of $220,000,000 plus accrued and unpaid dividends of preferred shares of the Parent in consideration for the Escrow LC Facility Lenders' entry into the Escrow LC Facility (the "**Preferred Interests**"). The Preferred Interests may be redeemed at the option of any holder on or after 31 December 2025.

4.39   The Plan Company is not a primary obligor or guarantor of any payments due under the Preferred Interests.

Letters of Credit

4.40   As noted above, each of the Super Senior LC Facility, the Senior LC Facility, the Escrow LC Facility and the Bilateral Facilities provide the Group with committed agreements from certain lenders to issue letters of credit to the Group's commercial counterparties to support the Group's operations, subject to the satisfaction of certain issuance conditions (the "**Letters of Credit**"). Various entities in the Group have accordingly requested that the Issuers issue the Letters of Credit pursuant to their obligations under the Super Senior LC Facility, the Senior LC Facility and the Bilateral Facilities and the Escrow LC Facility (each an "**Letter of Credit Issuer**"), and such issuing banks have issued such letters of credit pursuant to the terms of the relevant facility (the "**Super Senior Letters of Credit**", "**Senior Letters of Credit**", "**Escrow Letters of Credit**" and "**Bilateral Letters of Credit**" respectively).

4.41   A summary of the Super Senior Letters of Credit, the Senior Letters of Credit, the Escrow Letters of Credit and the Bilateral Letters of Credit that have been issued by Letter of Credit Issuers, as at 30 June 2023, at the request of Group entities is set out below.

| Type | Issued Letter of Credit amount |
|---|---|
| Super Senior Letters of Credit | $651,000,000 |
| Senior Letters of Credit | $1,015,000,000 |
| Escrow Letters of Credit | $339,000,000 |
| Bilateral Letters of Credit | $1,405,000,000 |

4.42   The Letters of Credit do not form part of the indebtedness of the Group. Rather, the Letters of Credit are obligations of the applicable Letter of Credit Issuer to their relevant beneficiaries. The Group's liabilities exist pursuant to the relevant letter of credit facility as outlined in this letter.

**Other liabilities of the Plan Company**

4.43   As at the date of this letter, the Plan Company is subject to certain other unsecured liabilities in addition to the financial indebtedness described above. These primarily include:

(a)   certain dispute proceedings relating to the Reficar Claim and the Contraloría Claim (each as defined below);

(b)   Trade Liabilities;

(c)   Intercompany Indebtedness; and

(d)   Pension Plans,

(each as defined below).

Dispute Proceedings

4.44   The Plan Company is party to certain dispute proceedings in respect of current and former projects, and in particular the Reficar Claim and the Contraloría Claim. Further information is provided with respect to these proceedings at paragraphs 5.8 to 5.15 below.

Trade Liabilities

4.45   The Plan Company is party to a large number of contracts for the supply of goods and services including, but not limited to, contracts for:

(a)   the exchange of goods and services during the normal course of the Plan Company's business, primarily in respect of vendors or other suppliers of goods and services;

(b)   the provision of banking services to the Plan Company;

(c)   the provision of consulting, advisory, legal and/or financial services to the Plan Company; and

(d)   the provision of employee and/or human resources services to the Plan Company,

(the "**Trade Liabilities**" and the "**Trade Creditors**").

11

4.46    As at 30 June 2023, $30,119,216 was owed by the Plan Company to Trade Creditors in respect of the Trade Liabilities.

Intercompany Indebtedness

4.47    The Plan Company is party to a number of financial arrangements with certain other members of the Group, including intercompany payables to certain Group companies amounting to $70,980,535 (the "**Intercompany Indebtedness**", and the "**Intercompany Creditors**").

Pension Plans

4.48    The Plan Company operates three defined benefit pension schemes, being the CB&I John Brown Pension Scheme, the Shaw Group UK 1997 Pension Scheme and the S&W Plan, as well as a defined contribution plan (the "**Pension Plans**").

## 5    BACKGROUND TO THE GROUP'S FINANCIAL DIFFICULTIES

5.1    A number of events have taken place since the Chapter 11 Process which have had a material impact on the Group's liquidity position.

**Business performance**

5.2    Since 2021, the Group has recognized material unfavourable changes in estimates in relation to a group of challenging projects. These projects caused a significant strain on the Group's liquidity. The Reficar Claim (as described below at paragraphs 5.8 to 5.11) and the ongoing discussions relating to the amendment and extension of the Secured Exit Credit Agreements have created greater uncertainty in the Group's operating environment. This uncertainty has caused the Group's customers, vendors, and banks to behave more cautiously when doing business with the Group. During the most recent financial quarter in particular, the Group received a retraction of previously announced significant awards as a result of the Group's inability to post requisite letters of credit. Absent the relief contemplated by the Restructuring Plan, this uncertainty could continue to impact the Group's bidding activity and ongoing projects in the backlog for the remainder of 2023. Additionally, the Group has increasingly unfavourable payment terms with its critical suppliers, which can lead to delays in project completion and achievement of customer's payment milestones, further exacerbating the unfavourable payment terms.

5.3    Further, the Group's industry was adversely affected by geopolitical events that increased the supply of low-priced oil to the global market at the same time that worldwide demand weakened due to the effects of the coronavirus pandemic, leading to a collapse in oil prices during March 2020. In 2021 U.S. oil production stabilized as commodity prices increased and demand for oil rebounded. This trend continued into 2022. In its report issued on 14 February 2023, the Organization of the Petroleum Exporting Counties ("**OPEC**") noted that for 2023, the forecast for world oil demand growth stands at 2.3 million barrels per day. Following the February report, in April 2023, OPEC and partner countries announced a crude oil production cut of approximately 1.2 million barrels per day, bringing the total voluntary crude oil production cut to approximately 1.6 million barrels per day. This cut is to extend through the end of 2023. On 4 June 2023, these production cuts were further extended through the end of 2024 for total production cuts of approximately 3.6 million barrels per day. Although the world oil demand in 2023 is expected to be supported by solid economic performance in major oil consuming countries, as well as improvements in coronavirus pandemic restrictions, the Group cannot predict the ultimate impact of these events on commodity prices. We expect to see continued volatility in oil and natural gas prices for the foreseeable future due to near-term production instability, potential sanctions and embargoes, the possibility of recession or financial market instability, and supply chain disruption resulting from, among other things, the Russia-Ukraine

crisis and adverse developments affecting financial institutions and companies in the financial services industry.

5.4    The Russia-Ukraine crisis is expected to have further global economic consequences, including continued disruptions of the global supply chain and energy markets. The global market is also experiencing inflationary pressures, including rising costs, a tightening steel market and labour shortages, which could result in increases to our operating costs that are not fixed, in addition to raising costs for our customers. While the Group considers that demand for hydrocarbon resources for both fuel and other downstream activities will continue increasing in the second half of 2023, the Group expects to see continued volatility in oil and natural gas prices for the foreseeable future due to, among other things, the Russia-Ukraine crisis, which could, over the long term, adversely impact our industry and create uncertainty in our business. The Group is currently experiencing disruptions to its global supply chain which have resulted in project prolongations, and which have negatively impacted performance. These disruptions and the resulting impacts have led to an increase in the number and amounts of unapproved change orders that the Group is currently pursuing with its customers. The ultimate impact of the Russia-Ukraine crisis will depend on future developments and the timing and extent to which normal economic and operating conditions resume.

**Cybersecurity incident**

5.5    In April 2023, the Group experienced a cybersecurity incident involving social engineering followed by the encryption of certain McDermott systems. After detecting the incident, the Group took certain of its global IT systems offline to prevent further compromise and engaged third-party cybersecurity experts to assist in the containment of the threat and restoration of its systems. During the second quarter of 2023, the Group incurred approximately $26,000,000 of expenses related to this incident, including expenses to respond to, remediate, and investigate this matter.

**Engagement with the Ad Hoc Group and the Steering Committee**

5.6    Due to the factors described above, and given the critical nature of the Secured Exit Credit Agreements to the Group's ability to continue as a going concern and the upcoming maturity dates in respect of the Secured Exit Credit Agreements, in order to proactively address the Group's liquidity needs and to address to upcoming maturity of the Secured Exit Credit Agreements, the Group commenced negotiations with certain of the Secured Exit Credit Facility Lenders with respect to, among other things, an extension of the term of the Secured Exit Credit Facilities.

5.7    The Group commenced engaging with certain of the lenders to the Secured Exit Credit Agreements, including: (i) an ad hoc group of certain cross-over lenders under the Group's credit facilities and shareholders of the Parent (the "**Ad Hoc Group**") and (ii) a steering group comprising Crédit Agricole Corporate and Investment Bank, in its capacity as LC Administrative Agent (as defined therein) under certain of the Group's letter of credit facilities and certain other lenders and issuers to the Group's credit facilities (comprising the "**Steering Committee**") in or around December 2022 with a view to agreeing a transaction that would provide the Group with, among other things, a maturity extension in respect of the Secured Exit Credit Facilities.

**Reficar Claim**

5.8    Since 8 March 2016 various persons including three Group subsidiaries, being (i) MIH; (ii) the Plan Company; and (iii) CB&I Colombiana S.A. (together the "**Reficar Claim Respondents**"), have been involved in arbitration proceedings entitled *Refineria de Cartagena SA. V. Chicago Bridge & Iron Company N.V., et al.* and governed by the arbitration rules of the International

Chamber of Commerce (the "**Reficar Arbitration**"). The Reficar Arbitration relates to certain disputes concerning a large engineering, procurement and construction agreement for the expansion of a refinery in Cartagena, as completed by the Group in 2015. Refineria de Cartagena (the "**Reficar Claim Plan Creditor**"), the customer on the project, alleged that the Reficar Claim Respondents (including the Plan Company) were responsible for certain cost overruns, delays and consequential damages on the construction project. The Reficar Claim Plan Creditor claimed total damages in excess of $4.5 billion against the Reficar Claim Respondents. Hearings in relation to the Reficar Arbitration were held on several dates beginning in May 2021 through July 2021. Post hearing briefs were submitted and closing arguments were held in November 2021.

5.9     The Reficar Claim Plan Creditor has been issued a letter of credit in the amount of $95,000,000 by Crédit Agricole Corporate and Investment Bank pursuant to the terms of the Exit Credit Agreement (pursuant to the Senior LC Facility) in support of the Plan Company's obligations in connection with the refinery project in Cartagena (the "**Reficar Letter of Credit**").

5.10    On or around 7 June 2023, the Reficar Claim Respondents received notice of an arbitration award being issued against them on a joint and several basis in favour of the Reficar Claim Plan Creditor, in connection with the Reficar Claim. In full, following offsetting claims and recoveries in favour of defendants, the arbitration panel granted the Reficar Claim Plan Creditor net damages of approximately $938,000,000 plus legal costs reimbursement (net of costs awarded to the defendants) of approximately $59,000,000 (the "**Reficar Claim**"). The tribunal also granted the Reficar Claim Plan Creditor interest on the damages award from 31 December 2015 (the date determined to be the liquidation of the contract) and interest on the legal costs award from the date of notice of the award (7 June 2023) at LIBOR plus 2% (until such time as LIBOR ceases to exist, and then at SOFR plus 2%) through date of payment of the award. On 8 June 2023, the Plan Company and MIH filed a petition to vacate (set aside) the award in the Southern District of New York asserting that the arbitration decision is based upon fundamental legal error and violation of due process related to procedural matters and the impact of various proceedings initiated by other agencies of the Colombian government. On 4 August 2023, the Reficar Claim Plan Creditor filed a motion to confirm the award. A scheduling order has been issued under which the parties will submit legal briefings on dates through 22 September 2023, after which the Plan Company anticipates that the court will schedule an oral hearing. Both the Plan Company and the Reficar Claim Plan Creditor have rights to appeal a decision of the Court of the Southern District of New York.

5.11    In the event that the defence of the Reficar Claim is not successful, it is possible that the Plan Company may be jointly and severally liable in respect of the Reficar Claim including in respect of a potential contribution claim from other of the Reficar Claim Respondents should another Reficar Claim Respondent make payment in respect of the Reficar Claim (being the "**Reficar Contribution Claims**", and such claimants being the "**Reficar Contribution Claim Plan Creditors**"). The Reficar Contribution Claim is currently contingent. The Plan Company considers it very unlikely that such contingent claims will crystallise in the near future. The Plan Company accordingly proposes to value the Reficar Contribution Claims at £1 for voting purposes.

**Contraloría Claims**

5.12    In 2017, the *Contraloría General de la República* (the "**Contraloría Claim Plan Creditor**"), an administrative agency of the Republic of Colombia, commenced an investigation against multiple parties alleging that improper cost overruns occurred in connection with the construction and modernisation of the Reficar refinery which was the subject of the Reficar Claim. The parties which were the subject of the investigation included two of the Group's subsidiaries (one of which is the Plan Company), two unrelated companies, five insurance

companies and twelve individuals, none of whom are associated with the Group (the "**Contraloría Claim Respondents**").

5.13    On 26 April 2021, following the conclusion of its investigation the Contraloría Claim Plan Creditor issued its opinion that the Contraloría Claim Respondents were jointly and severally responsible for cost overruns totalling approximately 2.95 trillion Colombian pesos (or an equivalent US dollar amount of approximately $718,400,000 as the date of this Practice Statement Letter) on the project (the "**Contraloría Claim**").

5.14    The Group and certain other respondents asserted that all costs were properly incurred and spent on the project and that the two relevant Group entities (including the Plan Company) were not subject to the investigatory powers of the Contraloría Claim Plan Creditor. The Plan Company sought to void the Contraloría Claim within the Colombian court system, however that claim was rejected on appeal in February 2022. The Group (and certain other Contraloría Claim Respondents) have now filed a bilateral investment treaty arbitration with the International Settlement of Investment Disputes and with separate Colombian court proceedings which are ongoing and pursuant to which the Group (and others) counterclaim against the Contraloría Claim being issued against them.

5.15    In the event that the defence of the Contraloría Claim is not successful, either through the Columbian court system or through the bilateral investment treaty arbitration proceedings, it is possible that the Plan Company may be jointly and severally liable in respect of the Contraloría Claim including in respect of a potential contribution claim from other of the Contraloría Claim Respondents should another Contraloría Claim Respondent make payment in respect of the Contraloría Claim (being the "**Contraloría Contribution Claims**" and such claimants being the "**Contraloria Contribution Claim Plan Creditors**"). The Contraloría Contribution Claim is currently contingent. The Plan Company considers it very unlikely that such contingent claims will crystallise in the near future. The Plan Company accordingly proposes to value the Contraloría Contribution Claims at £1 for voting purposes.

**New money discussions**

5.16    Further, in or around June 2023 the Group's liquidity forecasts indicated that the Group would not have sufficient liquidity to be able to maintain progress on key projects and achieve business plan projections absent new money and a reduction in the minimum liquidity covenant. The Group therefore commenced negotiations with the Ad Hoc Group and the Steering Committee. Following extensive negotiation, certain members of the Ad Hoc Group agreed to provide the funding necessary to support the Group's immediate liquidity needs. It was a condition of the provision of the Tanks Term Loan Facility and the Tanks LC Facilities:

(a)    the Group implemented a corporate reorganisation involving the transfer of the Group's U.S. domestic and international storage tanks business (the "**Tanks Business**") to an unrestricted subsidiary in the Group; and

(b)    the lenders under the Tanks Term Loan Facility benefited from security over the Tanks Business.

5.17    In order to incur the Tanks Term Loan Facility and to facilitate the granting of security over the Tanks Business, the Group required consents from the Secured Exit Credit Facility Lenders under the terms of the Secured Exit Credit Agreements. Based on discussions with the Ad Hoc Group and members of the Steering Committee, it was a condition of the Group receiving those consents that the Group undertook to migrate certain Letters of Credit issued under the Secured Exit Credit Agreements (which supported the Tanks Business) to a new letter of credit facility incurred by the Tanks Business.

5.18    The borrowing of the Tanks Term Loan Facility prior to the sanction of the Restructuring Plan was required due to the Group's expected cashflow needs and liquidity shortfall in the immediate term. The Group concluded that the Tanks Term Loan Facility was the only available route to obtain the funding on an expedited basis in the circumstances. There is no super senior basket that would have enabled the Group to procure additional liquidity within the confines of the Secured Exit Credit Facilities and there were no other available baskets that could have enabled the funding in the quantum and on the timeline required.

5.19    The Tanks Transactions were aimed at (i) reducing pressure on the Group's liquidity and working capital; (ii) reducing the risk of cross-defaults and termination of contracts which are material to the Group's operations; and (iii) reducing the risk of management of certain key operating companies in the Group being obliged to commence formal insolvency proceedings which, given the interconnected financing arrangements of the Group, would in turn precipitate further insolvency filings throughout the Group.

Tanks Transactions

5.20    On 1 September 2023 the Group commenced consent solicitation processes under the terms of the Exit Credit Agreement and the Exit Escrow LC Facility Agreement (the "**Consent Solicitations**") with the view to implementing the Tanks Transactions. The Consent Solicitations sought consent from the requisite threshold of Super Senior LC Facility Lenders, Senior LC Facility Lenders, Make-Whole Term Loan Facility Lenders and Takeback Term Loan Facility Lenders to (i) approve the Tanks Transactions and (ii) effect a migration of certain Super Senior Letters of Credit and Escrow Letters of Credit to the new letters of credit facilities to be established by the entities comprising the Tanks Business. The Group implemented the Tanks Transactions on and following 7 September 2023. The Tanks Transactions comprised the following steps (in summary):

(a)    the Group and the relevant consenting lenders entered certain amendment agreements to the Exit Credit Agreement and the Exit Escrow LC Facility Agreement to provide for, among other things, the transactions contemplated at paragraphs (b) to (g) below;

(b)    the Group undertook an internal reorganisation of the Tanks Business;

(c)    LFC designated all subsidiaries constituting the Tanks Business (the "**Tanks Entities**") as unrestricted subsidiaries for the purposes of the Secured Exit Credit Agreements, with the liens and guarantees given by or over the assets of the Tanks Entities pursuant to the Exit Credit Agreement and Exit Escrow LC Facility Agreement accordingly being released or assigned to the Collateral Agent pursuant to the terms of the amended Secured Exit Credit Facilities;

(d)    CB&I STS Delaware LLC, as well as certain other Tanks Entities executed a new facilities agreement which provided for the Tanks Credit Facilities to come into existence. Relevantly, the Tanks Credit Facilities were compromised of:

(i)    the $250,000,000 senior secured Tanks Term Loan Facility (as defined above) made available by certain members of the Ad Hoc Group, with the whole of the Tanks Term Loan Facility available to be drawn (and was fully drawn) on 8 September 2023;

(ii)    the approximately $254,000,000 senior secured Tanks Senior LC Facility (as defined above) to provide for issuance of financial and performance letters of credit, which was structured in two tranches:

a.    an initial tranche of $161,450,000, being an amount equal to the face amount of all of the outstanding Letters of Credit issued under the Exit Credit Agreement Facilities which support the Tanks Business (the "**Tanks Senior LC Facility Tranche 1**") which became effective 8 September 2023 for Super Senior LC Facility Lenders which elected to participate pursuant to the relevant Consent Solicitation (the "**Consenting Super Senior LC Facility Lenders**");

b.    a second tranche of $92,160,000, which shall be made available on the Restructuring Effective Date (the "**Tanks Senior LC Facility Tranche 2**").

(iii)    an approximately $66,000,000 escrow letter of credit facility, being the Tanks Escrow LC Facility, to provide for issuance of financial and performance letters of credit;

(e)    all Super Senior LC Facility Lenders were offered an ability to participate in the full Tanks Senior LC Facility of the $253,610,000 (i.e. the aggregate of the Tanks Senior LC Facility Tranche 1 and the Tanks Senior LC Facility Tranche 2) pro rata to their commitments under the Super Senior LC Facility pursuant to the Consent Solicitation under the Exit Credit Agreement. Those Super Senior LC Facility Lenders which elected to participate as at 8 September 2023, being the Consenting Super Senior LC Facility Lenders have partially received that pro rata share of the Tanks Senior LC Facility as a portion of the Tanks Senior LC Facility Tranche 1 commitments, and will receive the remainder of that pro rata share of the Tanks Senior LC Facility as a portion of the Tanks Senior LC Facility Tranche 2 commitments. Each Super Senior LC Facility Lender who did not elect to participate in the Tanks Senior LC Facility Tranche 1 before 8 September 2023 (the "**Non-Consenting Super Senior LC Facility Lenders**") will remain entitled to elect (up until the first business day following the proposed Plan Meeting) to take up their pro rata share of the Tanks Senior LC Facility as a portion of the Tanks Senior LC Facility Tranche 2 commitments in connection with the Restructuring Plan;

(f)    the Group entered into side letters with the Consenting Super Senior LC Facility Lenders and each of the relevant banks which issued letters of credit in connection with the same and in support of the Tanks Business (the "**Consenting Issuing Banks**") which had the effect of freezing certain commitments under the Super Senior LC Facility in the same amount that the relevant Consenting Super Senior LC Facility Lenders had agreed to participate under the Tanks Senior LC Facility, grossed up to account for non-migrating Super Senior LC Facility commitments; and

(g)    the relevant Super Senior Letters of Credit and Escrow Letters of Credit issued by Consenting Issuing Banks were migrated to the Tanks Senior LC Facility and the Tanks Escrow LC Facility.

**Transaction Support Agreement and terms of the proposed Restructuring**

Transaction Support Agreement

5.21    The negotiations between the Group, the Ad Hoc Group, the Steering Committee and the other relevant stakeholders in the Group in respect of the proposed restructuring ultimately culminated in a transaction support agreement which was entered into between (among others) the Parent, the Plan Company and the Consenting Stakeholders (as outlined and defined below) on 8 September 2023 (the "**Transaction Support Agreement**").

5.22    As at the date of this Practice Statement Letter, the Transaction Support Agreement has been entered into by:

(a)    certain members of the Group comprising the Company Parties (as defined therein);

(b)    Super Senior LC Facility Lenders holding approximately 85% of commitments under the Super Senior LC Facility;

(c)    Make-Whole Term Loan Facility Lenders holding approximately 39% of commitments under the Make-Whole Term Loan Facility;

(d)    Senior LC Facility Lenders holding approximately 69% of commitments under the Senior LC Facility;

(e)    Escrow LC Facility Lenders holding (or entitled to hold) approximately 99% of commitments under the Escrow LC Facility;

(f)    Takeback Term Loan Facility Lenders holding approximately 72% of commitments under the Takeback Term Loan Facility; and

(g)    all of the issuers of the Super Senior Letters of Credit, Senior Letters of Credit and Escrow Letters of Credit,

(each party in paragraph (a) - (g) above (as defined in the Transaction Support Agreement) being a "**Consenting Stakeholder**").

5.23    Under the terms of the Transaction Support Agreement, among other things:

(a)    the relevant members of the Group agreed to implement the Restructuring in accordance with several timing milestones; and

(b)    each of the Consenting Stakeholders has undertaken to use commercially reasonable efforts to take all actions reasonably necessary in order to support, facilitate, implement, consummate or otherwise give effect to all or any part of the Restructuring.

5.24    LFC has agreed to pay certain fees to the Secured Exit Credit Facility Lenders which have executed the Transaction Support Agreement (including through a joinder) ahead of the Restructuring Effective Date upon the Restructuring becoming effective on the Restructuring Effective Date, including:

(a)    in respect of each of the Super Senior LC Facility Lenders, Senior LC Facility Lenders and Escrow LC Facility Lenders, 2.0% of the aggregate amount of the letter of credit commitments of all Super Senior LC Facility Lenders, Senior LC Facility Lenders and Escrow LC Facility Lenders, as applicable, paid in the form of additional Takeback Term Loan Facility participations or similar instruments, subject to final determination;

(b)    in respect of the Make-Whole Term Loan Facility Lenders, 2.0% of the aggregate amount of outstanding Make-Whole Term Loan Facility, paid in the form of additional Takeback Term Loan Facility participations or similar instruments, subject to final determination; and

(c)    in respect of the Takeback Term Loan Facility Lenders, 4.0% of the aggregate amount of outstanding Takeback Term Loan Facility, payable in kind, subject to final determination,

(together the "**TSA Consent Premium**").

## 6     OVERVIEW OF THE RESTRUCTURING

### The Restructuring

6.1    In addition to the Restructuring Plan, certain other members of the Group have conducted or are in the process of conducting other processes in parallel with the Restructuring Plan in order to give effect to a wider restructuring of the Group's capital structure:

(a)    as noted above at paragraph 5.20, prior to the date of this Practice Statement Letter, the Group implemented the Tanks Transactions to facilitate the provision of additional liquidity to the Group; and

(b)    on or around the date of this Practice Statement Letter, each of MIH and LFC intend to file opening declarations pursuant to the *Wet Homologatie Onderhands Akkoord* with the Amsterdam district court in the Netherlands (the "**Amsterdam District Court**"), signalling the commencement of parallel WHOA proceedings during which MIH and LFC will each prepare proposals (the "**WHOA Proposals**", and the "**MIH WHOA Proposal**" and the "**LFC WHOA Proposal**" respectively) for certain of their creditors (the "**WHOA Creditors**"). The primary purpose of the WHOA Proposals is to ensure that the transactions effected by the Restructuring Plan are, in parallel, effected with respect to the creditors of MIH and LFC, the vast majority of which are common to the Plan Creditors. On or around 20 October 2023, the WHOA Proposals will be offered for voting to the WHOA Creditors. Further details regarding the WHOA Proposals are provided at paragraph 6.6 below; and

(c)    on our following the Restructuring Effective Date a consensual amendment and extension transaction will be effected between the Parent and the requisite holders of the Preferred Interests, the precise terms of which are yet to be agreed (the "**Preferred Interest Extension**"),

(the Tanks Transactions, the Restructuring Plan, the WHOA Proposals and the Preferred Interest Extension together comprising the "**Restructuring**").

### Purpose of the Restructuring

6.2    The primary objectives of the Restructuring are to:

(a)    restore the Plan Company and the Group to financial stability and continue the business of the Group;

(b)    avoid the Plan Company and the wider Group having to enter into insolvent liquidation, which would likely result in recoveries for Plan Creditors being materially lower than if the Restructuring Plan were approved and sanctioned, this being nil in the case of the Dispute Proceeding Plan Creditors and the Contribution Claim Plan Creditors (see further in Section 11 (*Consequences if the Restructuring Plan is not successful*) below);

(c)    implement an amendment and extension of the Group's Secured Exit Credit Agreements, thereby extending the Group's access to critical committed letter of credit facilities and removing the risk of a cash collateralisation of outstanding letters of credit in the near term;

(d)    to facilitate the provision of additional liquidity to the Group pursuant to the Tanks Transactions;

19

(e)     protect the position of the employees of the Plan Company and maintain commercial relationships with critical suppliers; and

(f)     provide the Dispute Proceeding Plan Creditors with the opportunity to benefit from the potential upside anticipated assuming the successful implementation of the Restructuring through their receipt of the Dispute Proceeding Plan Creditor Consideration (defined below).

6.3     Following the implementation of the Restructuring, the Plan Company expects that the new financing, combined with cash generated from its operations, will be sufficient to enable the Plan Company and the wider Group to, on a global basis, continue operating in the normal course and fulfil its commitments to its stakeholders, including customers, suppliers, joint-venture partners, business partners and employees.

**Key terms of the Restructuring**

Tanks Transactions

6.4     As noted at paragraph 5.20 above, the Tanks Transactions were effectuated on 8 September 2023 on a fully consensual basis pursuant to the terms of the Secured Exit Credit Agreements.

Restructuring Plan

6.5     The Restructuring Plan is an integral part of the wider Restructuring as, if approved by the requisite Plan Creditors and sanctioned by the English court, it will allow the Group to implement certain elements of the Restructuring which cannot be achieved on a consensual basis. The key terms of the Restructuring Plan are set out in detail at Section 10 *(Key Terms of the Restructuring Plan)* below.

Parallel WHOA Proposals

6.6     As noted at paragraph 6.1(b)above, on or around the date of this Practice Statement Letter, each of MIH and LFC (together the "**WHOA Companies**") intend to file opening declarations pursuant to the *Wet Homologatie Onderhands Akkoord* with the Amsterdam District Court, as such initiating parallel WHOA proceedings. On or around 20 October 2023, the WHOA Companies intend to offer the MIH WHOA Proposal and the LFC WHOA Proposal respectively for voting to the relevant WHOA Creditors.

6.7     The Information Agent will make information available to the relevant creditors in respect of the WHOA Proposals on the Plan Portal.

6.8     The primary purpose of the WHOA Proposals is to implement the financial restructuring of MIH and LFC (and certain of its group companies) on the terms set out in the WHOA Proposals, in a manner which is broadly consistent with the terms of the Restructuring Plan. In particular:

(a)     subject to paragraph 6.9 below, the LFC WHOA will amend the terms of the Secured Exit Credit Agreements in a manner which is consistent with the Restructuring Plan, with respect to the Secured Exit Credit Facility Lenders only; and

(b)     the MIH WHOA will:

(i)     amend the terms of the Secured Exit Credit Agreements in a manner which is consistent with the LFC WHOA, with respect to the Secured Exit Credit Facility Lenders; and

(ii)     compromise the claims of the Reficar Claim Plan Creditor and the Reficar Contribution Claim Plan Creditors as against MIH.

6.9     Upon offering the WHOA Proposals to the WHOA Creditors, a voting period will commence during which each of the WHOA Creditors can vote either in favour or against the relevant WHOA Proposal. The WHOA Companies currently expect such voting period to run up to and including 3 November 2023, after which a voting report will be made available stating the outcome of the voting process. A WHOA Proposal can be submitted to the Dutch courts for sanctioning if at least one in-the-money class of creditors consents to such WHOA Proposal. A class of creditors is considered to have consented to a WHOA Proposal if the group of creditors within that class that has voted in favour of the plan represents at least two-thirds of the total amount of claims belonging to the creditors within that class who have cast their vote.

6.10    In line with the class constitution for the Restructuring Plan, and after having taken legal advice (privilege for which is not waived), the WHOA Companies have concluded that prima facie creditors fall into the following classes:

(a)     the Super Senior LC Facility Plan Creditors;

(b)     the Make-Whole Facility Plan Creditors;

(c)     the Senior LC Facility Plan Creditors;

(d)     the Escrow LC Facility Plan Creditors;

(e)     the Takeback Facility Plan Creditors; and

(f)     for the MIH WHOA Proposal only:

(i)     the Reficar Claim Plan Creditor; and

(ii)    the Reficar Contribution Claim Plan Creditors.

6.11    No other creditors of MIH and/or LFC than those listed under paragraph 6.10 above will be subject to the parallel WHOA proceedings that the WHOA Companies intend to initiate.

6.12    The WHOA Companies intend to request the Amsterdam District Court to appoint an observer (*observator*) to monitor the preparatory process and the structuring of the WHOA Proposals, including but not limited to the provision of information to the WHOA Creditors. The appointment of such observer is supported by the parties to the Transaction Support Agreement.

6.13    **Important**: If any WHOA Creditor has comments as to the proposed class constitution of WHOA Creditors or any other concerns with regard to the WHOA Proposals and the preparation thereof, they should in the first instance contact NautaDutilh N.V., Dutch counsel to the Plan Company and the WHOA Companies, with a copy to Kirkland & Ellis, using the contact details set out at the end of this letter. In this respect, reference is made to section 383 paragraph 9 of the Dutch Bankruptcy Act (*Faillissementswet*), which provides that a ground for rejection of sanction of a WHOA Proposal may not be invoked by a WHOA Creditor if it has not raised such ground for rejection with the debtor or, if applicable, the court appointed restructuring expert, within a reasonable time after it has discovered or reasonably should have discovered the possible existence of that ground for rejection.

**7      PURPOSE OF THE RESTRUCTURING PLAN**

7.1     The Restructuring Plan is being proposed to the Plan Creditors in order to restructure the Group's existing indebtedness. The primary aims of the Restructuring Plan are to facilitate an amendment and extension of the Group's primary financial indebtedness, reduction of commitments under the Secured Exit Credit Agreements and a compromise of unsecured liabilities that would otherwise prevent the Group and the Plan Company from continuing to operate as a going concern.

7.2     The Restructuring Plan will:

(a)     with effect from the Restructuring Effective Date, authorise the Plan Company to implement the Restructuring in accordance with the Restructuring Plan;

(b)     grant authority to the Plan Company to execute the documents required to implement the transactions contemplated by the Restructuring Plan to which the Plan Creditors are party in the capacity as Plan Creditors, on behalf of the Plan Creditors, including (without limitation):

(i)     an amended and restated Exit Credit Agreement which implements the amendments contemplated by the A&E Transaction (as it relates to the Exit Credit Agreement Facilities), the Migrated Super Senior Letter of Credit Commitment Tranche 1 Reduction (as defined below) and the Migrated Super Senior Letter of Credit Commitment Tranche 2 Reduction (as defined below);

(ii)    any documents required to effectuate the relevant lenders taking up commitments in the Tanks Senior LC Facility Tranche 2;

(iii)   an amended and restated Exit Escrow LC Facility Agreement which implements the amendments contemplated by the A&E Transaction (as defined below) (as it relates to the Escrow LC Facility);

(iv)    a deed of release giving effect to the releases contemplated at paragraphs 10.1(e), (f) and (g) below, and

(v)     any other document which the parties to the Transaction Support Agreement deem necessary to implement the Restructuring,

(together, the "**Implementation Documents**");

(c)     implement the transactions contemplated by the Restructuring Plan, as described at Section 10 *(Key Terms of the Restructuring Plan)* below; and

(d)     set out the order in which the steps required to implement the Restructuring will take place.

7.3     The Implementation Documents will be attached to the Explanatory Statement.

7.4     Further details of the Restructuring Plan will be set out in the Explanatory Statement to be provided in connection with the Restructuring Plan, which, provided that the Court gives its permission to convene the Plan Meetings, will be made available to Plan Creditors shortly after the Convening Hearing.

**8**      **INTERESTS SUBJECT TO THE RESTRUCTURING PLAN**

8.1      The Restructuring Plan is being proposed to the Plan Creditors in order to implement certain aspects of the Restructuring which are unable to be implemented on a fully consensual basis.

8.2      The Plan Company has a number of different sources of indebtedness, some (but not all) of which will be compromised under the Restructuring Plan. The interests to be compromised by the Restructuring Plan are set out below.

**Secured Exit Credit Agreements**

8.3      The Restructuring Plan will bind all Secured Exit Credit Facility Lenders under the Secured Exit Credit Agreements in relation to the amendments to the Secured Exit Credit Agreements which are subject of the Restructuring Plan, as described at Section 10 *(Key Terms of the Restructuring Plan)* below.

**Dispute Proceeding Plan Creditors**

8.4      The claims of the Reficar Claim Plan Creditor in respect of the Reficar Claim and the Contraloría Claim Plan Creditor in respect of the Contraloría Claim (together the "**Dispute Proceeding Plan Creditors**") will be compromised and discharged in full pursuant to the Restructuring Plan in exchange for the relevant Dispute Proceeding Plan Creditor Consideration.

8.5      The Reficar Claim Plan Creditor has the benefit of the Reficar Letter of Credit, which (upon being drawn) will result in a payment of $95,000,000 to the Reficar Claim Plan Creditor by the issuing bank without admission of liability in respect of any such claim alleged by it. The value of the Reficar Claim will accordingly be assessed by the Plan Company for the purposes of the Plan for a figure which is $95,000,000 less than the claim against the Plan Company as at 30 June 2023.

**Contribution Claim Plan Creditors**

8.6      The claims of the Reficar Contribution Claim Plan Creditors in respect of the Reficar Contribution Claims and the Contraloría Contribution Claim Plan Creditors in respect of the Contraloría Contribution Claims (together the "**Contribution Claim Plan Creditors**") will be compromised and discharged in full pursuant to the Restructuring Plan in exchange for £100,000 in aggregate to all Contribution Claim Plan Creditors.

**9**      **ARRANGEMENTS THAT ARE NOT SUBJECT TO THE RESTRUCTURING PLAN**

9.1      There are certain liabilities of the Group that are not the subject of the Restructuring Plan:

**Hedging Agreements**

9.2      The Plan Company does not intend to compromise the guarantee claims in respect of the Hedging Agreements. The Plan Company believes that compromising the claims of the Hedging Counterparties is not in its or its stakeholders' best interests and risks compromising the Restructuring and the overall long-term success of the Group.

**Surety Arrangements**

9.3      Any contingent liability of the Plan Company in connection with the Surety Arrangements is not proposed to be compromised by the Restructuring Plan. The Surety Arrangements provide critical collateral support to the Group which is required to enable the Group to participate in a

number of its key commercial relationships. The Plan Company believes that compromising the claims of the Surety Arrangements is not in its or its stakeholders' best interests and risks compromising the Restructuring and the overall long-term success of the Group.

**Tanks Credit Facilities**

9.4     The Tanks Credit Facilities will not be subject to the Restructuring Plan because (i) the Plan Company is not a party to the Tanks Credit Facilities; and (ii) each of the Tanks Term Loan Facility Lenders, Tanks Escrow LC Facility Lenders, and Tanks Senior LC Facility Lenders (the latter in respect of the Tanks Senior LC Facility Tranche 1 only) have already agreed to provide any necessary consents required to effect the Restructuring, including through their commitments in the Transaction Support Agreement.

**Trade Creditors**

9.5     The Plan Company does not intend to compromise the claims of Trade Creditors which fall within the following categories:

(a)     Trade Creditors who either (i) provide services to the Plan Company would be difficult to source from an alternative supplier and, if the Trade Creditor terminated its services, it is likely to cause significant operational disruption to the Plan Company, or (ii) provide services to both the Plan Company and the Group which would be difficult to source from an alternative supplier and, if the Trade Creditor terminated its services, it would likely cause significant operational disruption to the Plan Company and/or the Group (together the "**Critical Trade Creditors**"); and

(b)     certain other minor Trade Creditors who provide non-critical services to both the Plan Company and the Group (the "**Non-Critical Trade Creditors**").

(c)     The Plan Company has identified 68 Critical Trade Creditors, as at 30 June 2023, whose claims will not be compromised by the Plan. As at 30 June 2023, the Plan Company had a liability of $ 26,000,810 owed to the Critical Trade Creditors.

(d)     The liabilities of Critical Trade Creditors have been excluded for one or more of the following reasons:

(i)     the services provided by these Critical Trade Creditors would be difficult to source from an alternative supplier; and/or

(ii)    if a Critical Trade Creditor terminated its services, in particular as a result of a compromise or discharge by the Plan Company in respect of such Trade Creditors' claims, it would be likely to cause other Trade Creditors (both critical and non-critical) to terminate their services and relationships with the Plan Company and as a result would have significant operational and business disruption to the Plan Company and the Group as a whole.

9.6     The Plan Company believes that compromising the claims of the Critical Trade Creditors is not in its or its stakeholders' best interests and risks compromising the Restructuring and the overall long-term success of the Group.

9.7     The Plan Company has identified 28 Non-Critical Trade Creditors, as at 30 June 2023, whose claims will not be compromised by the Plan. As at 30 June 2023, the Plan Company had a liability of $624,786.93 owed to the Non-Critical Trade Creditors.

9.8     The liabilities of Non-Critical Trade Creditors have been excluded as, given the small size of the claims relative to claims of other unsecured creditors, the Plan Company considers that the benefits to compromising such liabilities would be outweighed by the operational disruption that would be caused to the Plan Company and/or the Group by virtue of compromising the claims of some trade creditors but not others. The Plan Company believes that compromising the claims of the Non-Critical Trade Creditors is not in its or its stakeholders' best interests for the reasons outlined at paragraph (ii) above.

**Intercompany Indebtedness**

9.9     The Plan Company has identified eighteen Intercompany Creditors whose claims will not be compromised pursuant to the Restructuring Plan:

(a)     Intercompany Indebtedness amounting to $56,578,981 and owing to twelve Intercompany Creditors which are obligors under the Secured Exit Credit Facilities, and each of which has granted security interests in respect of the Secured Property. Each of these entities has further acceded to the Exit Intercreditor Agreement. All of these debts have been pledged by the relevant Group entities in favour of the Collateral Agent on behalf of the Secured Exit Credit Facility Lenders pursuant to a pledge and security agreement. The Plan Company accordingly considers that in the Relevant Alternative (as defined below) the value associated with such intercompany receivables (if any) would ultimately be distributed to the Secured Exit Credit Facility Lenders (subject to any "prescribed part" deductions or similar legal mechanisms under the laws of a guarantor jurisdiction outside of England), and that there is accordingly no material benefit to compromising these liabilities; and

(b)     Intercompany Indebtedness amounting to $14,401,554 and owing to six Intercompany Creditors which are not obligors to the Secured Exit Credit Facilities. Each of these entities has consensually agreed to enter arrangements outside the terms of the Plan which will release the value of claims to zero.

**Pension Plans**

9.10    The Plan Company believes that compromising any outstanding liabilities in respect of the Pension Plans is not in its or its stakeholders' best interests and risks compromising the overall long-term success of the Group.

**Administrative agents and Issuers**

9.11    The Plan Company does not intend to compromise the claims and liabilities owed to administrative agents (the LC Administrative Agent (as defined in the Secured Exit Credit Facilities Agreement) and term loan administrative agents), collateral agents, escrow agents and Issuers under or in connection with the Secured Exit Credit Agreements. If consents of those agents or Issuers to the implementation of the Restructuring are required, such consents will be provided outside of the Plan.

**Other Group liabilities**

9.12    The following Group liabilities have been excluded because the Plan Company is either not a party or has no liability under the arrangements:

(a)     Bilateral liabilities have been excluded primarily because the Plan Company is not party to these arrangements. The bilateral letter of credit facility arrangements and the surety bond arrangements provide critical collateral support to the Group which is required to enable the Group to participate in a number of its key commercial

relationships. The Plan Company believes that compromising the claims of the Bilateral Facility Lenders is not in its or its stakeholders' best interests and risks compromising the Restructuring and the overall long-term success of the Group.

(b)     The liabilities arising to members of the Group as a result of the Amazon Facility have been excluded because the Plan Company has no liability under this arrangement. In addition, the Amazon Facility is secured over a specific vessel and sit outside the Exit Intercreditor Agreement.

(c)     The liabilities arising to members of the Group as a result of the Preferred Interests are not subject to the Restructuring Plan because the Plan Company has no liability under these arrangements.

## 10      KEY TERMS OF THE RESTRUCTURING PLAN

**Overview of the Restructuring Plan**

10.1    The Restructuring Plan provides for, in summary and among other things:

(a)     each of the Secured Exit Credit Facility Lenders to agree to certain amendments and extensions to the terms of the Exit Credit Agreement and the Exit Escrow LC Facility Agreement, as detailed below (the "**A&E Transaction**");

(b)     a reduction of the Super Senior LC Facility Lenders' commitments under the Super Senior LC Facility such that the Consenting Super Senior LC Facility Lenders' commitments in the Super Senior LC Facility will be reduced dollar-for-dollar by the amount of its commitment under the Tanks Senior LC Facility Tranche 1 (the "**Migrated Super Senior Letter of Credit Commitment Tranche 1 Reduction**");

(c)     the Non-Consenting Super Senior LC Facility Lenders will have the option to take up their pro rata share of the Tanks Senior LC Facility as a portion of the Tanks Senior LC Facility Tranche 2 commitments through the Restructuring Plan. Such pro rata entitlement will be equal to their pro rata share of the full Tanks Senior LC Facility of the $253,610,000 (i.e. the aggregate of the Tanks Senior LC Facility Tranche 1 and the Tanks Senior LC Facility Tranche 2). If Non-Consenting Super Senior LC Facility Lenders do not elect to take up their pro rata share, such unallocated share will be offered to each Consenting Super Senior LC Facility Lender;

(d)     a reduction of the Super Senior LC Facility Lenders' commitments under the Super Senior LC Facility such that those Super Senior LC Facility Lenders who have been allocated commitments in the Tanks Senior LC Facility Tranche 2 shall have their commitments in the Super Senior LC Facility reduced dollar-for-dollar by the amount of its commitment under the Tanks Senior LC Facility Tranche 2 in the event that not all of the Non-Consenting Super Senior LC Facility Lenders elect to participate in the Tanks Senior LC Facility Tranche 2 (the "**Migrated Super Senior Letter of Credit Commitment Tranche 2 Reduction**");

(e)     each of the Dispute Proceeding Plan Creditors' claims will be released in exchange for a right to receive the Dispute Proceeding Plan Creditor Consideration, as further described in paragraph 10.8;

(f)     each of the Contribution Claim Plan Creditors' claims will be released in exchange for a right to receive the Contribution Claim Plan Creditor Consideration; and

(g)     upon the completion of the Restructuring, among others, the Plan Company, its affiliates and their respective officers, directors and advisors will be given full and final releases in respect of the negotiation and implementation of the Restructuring.

**Treatment of Plan Creditors**

10.2    A table summarising the above terms of the Restructuring Plan and treatment of the creditors is set out below:

| Plan Creditor | Outstanding amount | Treatment under the Restructuring Plan |
|---|---|---|
| Super Senior LC Facility Lenders | $651,000,000 | Subject to the A&E Transaction (described at paragraph 10.3 below).<br><br>Offer to participate in the Tanks Senior LC Facility Tranche 2.<br><br>Migrated Super Senior Letter of Credit Commitment Tranche 1 Reduction and Migrated Super Senior Letter of Credit Commitment Tranche 2 Reduction (applicable to the Consenting Super Senior LC Facility Lenders only) (described in detail at paragraph 10.5 and paragraph 10.6 below). |
| Make-Whole Term Loan Facility Lenders | $43,000,000 | Subject to the A&E Transaction. |
| Senior LC Facility Lenders | $1,015,000,000 | Subject to the A&E Transaction. |
| Escrow LC Facility Lenders | $339,000,000 | Subject to the A&E Transaction. |
| Takeback Term Loan Facility Lenders | $508,000,000 | Subject to the A&E Transaction. |
| Dispute Proceeding Plan Creditors | $1,715,400,000 (excluding interest) | Full compromise and discharge of liabilities in return for an entitlement to receive Dispute Proceeding Plan Creditor Consideration (described in detail at paragraph 10.8 below). |
| Contribution Claims Plan Creditors | £1 | Full compromise and discharge of liabilities in return for an entitlement to receive Contribution Claim Plan Creditor Consideration. |

**A&E Transaction**

10.3    In addition to the amendments described above, the maturity date for the Super Senior LC Facility, the Make-Whole Term Loan Facility, the Senior LC Facility and the Escrow LC

27

Facility will be amended from 30 June 2024 to 30 June 2027, with the maturity of the Takeback Term Loan Facility being extended from 30 June 2025 to 31 December 2027.

10.4    Further, the Secured Exit Credit Agreements will be amended as follows pursuant to the A&E Transaction, with such amendments being binding upon each Secured Exit Credit Facility Lender:

(a)    *Minimum liquidity covenant*: the minimum liquidity covenant under the Secured Exit Credit Facilities will be modified in accordance with an agreed-upon schedule which will be set out in the Explanatory Statement.

(b)    *Asset Sale Proceeds Waterfall*: The Secured Exit Credit Agreements will be amended to ensure, among other things and in summary: (i) the first $50,000,000 of proceeds of certain asset sales shall not be subject to mandatory cash collateralization under certain conditions, (ii) certain assets sales which do not relate to the Tanks Business will result in a cash collateralisation of the letters of credit (firstly, under the Super Senior LC Facility and secondly under the Senior Letter of Credit Facility) issued under the Exit Credit Agreement with 50% of net cash proceeds from the relevant asset sale not reinvested or committed for reinvestment within 12 months (subject to a 180 day extension if there is a binding commitment for reinvestment within the 12 month period), and (iii) for certain assets sales which relate to the Tanks Business, certain restrictions on engaging in such sales and a establishing a prepayment waterfall in respect of the Tanks Credit Facilities, the Secured Exit Credit Agreements and issued letters of credit.

(c)    *Restricted Payments*: Certain restricted payments under the Secured Exit Credit Agreements in an amount not exceeding 50% of the aggregate amount of cash raised through equity issuances made after the Restructuring Effective Date shall be permitted in certain circumstances.

(d)    *Middle East Collateral*: A new lien basket will be created to support certain performance guarantees in KSA, Oman, Kuwait, Qatar and UAE secured by cash, bank accounts, and accounts receivable of the Plan Company.

(e)    *Permitted Incremental Indebtedness*: Permissions will be introduced in the Secured Exit Credit Agreements which allow the Plan Company (i) to use certain equity proceeds to cash collateralise incremental letters of credit facility in certain circumstances and (ii) to incur incremental indebtedness in the form of a "side-car" credit facility subject to certain requirements.

(f)    *Fixed Charge Cover Ratio*: The fixed charge cover ratio will be amended on certain terms which will be set out in the Explanatory Statement.

(g)    *Guarantor Threshold*: Subsidiaries formed in India shall be excluded from the security or guarantee requirement under the Secured Exit Credit Agreements. Definition of "Material Wholly-Owned Subsidiary" will be amended for the purposes of guarantor coverage test by increasing the current $35,000,000 threshold to $50,000,000.

(h)    *Quarterly Reports*: Management will provide reports regarding customary financial information regarding CB&I STS Holdings LLC and its direct and indirect subsidiaries on a consolidated basis to the Secured Exit Credit Facility Lenders on a quarterly basis, in addition to the reporting already required under the Secured Exit Credit Facilities.

(i)    *Reficar Letter of Credit Draw*: to provide that in the event that the Reficar Letter of Credit is drawn by the beneficiary thereof, which is funded by the Senior LC Facility

Lenders on a pro rata basis in accordance with the Exit Credit Agreement terms and not reimbursed by the relevant Group entity, such reimbursement obligation of the Group in respect of such drawn amounts shall be deemed to be a borrowing of term loans by the Group and shall be pari passu in terms of payment and priority with the reimbursement obligations in respect of the amounts drawn under the Super Senior Letters of Credit. In such case, Senior LC Facility commitments will be automatically reduced by the corresponding amount.

(j)     *Mutual Releases by the Parties*: On the Restructuring Effective Date certain members of the Group and the Consenting Stakeholders shall receive releases agreement and releases will be granted under the Restructuring Plan.

**Migrated Super Senior Letter of Credit Commitment Tranche 1 Reduction**

10.5    As noted at paragraph 10.1(b) above, it is proposed that the Restructuring Plan will authorise the Migrated Super Senior Letter of Credit Commitment Tranche 1 Reduction under the terms of the Exit Credit Agreement and, if necessary, to effect a reduction of the Super Senior LC Facility Lenders' commitments under the Super Senior LC Facility such that the Consenting Super Senior LC Facility Lenders' commitments in the Super Senior LC Facility will be reduced dollar-for-dollar by the amount of its commitment to the Tanks Senior LC Facility that migrated prior to the Restructuring Plan, being its Tanks Senior LC Facility Tranche 1 commitment. Such a reduction of the commitments of the Super Senior LC Facility Lenders under the terms of the Exit Credit Agreement requires the consent of all Super Senior LC Facility Lenders. The consent of all Super Senior LC Facility Lenders was not obtained pursuant to the relevant Consent Solicitation. The Restructuring Plan will accordingly amend the Exit Credit Agreement to provide for a reduction of commitments for the Consenting Super Senior LC Facility Lenders equal to such lender's commitments under the Tanks Senior LC Facility Tranche 1 that the relevant lender consented to pursuant to the relevant Consent Solicitation.

**Migrated Super Senior Letter of Credit Commitment Tranche 2 Reduction**

10.6    As noted at paragraph 5.20(d) and 10.1(d) above, on the Restructuring Effective Date the Tanks Senior LC Facility Tranche 2 will be effected pursuant to the Restructuring Plan. Super Senior LC Facility Lenders which elect to participate in the Tanks Senior LC Facility Tranche 2 will receive new commitments in the Tanks Senior LC Facility. A reduction of such commitments under the Super Senior Letter of Credit Facility will then occur in the manner described at paragraph 10.5 above (being the Migrated Super Senior Letter of Credit Commitment Tranche 2 Reduction).

**Dispute Proceeding Plan Creditor Consideration**

10.7    Under the terms of the Restructuring Plan, the rights of the Dispute Proceeding Plan Creditors will be compromised as follows:

(a)     the Reficar Claim held by the Reficar Claim Plan Creditor and the Contraloría Claim held by the Contraloría Claim Plan Creditor (together the "**Dispute Proceeding Plan Creditor Claims**") will be released in full on the Restructuring Effective Date; and

(b)     in consideration for compromising the Dispute Proceeding Plan Creditor Claims in full, each Dispute Proceeding Plan Creditor will be entitled to receive the Dispute Proceeding Plan Creditor Consideration (defined below).

10.8    The Restructuring Plan will include an entitlement for the Dispute Proceeding Plan Creditors to receive a variable contingent cash amount pro rata between them based on the value of their

claims against the Plan Company (including accrued interest) (the "**Dispute Proceeding Plan Creditor Consideration**"). Such variable contingent cash amount will be calculated yearly based upon the annual performance of the Group in respect of the financial years ending 2023 and 2024 based on the currently projected EBITDA detailed in its most recent business plan which is $154,000,000 for 2023 and $318,000,000 for 2024 (the "**Target EBITDA**").

10.9    If the Group exceeds the Target EBITDA for that financial year, a contingent payment will accrue in respect of that financial year of an amount equal to 2% of the excess above the Target EBITDA with a maximum payment to all Dispute Proceeding Plan Creditors in aggregate per annum of $2,000,000 Such contingent amounts, as applicable, will accumulate each year for 2023 and 2024 but not be payable until following the latest maturity under the Secured Exit Credit Agreements.

10.10   For example, if the Group's Target EBITDA for FY23 was $100,000,000, but it actually earned $150,000,000, that would entitle the Dispute Proceeding Plan Creditors in aggregate to $1,000,000 for the financial year 2023 (being $50,000,000 (the Target EBITDA excess) x 0.02 = $1,000,000), split pro rata between each of the Dispute Proceeding Plan Creditors.

10.11   There will be no minimum payment amount. The maximum amount in each financial year to be paid by the Plan Company to the Dispute Proceeding Plan Creditors in aggregate is $2,000,000.

10.12   Nothing in this Plan shall affect the rights of the Dispute Proceeding Plan Creditors under the *Third Parties (Rights against Insurers) Act 2010* (UK) against an insurer in respect of a liability under a contract of insurance.

**Contribution Claim Plan Creditor Consideration**

10.13   Under the terms of the Restructuring Plan, the rights of the Contribution Claim Plan Creditors will be compromised as follows:

(a)     the Reficar Contribution Claims held by the Reficar Contribution Claim Plan Creditors and the Contraloría Contribution Claims held by the Contraloría Contribution Claim Plan Creditors (together the "**Contribution Claim Plan Creditor Claims**") will be released in full on the Restructuring Effective Date; and

(b)     in consideration for compromising the Contribution Claim Plan Creditor Claims in full, each Contribution Claim Plan Creditor will be entitled to receive the Contribution Claim Plan Creditor Consideration (defined below).

10.14   The Restructuring Plan will include an entitlement for the Contribution Claim Plan Creditors to receive an amount of £100,000 in aggregate to all Contribution Claim Plan Creditors (the "**Contribution Claim Plan Creditor Consideration**").

**Final documentation for the Restructuring Plan**

10.15   The documentation reflecting the matters provided for above will be circulated to the Plan Creditors with the Explanatory Statement which will accompany the Restructuring Plan.

**Effectiveness and Process**

10.16   The Restructuring Plan will only become effective and legally binding on the Plan Company and the Plan Creditors, in accordance with their terms, following (among other items):

(a)     the sanction of the Restructuring Plan by the Court at the Sanction Hearing;

(b)     delivery of a copy of the order sanctioning the Restructuring Plan to the Registrar of Companies for England and Wales; and

(c)     sanction of the WHOA Proposals by the Amsterdam District Court.

**Sources of Information**

10.17    Further details of the Restructuring Plan will be set out in the Explanatory Statement. For details on dissemination of the Explanatory Statement and other related material, please refer to paragraphs 18.2 to 18.5 (*Publication of Plan Documentation*) below.

10.18    Provided the Court gives its permission to the Plan Company to convene the Plan Meetings, the Plan Company will notify the Plan Creditors in accordance with the directions of the Court of the time, date and venue of the Plan Meetings, set out how any Plan Creditors may vote at the Plan Meetings and provide further details of the terms of the Restructuring Plan via the Information Agent and the Plan Portal and will communicate any change in the same manner.

10.19    Any further details regarding the Restructuring Plan and the Convening Hearing or Sanction Hearing dates will be made available on the Plan Portal.

*Enquiries*

10.20    If you have any questions in relation to this Practice Statement Letter or the Restructuring Plan, please refer to Section 19 (*Enquiries and Further Information*) for contact details.

10.21    If you have any questions in relation to the references made to the WHOA Proposals in this Practice Statement Letter, please refer to Section 19 (*Enquiries and Further Information*) for contact details.

## 11    CONSEQUENCES IF THE RESTRUCTURING PLAN IS NOT SUCCESSFUL

*What happens if the Restructuring Plan is not sanctioned?*

11.1    In light of the conditions affecting the Group, it is the view of the Board of the Plan Company (the "**Board**") that if the Group is unable to implement the Restructuring, the Plan Company will be unable to meet its outstanding and upcoming payment obligations to its creditors and the Group would not have sufficient liquidity to support the Plan Company in order for it to continue as a going concern.

11.2    If the Restructuring is not implemented, given the Plan Company's liquidity position and the maturity profile of the Secured Exit Credit Agreements, there would be insufficient time to seek, and significant uncertainty as regards the Plan Company's ability to obtain, the requisite level of creditor support to implement any alternative transaction.

11.3    In order to assist each of the Plan Company, LFC and MIH with their contingency planning, Grant Thornton UK LLP ("**Grant Thornton**") was engaged by each of the Plan Company, LFC and MIH to:

(a)     assist the Plan Company (along with its financial and legal advisors) to identify the scenario/s that are likely in the event that the Restructuring Plan, the WHOA Proposals and the Restructuring were unsuccessful; and

(b)     prepare a report estimating the financial return to the Plan Creditors in such scenario(s).

11.4    The Board of the Plan Company have concluded that the only viable option which could be delivered to enable the Plan Company and the wider Group to continue operating in the manner outlined is the Restructuring Plan and the Restructuring as described in this Practice Statement Letter. If the Restructuring, comprising inter alia the Restructuring Plan and the WHOA Proposals, is not implemented, the Board of the Plan Company consider that the Plan Company would have no choice but to enter into insolvency proceedings across multiple jurisdictions including – in respect of the Plan Company – in England (the "**Relevant Alternative**"). The Board of the Plan Company have concluded, with the benefit of Grant Thornton's expertise, that the returns to the Plan Creditors in the Relevant Alternative would be materially worse than the return available to Plan Creditors through the Restructuring.

### *What happens if one or more of the WHOA Proposals is not sanctioned?*

11.5    As noted above, the Restructuring Plan and the transactions contemplated by it will only become effective following, among other items, sanction of the WHOA Proposals by the Amsterdam District Court. If the Restructuring Plan is sanctioned by the English Court but one or more of the WHOA Proposals are not sanctioned by the Amsterdam District Court, the conditions to the Restructuring Plan will not be able to be fully satisfied, and the Restructuring will not be effected.

11.6    The Board of the Plan Company therefore believes (based on advice from Grant Thornton and its other professional advisors) that if the WHOA Proposals are not sanctioned, even in circumstances where the Restructuring Plan is sanctioned, the Plan Company would have no choice but to enter into administration, absent a prompt and significant liquidity injection.

11.7    Since the Plan Company, LFC and MIH are each key operating, financial or guarantor entities for the Group, if one or all of them are placed into insolvency proceedings in any jurisdiction this would likely result in the Group as a whole ceasing to be able to operate as a going concern and the subsequent insolvent liquidation of the Group.

## 12    RECOMMENDATION OF THE BOARD

The Board of the Plan Company, on the basis of the professional advice they have received (privilege for which is not waived), consider that the entry into the arrangements contemplated by the Restructuring Plan is in the best interests of the Plan Creditors. In light of the above, the Board seek your support for the Restructuring Plan and recommend that the relevant Plan Creditors vote in favour of the Restructuring Plan at the Plan Meetings.

## 13    PROPOSED CLASS CONSTITUTION OF PLAN CREDITORS

13.1    In accordance with the Practice Statement, it is the responsibility of the Plan Company to determine whether more than one meeting of creditors is required by their respective Restructuring Plan and, if so, to ensure that those meetings are properly constituted.

### Applicable tests for determining class constitution

13.2    A summary of the tests applied by the Court for class constitution for analogous schemes of arrangement under Part 26 of the Companies Act 2006 ("**scheme**") is set out below. It has been confirmed that the same considerations will apply in determining class constitution for a restructuring plan under Part 26A of the Companies Act 2006:

    (a)    Where creditors or members affected by a scheme have rights which are so dissimilar, or would be affected so differently by the scheme, as to make it impossible for them to consult together with a view to their common interest, they must be divided into

separate classes, and a separate meeting must be held for each class of creditor and member.

(b) It is the legal rights of creditors and members, and not their separate commercial or other interests, which determine whether they form a single class or separate classes. Conflicting interests are matters that may properly be taken into account at the sanction stage, but do not go to class composition.

(c) The essential requirement is that the class should be comprised only of persons whose rights in terms of their existing rights and the rights offered in the replacement, in each case against the company, are sufficiently similar to enable them to properly consult and identify their true interests together.

(d) It is also necessary to consider whether the rights of those who are to be affected by the scheme proposed are such that the scheme can be seen as a single arrangement; or ought the scheme to be regarded, on a true analysis, as a number of linked arrangements.

(e) It is not the case that different treatments under a scheme (e.g. in the case of vested or contingent rights, or rights under matured or current policies) necessarily mean that the rights are so dissimilar that persons must be put in different classes.

13.3 Where rights are "sufficiently similar" to the rights of others that they can properly consult together, then they should be required to do so.

**The present case**

13.4 The Plan Company has considered:

(a) the current rights of the Plan Creditors against the Plan Company and the rights which will be conferred by the Restructuring Plan;

(b) whether:

(i) the rights of the Plan Creditors proposed are such that the Restructuring Plan can each be seen as a single arrangement; or

(ii) the Restructuring Plan ought to be regarded, on a true analysis, as a number of linked arrangements; and

(iii) which Plan Creditors' rights are "sufficiently similar" to the rights of other Plan Creditors that they can properly consult together.

*The Plan Company*

13.5 Having considered the above and taken legal advice (privilege for which is not waived), the Plan Company has concluded that the Plan Creditors fall into the following classes:

(a) the Super Senior LC Facility Plan Creditors;

(b) the Make-Whole Facility Plan Creditors;

(c) the Senior LC Facility Plan Creditors;

(d) the Escrow LC Facility Plan Creditors;

(e) the Takeback Facility Plan Creditors;

(f)    the Dispute Proceeding Plan Creditors; and

(g)    the Contribution Claim Plan Creditors.

13.6    The Plan Company has reached this conclusion on the following bases:

Secured Exit Credit Plan Creditor

13.7    The Secured Exit Credit Facility Lenders have the benefit of a common security package, being the Secured Property. As noted at paragraph 4.23 above, the effect of the ranking provisions in the Exit Credit Agreement, Exit Escrow LC Facility Agreement, Exit Collateral Agency Agreement and the Exit Intercreditor Agreement are that the Secured Exit Credit Facility Lenders' rights against the Secured Property upon an insolvency of the Group and the Plan Company will rank in the following order:

(a)    firstly, pari passu between the Super Senior LC Facility Plan Creditors;[1]

(b)    secondly, pari passu between the Make-Whole Facility Plan Creditors;

(c)    thirdly, pari passu between the Senior LC Facility Plan Creditors and Escrow LC Facility Plan Creditors; and

(d)    fourthly, the Takeback Facility Plan Creditors.

13.8    Subject to paragraph 13.9 below, each Secured Exit Credit Facility Lender within a category detailed at paragraph 13.7 above accordingly has the same rights against the Plan Company and the Secured Property as does each other member of that category of Secured Exit Credit Facility Lender. For this reason, the Plan Company considers that the rights of members of categories of Secured Exit Credit Facility Lender as between other members of the same category are each the same, or not so dissimilar as to make it impossible for them to consult with members of that group with a view to their common interest.

13.9    It is considered that the Super Senior LC Facility Plan Creditors are sufficiently similar that they can consult together in their common interest. The Plan Company places particular reliance on the following matters:

(a)    all of the Super Senior LC Facility Lenders were given the right to participate in the Tanks Senior LC Facility Tranche 1;

(b)    each Super Senior LC Facility Lender that did not elect to participate in the Tanks Senior LC Facility Tranche 1 will nevertheless be entitled to elect through the Restructuring Plan/WHOA to take up their pro rata share of the Tanks Senior LC Facility through Tanks Senior LC Facility Tranche 2, which shall become effective on the Restructuring Effective Date when the Tanks Senior LC Facility Tranche 2 becomes effective; and

(c)    if a Non-Consenting Super Senior LC Facility Lender elects not to take up its pro rata entitlement to the Tanks Senior LC Facility, each Consenting Super Senior LC Facility Lender will be offered an ability (on a pro rata basis as between them) to take up such

---

[1]    The Hedging Counterparties also rank in this category, however their rights and interests are not proposed to be amended by the Plan. The Plan Company considers that the Hedging Counterparties should accordingly not form part of this class.

Non-Consenting Super Senior LC Facility Lender's entitlement to participate in the Tanks Senior LC Facility (the "**Over-Subscription Right**").

13.10   Each Consenting Super Senior LC Facility Lender will have the benefit of an Over-Subscription Right. The Plan Company considers this difference is commercially necessary in order to calculate the relevant lender commitments ahead of the Restructuring Effective Date, is commercially justified as it encourages lenders to participate early in the process, and in any event does not make it impossible for them to consult with a view to their common interests.

13.11   As noted at paragraph 5.24 above, LFC has agreed to pay a TSA Consent Premium to certain Secured Exit Credit Facility Lenders which have executed the Transaction Support Agreement (including through a joinder) ahead of the Restructuring Effective Date. The Plan Company (having taken legal advice in respect of which privilege is not waived) believe that no class issues arise as a result of a Secured Exit Credit Facility Lender entering into the Transaction Support Agreement, and accordingly qualifying to receive the TSA Consent Premium, as the ability to accede to the Transaction Support Agreement, and therefore receive the TSA Consent Premium, was made available to all Secured Exit Credit Facility Lenders and is an immaterial amount relative to the commitments of Secured Exit Credit Facility Lenders to be amended by the Restructuring Plan.

13.12   Certain fees were paid and/or will be payable to the lenders to the Tanks Term Loan Facility, including:

(a)   on the closing date of the Tanks Credit Facilities, each Tanks Term Loan Facility Lender which had committed to participate in the Tanks Term Loan Facility as of that date received equity representing (i) 10% of all shares of common equity of the Parent outstanding as of the closing date and (ii) 10% of the outstanding amount of shares of preferred equity of the Parent as of the closing date; and

(b)   an exit premium payable upon the date on which the Tanks Term Loan Facilities are prepaid, repaid, required to be repaid or accelerated in favour of each Tanks Term Loan Facility Lender as at the closing date, in an amount equal to 12.5% of the aggregate principal amount of the outstanding Tanks Term Loans held by each such Tanks Term Loan Facility Lender.

13.13   Those fees were paid to the lenders under the Tanks Term Loan Facility in exchange for a commercial service (being the provision of new money financing to the Group during a period of significant stress and uncertainty). The Plan Company does not believe that, for those Secured Exit Credit Facility Lenders who are also lenders under the Tanks Term Loan Facility, their interest in the Tanks Term Loan Facility will be a material factor for such lenders when evaluating the Restructuring Plan. This is because the Tanks Credit Facilities is of a non-material quantum when compared to (i) the aggregate claims of the those Secured Exit Credit Facility Lenders who are also lenders under the Tanks Term Loan Facility against the Plan Company on an absolute basis, and (ii) when considering the consequences of the failure of the Restructuring Plan (as described above) and the impact that this may have on the recoveries of relevant lender with respect to their claims against the Plan Company. Therefore, when evaluating the Restructuring Plan, a Secured Exit Credit Facility Lender who is also a lender under the Tanks Term Loan Facility is unlikely to be materially influenced by the impact of the Restructuring Plan with respect to its participation in the Tanks Term Loan Facility.

13.14   The Plan Company is aware that a number of the Secured Exit Credit Facility Lender are also members of the Ad Hoc Group and members of the Steering Committee and will have certain professional fees of their advisers met by the Group in respect of the negotiation and documentation of the Restructuring. The payment of these professional fees will occur independently from the process of the Restructuring Plan and will not be contingent upon the

sanction of the Restructuring Plan. As such, the Plan Company has been advised and believe that these Plan Creditors are not required to be placed in a separate class from those Secured Exit Credit Facility Lenders that are not part of the Ad Hoc Group or the Steering Committee. In addition, the Plan Company (having taken legal advice, privilege for which is not waived) believe that no class issues arise as a result of a Plan Creditor entering into the Transaction Support Agreement, as the ability to accede to the Transaction Support Agreement, and therefore receive the TSA Consent Premium, was made available to all members of each category of Secured Exit Credit Facility Lender and is an immaterial amount relative to the amount of each Secured Exit Credit Facility Lender's claim to be affected by the Restructuring Plan.

13.15   The Plan Company considers that each category of Secured Exit Credit Facility Lender has different rights against the Plan Company in the Relevant Alternative in respect of their claims which are subject to the Restructuring Plan when compared to each other class of Secured Exit Credit Facility Lender, namely, the level of recoveries received in respect of an enforcement of their respective security interests to recover their assessment claims. The recoveries of the Secured Exit Credit Facility Lenders across different categories would also be substantially different from each other.

13.16   For these reasons, the Plan Company considers that the rights of:

(a)   the Super Senior LC Facility Plan Creditors;

(b)   the Make-Whole Facility Plan Creditors;

(c)   the Senior LC Facility Plan Creditors;

(d)   the Escrow LC Facility Plan Creditors; and

(e)   the Takeback Facility Plan Creditors,

as between each other category of Secured Exit Credit Facility Lender are sufficiently dissimilar so as to make it impossible for them to consult with members of another category of Secured Exit Credit Facility Lender with a view to their common interest.

Dispute Proceeding Plan Creditors

13.17   Each of the Reficar Claim Plan Creditor and the Contraloría Claim Plan Creditor would have the same rights against the Plan Company in the Relevant Alternative in respect of their claims which are subject to the Restructuring Plan, namely, a right to claim in the liquidation of the Plan Company for any sums owing to them. Each such claim would be treated in the same way and would rank pari passu for payment from the Plan Company's unencumbered assets. Accordingly, the existing rights of each Dispute Proceeding Plan Creditor against the Plan Company in respect of the claims which are subject to the Restructuring Plan are the same.

13.18   Notwithstanding that each of the Dispute Proceeding Plan Creditors' claims relate to separate proceedings, have been made against different entities within the Group in addition to the Plan Company, remain subject to ongoing dispute and have different jurisdictional considerations the Plan Company considers that any differences in such claims do not give rise to any difference of rights in the Relevant Alternative so as to make it appropriate or necessary for any of the Dispute Proceeding Plan Creditors, either individually or cumulatively, to be placed in a separate class for the purposes of voting on the Restructuring Plan. Each of the Dispute Proceeding Plan Creditors would receive nil in the Relevant Alternative.

13.19    As set out in Section 10 (*Key terms of the Restructuring*) above, in relation to treatment under the Restructuring Plan, the Dispute Proceeding Plan Creditors are all being treated in the same way and will receive the same rights under the Restructuring Plan.

13.20    Since the Dispute Proceeding Plan Creditors have the same existing rights against the Plan Company and will be treated in the same way, it is therefore proposed that the Dispute Proceeding Plan Creditors together constitute a single class and that they vote on the Restructuring Plan at a single meeting.

Contribution Claim Plan Creditors

13.21    Each of the Contribution Claim Plan Creditors would have the same right against the Plan Company in the Relevant Alternative in respect of their claims which are subject to the Restructuring Plan, namely, a right to claim in the liquidation of the Plan Company for any contingent claims which they may have against the Plan Company. Each such claim would be treated in the same way and would rank pari passu for payment from the Plan Company's unencumbered assets. However, their claims would be super-subordinated by virtue of the rule against double proof (which, in summary, would prevent any return to the Contribution Claim Plan Creditors until such time as the relevant principal debt was paid in full).

13.22    Notwithstanding that each of the Contribution Claim Plan Creditors' claims relate to separate proceedings, have been made against different entities within the Group in addition to the Plan Company, remain subject to ongoing dispute and have different jurisdictional considerations the Plan Company considers that any differences in such claims do not give rise to any difference of rights in the Relevant Alternative so as to make it appropriate or necessary for any of the Contribution Claim Plan Creditors, either individually or cumulatively, to be placed in a separate class for the purposes of voting on the Restructuring Plan. Each of the Contribution Claim Plan Creditors would receive nil returns in the Relevant Alternative.

13.23    As set out in Section 10 (*Key terms of the Restructuring*) above, in relation to treatment under the Restructuring Plan, the Contribution Claim Plan Creditors are all being treated in the same way and will receive the same rights under the Restructuring Plan.

13.24    Since the Contribution Claim Plan Creditors have the same existing rights against the Plan Company and will be treated in the same way, it is therefore proposed that the Contribution Claim Plan Creditors together constitute a single class and that they vote on the Restructuring Plan at a single meeting.

13.25    For these reasons, the Plan Company considers that the rights of:

(a)      the Super Senior LC Facility Plan Creditors;

(b)      the Make-Whole Facility Plan Creditors;

(c)      the Senior LC Facility Plan Creditors;

(d)      the Escrow LC Facility Plan Creditors;

(e)      the Takeback Facility Plan Creditors;

(f)      the Dispute Proceeding Plan Creditors; and

(g)      the Contribution Claim Plan Creditors,

as between other members of the same group are each the same, or not so dissimilar as to make it impossible for them to consult with the other members of the group with a view to their common interest.

*Important: if any Plan Creditor has comments as to the proposed class constitution of Plan Creditors, or any other concerns which they consider should be raised with the Court, they should in the first instance contact Kirkland & Ellis, using the contact details set out at the end of this letter.*

## 14    EFFECTIVENESS OF THE RESTRUCTURING PLAN AND THE RESTRUCTURING

14.1    If the Restructuring Plan becomes effective as detailed in Section 2 (*What is a Restructuring Plan?*) above, it will affect all Plan Creditors.

14.2    All Plan Creditors (including those who did not vote in favour of the Restructuring Plan or those who did not vote at all) will be bound by the terms of the Restructuring Plan as a matter of English law, irrespective of the jurisdiction in which a Plan Creditor resides or has their seat, along with the Plan Company.

## 15    JURISDICTION

15.1    The Plan Company considers that the Court has jurisdiction to sanction the Restructuring Plan for the following reasons.

### Plan Company liable to be wound up under the Insolvency Act 1986

15.2    Section 901A of the Companies Act 2006 applies to a "company" which means any company liable to be wound up under the Insolvency Act 1986. The Plan Company considers that the Court has jurisdiction in relation to the Restructuring Plan in that the Plan Company is incorporated under the laws of England and Wales and is liable to be wound up under the Insolvency Act 1986.

### Financial difficulties

15.3    To invoke the Court's jurisdiction, it must be shown that the applicant company has encountered or is likely to encounter financial difficulties that are affecting or will or may affect its ability to carry on business as a going concern. The Plan Company has encountered significant financial difficulties, described above in Section 5 *(Background to the Group's financial difficulties)*, which are affecting their (and the Group's) ability to carry on business as a going concern.

### Compromise or arrangement

15.4    It is necessary for the proposals under the Restructuring Plan to be a "compromise" or "arrangement" between the Plan Company and the Plan Creditors or any class of the Plan Company's creditors. The Restructuring Plan contains the requisite elements of "give and take" in order to constitute an "arrangement" for these purposes. Further, there is no requirement for the Plan Company to provide for any "give and take" to a class of creditors which is "out of the money" in the relevant alternative.

### Purpose

15.5    As explained above, the purpose of the Restructuring Plan is to eliminate, reduce or mitigate the effect of the Plan Company's financial distress. Compromising the existing claims of the

Plan Creditors against the Plan Company in the manner proposed, and implementing the Restructuring as a whole, will address the financial difficulties encountered by the Plan Company and enable their business to continue as a going concern.

**Deed of Contribution**

15.6    On 7 September 2023, the Plan Company entered into a deed of contribution in favour of LFC (the "**Deed of Contribution**"), pursuant to which the Plan Company will agree to pay to LFC, by way of contribution, an amount that is equal to the Plan Company's share of the amount of such obligation that has been paid by LFC under the Secured Exit Credit Agreements, calculated on the basis that the relevant obligation will be split in equal proportions between the Plan Company and LFC on a joint and several basis as primary obligors. The Deed of Contribution results in LFC and the Plan Company having rights of contribution against each other as primary obligors in respect of the Secured Exit Credit Agreements, and the Plan Company and the other obligors to the Secured Exit Credit Agreements having rights of contribution against each other pursuant to the Secured Exit Credit Agreements.

15.7    The Plan Company therefore considers that it has jurisdiction to propose the arrangement and compromise in respect of the Secured Exit Credit Agreements set out under the Restructuring Plan as it relates to the Secured Exit Credit Facility Lenders.

**Jurisdiction**

15.8    Given the matters described above, the Plan Company considers that the English Court has jurisdiction to sanction the arrangement and compromise in respect of the claims and liabilities set out in the Restructuring Plan (provided the requisite statutory requirements are satisfied).

## 16    RECOGNITION AND EFFECTIVENESS

16.1    The Restructuring Plan will be effective as a matter of English law to vary the claims and liabilities of the Plan Creditors subject to the Restructuring Plan.

16.2    In parallel with the Restructuring Plan, the Plan Company expects to file an application for recognition of the Restructuring Plan in the United States under Chapter 15, Title 11 of the United States Bankruptcy Code. If the Restructuring Plan is approved by the Plan Creditors and sanctioned by the Court, the Plan Company expects that the Restructuring Plan and its effects will be recognised in the United States shortly after the Sanction Hearing.

16.3    The Plan Company will publish notice of the Chapter 15 filing on the Plan Portal.

16.4    Further, the Plan Company expects to obtain an opinion from an independent expert that the effects of the Restructuring Plan are likely to be recognised, and given effect to, in Panama, a jurisdiction in which the guarantors to the Secured Exit Credit Agreements hold material assets.

## 17    CREDITOR ISSUES

17.1    This letter is intended to provide Plan Creditors with sufficient information regarding the Restructuring Plan and the proposals for convening the Plan Meetings of the Plan Creditors, so that, should they wish to raise:

(a)    any issues which may arise as to the constitution of the Plan Meetings, or which otherwise affect the conduct of those Plan Meetings;

(b)    any issues as to the existence of the Court's jurisdiction to sanction the Restructuring Plan; or

(c)     any other issue not going to the merits or fairness of the Restructuring Plan, but which might lead the Court to refuse to sanction the Restructuring Plan,

(together, "**Creditor Issues**"), they may attend and be represented before the Court at the Convening Hearing. Details of the Convening Hearing are set out in paragraph 18.1 (*Convening Hearing*) of this letter.

17.2    Plan Creditors are also able to raise other issues at the Convening Hearing but, consistent with the Court's usual approach, certain issues are likely only to be considered by the Court at the Sanction Hearing in due course if the Restructuring Plan is approved by the requisite majorities of the classes of Plan Creditors voting at the Plan Meetings. Please refer to paragraphs 18.1(c) (*Matters to be addressed*) and 18.7(c) (*Matters to be addressed*) for detail on the division of content between the Convening Hearing and the Sanction Hearing.

17.3    Plan Creditors should consider taking advice from their professional advisors if they have any concerns in relation to the matters set out in this letter.

17.4    Plan Creditors should be aware that, under the terms of the Practice Statement, the Court has indicated that Creditor Issues should be raised at the Convening Hearing. If Plan Creditors fail to raise these matters at the Convening Hearing, whilst they will still be able to appear and raise objections at the Sanction Hearing, the Court at the Sanction Hearing will expect those Plan Creditors to provide good reason why they did not raise any Creditor Issues at an earlier stage.

17.5    Plan Creditors are therefore requested to raise any Creditor Issues they have at the Convening Hearing.

**18      NEXT STEPS**

18.1    **Convening Hearing**

The Plan Company intends to apply to the Court for an order granting the Plan Company certain directions in relation to the Restructuring Plan, including permission to convene the Plan Meetings of the Plan Creditors and to circulate the Explanatory Statement.

(a)     *Time and place*

The Convening Hearing is currently anticipated to be held on **28 September 2023**. The Plan Company's applications at the Convening Hearing will be heard by a High Court Judge of the Chancery Division, Companies Court of the High Court of Justice of England and Wales at the Rolls Buildings Courts, 7 Rolls Buildings, Fetter Lane, London EC4A 1NL.

(b)     *Attendance*

Plan Creditors are entitled to attend the Convening Hearing in person or through counsel and to make representations at the Convening Hearing, although they are not obliged to do so. Plan Creditors who wish to attend the Convening Hearing in person or through counsel should contact Kirkland & Ellis (using the contact details in paragraph 19.1 (*Contact details*) below) to obtain instructions for attending the Convening Hearing.

Plan Creditors wishing to attend the Convening Hearing remotely are invited to contact Kirkland & Ellis (using the contact details in paragraph 19.1 (*Contact details*) below) at least two business days in advance. This will ensure that the access details of the Convening Hearing are provided to you and your advisors as soon as they are available.

Access details of the Convening Hearing will be available on the Plan Portal. Alternatively, Plan Creditors can contact the Court directly.

(c)    *Matters to be addressed*

At the Convening Hearing the Court will consider whether or not to make an order convening the Plan Meetings of the Plan Creditors. In so doing, the Court will consider:

(i)     the purpose and effects of the Restructuring Plan and the Restructuring (as to which, see Sections 7 *(Purpose of the Restructuring Plan)*, 8 *(Interests subject to the Restructuring Plan)* and 10 *(Key Terms of the Restructuring Plan)* above);

(ii)    the relevant comparator to the respective Restructuring Plan;

(iii)   whether it has jurisdiction to convene the Plan Meetings (see Section 15 (*Jurisdiction*));

(iv)    class composition (see Section 13 (*Proposed Class Constitution of Plan Creditors*) (the Court will consider whether more than one Plan Meeting is required, and if so, what is the appropriate composition of those Plan Meetings); and

(v)     any considerations that might preclude the Court from exercising its sanction discretion at the Sanction Hearing.

The Plan Company will also draw to the Court's attention to:

(i)     any Creditor Issues (see Section 17 (*Creditor Issues*)); and

(ii)    any (other) issues raised by any Plan Creditor in response to this letter.

(d)    *Comments or objections*

If you disagree with the Plan Company's proposals regarding the convening of the Plan Meetings outlined above (including the proposed composition of the voting classes of Plan Creditors in respect of the Restructuring Plan) or wish to raise any other issue in relation to the jurisdiction of the Court, the constitution of the Plan Meetings or any other matters that otherwise affect the conduct of the Plan Meetings, or disagree with the Plan Company's conclusion that the Court has jurisdiction to sanction the Restructuring Plan, you should write to Kirkland & Ellis as soon as practicable using the contact details listed in paragraph 19.1 (*Contact details*) below setting out your concern and may (but are not obliged to) attend and be represented before the Court at the Convening Hearing.

If the Restructuring Plan is approved at the Plan Meetings, it may still be possible for Plan Creditors to raise certain objections on the question of class and jurisdiction (as well as other matters) at the subsequent Sanction Hearing. However, in that event, the Court is likely to expect Plan Creditors to show good reason why they did not object to the constitution of the classes of Plan Creditors at an earlier stage.

**Publication of Plan Documentation**

18.2    Following the Convening Hearing, provided that the Court grants the order for the Plan Company to convene the Plan Meetings, the Plan Company will:

(a)    convene the Plan Meetings of the Plan Creditors by notifying them in accordance with the directions of the Court of the time and date of and means of attending the Plan Meetings; and

(b)    make available to Plan Creditors the following important documents relating to the Restructuring Plan:

(i)    the Explanatory Statement;

(ii)   the Restructuring Plan document;

(iii)  the notices convening the relevant Plan Meetings;

(iv)   a voting and proxy form that the Plan Creditors will need to complete in order to vote at or appoint a proxy to attend and vote on their behalf at the Plan Meetings; and

(v)    the principal agreements and other related documents that will document the terms of the Restructuring,

(together the "**Plan Documentation**").

18.3   Plan Creditors will receive the Plan Documentation by email from the Information Agent and be able to view and download the Plan Documentation in electronic format via the Plan Portal (that will be made available to access for Plan Creditors) and a notice in this regard will be circulated to Plan Creditors via the Information Agent on or about 28 September 2023. In addition, a notice directing Plan Creditors to the copies of the Plan Documentation will be available on the Plan Portal.

18.4   Any of the Plan Documentation provided to Plan Creditors on the Plan Portal can also be provided in hard copy free of charge if so requested by a Plan Creditor. Any such request should be made to Kirkland & Ellis at the contact details set out in paragraph 19.1 (*Contact details*) below.

18.5   The Information Agent has been engaged to assist with, among other things, the distribution of Plan Documentation and tabulation in respect of votes of the Plan Creditors at the Plan Meetings. The Plan Company (or the Information Agent on their behalf) will provide any further updates on this to Plan Creditors as and when applicable.

18.6   **Restructuring Plan Meetings**

The Plan Company currently expects that the Plan Meetings of the Plan Creditors in respect of the Restructuring Plan will be held on 6 November 2023. The date and time at which the claims of Plan Creditors under the Restructuring Plan and the resulting entitlements of Plan Creditors under the Restructuring Plan shall be determined by the Plan Company will occur at 12:00 p.m. (London time) on 1 November or, if the date of the Plan Meetings changes, 12:00 p.m. (London time) on the date which is one business day before the Plan Meetings.

Further details with respect to the Plan Meetings will be provided in the Plan Documentation.

18.7   **Sanction Hearing**

Following the Plan Meetings of the Plan Creditors, provided that the requisite majorities of the Plan Creditors vote in favour of the Restructuring Plan, the Plan Company intend to apply at

the Sanction Hearing, currently expected to be held on **10 November 2023**, for an order sanctioning the Restructuring Plan.

(a)     *Timing and location*

The Plan Company will notify Plan Creditors of the precise time of the Sanction Hearing via the Information Agent and the Plan Portal and will communicate any change to the date of the Sanction Hearing in the same manner.

(b)     *Attendance*

Plan Creditors are entitled to attend the Sanction Hearing in person or through counsel and to make representations and raise objections at the Sanction Hearing, although they are not obliged to do so. Plan Creditors who wish to attend the Sanction Hearing in person or through counsel should contact the Information Agent (using the contact details below) to obtain instructions for attending the Sanction Hearing.

Plan Creditors wishing to attend the Sanction Hearing remotely are invited to contact the Information Agent using the contact details listed below at least two days in advance. This will ensure that the access details of the hearing are provided to you and your advisors as soon as they are available. Access details of the hearing will be available on the Plan Portal. Alternatively, Plan Creditors can contact the Court directly.

(c)     *Matters to be addressed*

At the Sanction Hearing the Court will consider whether or not to make an order sanctioning the Restructuring Plan. In so doing, the Court will consider whether:

(i)      the provisions of the statute have been complied with. This will include questions of class composition, whether the statutory majorities were obtained, and whether an adequate explanatory statement was distributed to the creditors;

(ii)     the classes of Plan Creditors were fairly represented by those who attended the Plan Meetings, and the statutory majority were acting bona fide and not coercing the minority in order to promote interests adverse to those of the class they purpose to represent;

(iii)    each Restructuring Plan is a fair Restructuring Plan which a creditor could reasonably approve. Importantly it must be appreciated that the Court is not concerned to decide whether the Restructuring Plan is the only fair Restructuring Plan or even the "best" Restructuring Plan; and

(iv)     there is any "blot" or defect in the Restructuring Plan that would, for example, make it unlawful or in any other way inoperable.

The Plan Company will also draw the Court's attention to:

(i)      objections on the question of class and jurisdiction; however, as noted in paragraph 18.1 (*Convening Hearing*) above, the Court is likely to expect Plan Creditors to show good reason why they did not object to the constitution of the classes of Plan Creditors at an earlier stage; and

(ii)    other matters pertaining to the points set out above, including, for example, whether a Plan Creditor has indicated it has not had adequate notice of the Plan Meetings.

(d)    *Comments or objections*

If you have any comments or objections relating to the matters to be dealt with at the Sanction Hearing, as detailed in paragraph 18.7(c) (*Matters to be addressed*) above, you should write to Kirkland & Ellis as soon as practicable using the contact details listed in paragraph 19.1 (*Contact details*) below setting out your concern and may (but are not obliged to) attend and be represented before the Court at the Sanction Hearing.

## 19    ENQUIRIES AND FURTHER INFORMATION

### 19.1    Contact details

If you have any questions in relation to this letter, the Restructuring Plan or the Restructuring, please contact Kirkland & Ellis (noting the statements in paragraph 19.4 (*Legal advice*)) using the contact details below:

**English Legal Advisors to the Plan Company**

Kirkland & Ellis International LLP
30 St Mary Axe
London
EC3A 8AF
Attention: Kon Asimacopoulos / Hannah Crawford
Email: MDR_ProjectLego_KE_Core@kirkland.com

**Dutch Legal Advisors to the Group**

Nauta Dutilh
N.V.
Beethovenstraat 400
1082 PR Amsterdam
The Netherlands
Attention: Marc Orval / Teun Struycken
Email: 2projectdiscovery@nautadutilh.com

**Information Agent**

Kroll Issuer Services Limited
The Shard
32 London Bridge Street
London
SE1 9SG
United Kingdom
Attention: Illia Vyshenskyi
Telephone: + 44 20 7704 0880
Email: mcdermott@is.kroll.com
Website: https://deals.is.kroll.com/mcdermott

### 19.2    Plan Portal

(a)   The Information Agent has set up the Plan Portal to disseminate information and communications about the Restructuring Plan and to facilitate the implementation of the Restructuring Plan. Plan Creditors may download documents relating to the Restructuring Plan from the Plan Portal that will be made available to Plan Creditors and which Plan Creditors will be invited to access shortly.

(b)   If a Plan Creditor has not received an invitation to access the Plan Portal or encounters any technical difficulties accessing any Plan Documentation via the Plan Portal, please contact the Information Agent using the details set out at paragraph 19.1 (*Contact details*) above.

19.3   **Physical copies available for inspection**

Physical copies of the Plan Documentation will be available from Kirkland & Ellis at the address listed at paragraph 19.1 (*Contact details*) above.

19.4   **Legal advice**

Kirkland & Ellis, as legal advisors to the Plan Company rather than the Plan Creditors, will be unable to offer legal advice to Plan Creditors relating to the Restructuring Plan.

20   **REQUEST FOR SUPPORT**

For the reasons set out above, the Board of the Plan Company considers that the Restructuring Plan is in the best interests of the Plan Company and of the Plan Creditors and recommends that the Plan Creditors vote in favour of the Restructuring Plan at the relevant Plan Meetings.

Yours faithfully

DocuSigned by:

*Ashok Joshi*

D8C08D3652D3442...

Authorised signatory of

**CB&I UK Limited**

**APPENDIX 1**

**DEFINITIONS**

"**A&E Transaction**" has the meaning set out at paragraph 10.1(a).

"**Ad Hoc Group**" has the meaning set out at paragraph 5.7.

"**Amazon Facility**" has the meaning set out at paragraph 4.36.

"**Amsterdam District Court**" has the meaning set out at paragraph 6.1(b).

"**Bilateral Facilities**" has the meaning set out at paragraph 4.28.

"**Bilateral Facility Lenders**" has the meaning set out at paragraph 4.28.

"**Bilateral Letters of Credit**" has the meaning set out at paragraph 4.40.

"**Board**" has the meaning set out in paragraph 11.1

"**Chapter 11 Process**" has the meaning set out at paragraph 4.8.

"**Collateral Agent**" has the meaning set out at paragraph 4.22(a).

"**Consent Solicitations**" has the meaning set out at paragraph 5.20.

"**Consenting Issuing Banks**" has the meaning set out at paragraph 5.20(f).

"**Consenting Stakeholder**" has the meaning set out at paragraph 5.22.

"**Consenting Super Senior LC Facility Lenders**" has the meaning set out at paragraph 5.20(d)(ii)a.

"**Contraloría Claim**" has the meaning set out at paragraph 5.13.

"**Contraloría Claim Plan Creditor**" has the meaning set out at paragraph 5.12.

"**Contraloría Claim Respondents**" has the meaning set out at paragraph 5.12.

"**Contraloría Contribution Claim Plan Creditors**" has the meaning set out at paragraph 5.15.

"**Contraloría Contribution Claims**" has the meaning set out at paragraph 5.15.

"**Contribution Claim Plan Creditor Claims**" has the meaning set out at paragraph 10.13(a).

"**Contribution Claim Plan Creditor Consideration**" has the meaning set out at paragraph 10.14.

"**Contribution Claim Plan Creditors**" has the meaning set out at paragraph 8.6.

"**Convening Hearing**" has the meaning set out at paragraph 1.3(c).

"**Court**" has the meaning given in 1.1.

"**Creditor Issues**" has the meaning set out at paragraph 17.1.

"**Critical Trade Creditors**" has the meaning set out at paragraph 9.5(a).

"**Deed of Contribution**" has the meaning set out in 15.6.

"**Dispute Proceeding Plan Creditor**" has the meaning set out at paragraph 8.4.

"**Dispute Proceeding Plan Creditor Claims**" has the meaning set out at paragraph 10.7(a).

"**Dispute Proceeding Plan Creditor Consideration**" has the meaning set out at paragraph 10.8.

"**Dissenting Class**" has the meaning set out at paragraph 2.4(b).

"**Escrow Account**" has the meaning set out at paragraph 4.16.

"**Escrow LC Facility**" has the meaning set out at paragraph 4.15.

"**Escrow LC Facility Lenders**" has the meaning set out at paragraph 3.1(d)

"**Escrow LC Facility Plan Creditors**" has the meaning set out at paragraph 3.1(d)

"**Escrow Letters of Credit**" has the meaning set out at paragraph 4.40.

"**Exit Collateral Agency Agreement**" has the meaning set out at paragraph 4.22(b).

"**Exit Credit Agreement**" has the meaning set out at paragraph 4.11.

"**Exit Credit Agreement Facilities**" has the meaning set out at paragraph 4.14(a).

"**Exit Credit Agreement Facilities Lenders**" has the meaning set out at paragraph 4.14(c).

"**Exit Escrow LC Facility Agreement**" has the meaning set out at paragraph 4.15.

"**Exit Intercreditor Agreement**" has the meaning set out at paragraph 4.22(c).

"**Exit LC Facilities**" has the meaning set out at paragraph 4.14(b).

"**Exit LC Lenders**" has the meaning set out at paragraph 4.14(d).

"**Explanatory Statement**" has the meaning set out at paragraph 1.4.

"**Grant Thornton**" has the meaning set out at paragraph 11.3.

"**Group**" has the meaning set out at paragraph 4.3.

"**Hedging Agreements**" has the meaning set out at paragraph 4.25.

"**Hedging Counterparties**" has the meaning set out at paragraph 4.25.

"**Implementation Documents**" has the meaning set out at paragraph 7.2.

"**Information Agent**" has the meaning set out at paragraph 1.4(a).

"**Intercompany Creditors**" has the meaning set out at paragraph 4.47.

"**Intercompany Indebtedness**" has the meaning set out at paragraph 4.47.

"**Letter of Credit Issuer**" has the meaning set out at paragraph 4.40.

"**Letters of Credit**" has the meaning set out at paragraph 4.40.

"**LFC**" has the meaning set out at paragraph 4.11.

"**LFC WHOA Proposal**" has the meaning set out at paragraph 6.1(b)

"**Make-Whole Facility Plan Creditors**" has the meaning set out at paragraph 3.1(b).

"**Make-Whole Term Loan Facility**" has the meaning set out at paragraph 4.13(b).

"**Make-Whole Term Loan Facility Lenders**" has the meaning set out at paragraph 3.1(b).

"**Migrated Super Senior Letter of Credit Commitment Tranche 1 Reduction**" has the meaning set out at paragraph 10.1(b).

"**Migrated Super Senior Letter of Credit Commitment Tranche 2 Reduction**" has the meaning set out at paragraph 10.1(d).

"**MIH**" has the meaning set out at paragraph 4.11.

"**MIH WHOA Proposal**" has the meaning set out at paragraph 6.1(b)

"**Non-Consenting Super Senior LC Facility Lenders**" has the meaning set out at paragraph 5.20(e).

"**Non-Critical Trade Creditors**" has the meaning set out at paragraph 9.5(b).

"**OPEC**" has the meaning set out at paragraph5.3.

"**Over-Subscription Right**" has the meaning set out at paragraph 13.9(c).

"**Parent**" has the meaning set out at paragraph 4.2.

"**Pension Plans**" has the meaning set out in paragraph 4.48.

"**Plan**" has the meaning set out in paragraph 1.1.

"**Plan Creditor**" has the meaning set out at paragraph 1.1.

"**Plan Documentation**" has the meaning set out at paragraph 18.2.

"**Plan Meetings**" has the meaning set out at paragraph 1.3(c).

"**Plan Portal**" has the meaning set out at paragraph 1.4(b).

"**Practice Statement**" has the meaning set out in 1.1.

"**Preferred Interest Extension**" has the meaning set out at paragraph 6.1(c).

"**Preferred Interests**" has the meaning set out at paragraph 4.38.

"**Reficar Arbitration**" has the meaning set out at paragraph 5.8.

"**Reficar Claim**" has the meaning set out at paragraph 5.10.

"**Reficar Claim Plan Creditor**" has the meaning set out at paragraph 5.8.

"**Reficar Claim Respondents**" has the meaning set out at paragraph 5.8.

"**Reficar Contribution Claim Plan Creditors**" has the meaning set out at paragraph 5.11.

"**Reficar Contribution Claims**" has the meaning set out at paragraph 5.11.

"**Reficar Letter of Credit**" has the meaning set out at paragraph 5.9.

"**Relevant Alternative**" has the meaning set out at paragraph 11.4.

"**Restructuring**" has the meaning set out at paragraph 6.1.

"**Restructuring Effective Date**" has the meaning set out at paragraph 4.31.

"**Restructuring Plan**" has the meaning set out at paragraph 1.1.

"**Sanction Hearing**" has the meaning set out at paragraph 2.4(c).

"**scheme**" has the meaning set out at paragraph 13.2.

"**Secured Exit Credit Agreements**" has the meaning set out at paragraph 4.17.

"**Secured Exit Credit Facilities**" has the meaning set out at paragraph 4.17.

"**Secured Exit Credit Facility Lenders**" has the meaning set out at paragraph 4.17.

"**Secured Parties**" has the meaning set out at paragraph 4.23.

"**Secured Property**" has the meaning set out at paragraph 4.22(a).

"**Senior LC Facility**" has the meaning set out at paragraph 4.13(c).

"**Senior LC Facility Lenders**" has the meaning set out at paragraph 3.1(c).

"**Senior LC Facility Plan Creditors**" has the meaning set out at paragraph 3.1(c).

"**Senior Letters of Credit**" has the meaning set out at paragraph 4.40.

"**Steering Committee**" has the meaning set out at paragraph 5.7.

"**Super Senior LC Facility**" has the meaning set out at paragraph 4.13(a).

"**Super Senior LC Facility Lenders**" has the meaning set out at paragraph 3.1(a).

"**Super Senior LC Facility Plan Creditors**" has the meaning set out at paragraph 3.1(a).

"**Super Senior Letters of Credit**" has the meaning set out at paragraph 4.40.

"**Surety Arrangements**" has the meaning set out at paragraph 4.30.

"**Takeback Facility Plan Creditors**" has the meaning set out at paragraph 3.1(e).

"**Takeback Term Loan Facility**" has the meaning set out at paragraph 4.13(d).

"**Takeback Term Loan Facility Lenders**" has the meaning set out at paragraph 3.1(e).

"**Tanks Business**" has the meaning set out at paragraph 5.16(a).

"**Tanks Credit Facilities**" has the meaning set out at paragraph 4.35

"**Tanks Entities**" has the meaning set out at paragraph 5.20(c).

"**Tanks Escrow LC Facility**" has the meaning set out at paragraph 4.34.

"**Tanks Escrow LC Facility Lenders**" has the meaning set out at paragraph 4.34.

"**Tanks LC Facilities**" has the meaning set out at paragraph 4.34.

"**Tanks Senior LC Facility**" has the meaning set out at paragraph 4.34

"**Tanks Senior LC Facility Lenders**" has the meaning set out at paragraph 4.34.

"**Tanks Senior LC Facility Tranche 1**" has the meaning set out in paragraph 5.20(d)(ii)a

"**Tanks Senior LC Facility Tranche 2**" has the meaning set out in paragraph 5.20(d)(ii)b.

"**Tanks Term Loan Facility**" has the meaning set out at paragraph 4.31.

"**Tanks Term Loan Facility Lenders**" has the meaning set out at paragraph 4.31.

"**Tanks Transactions**" has the meaning set out at paragraph 4.32.

"**Target EBITDA**" has the meaning set out at paragraph 10.8.

"**Trade Creditors**" has the meaning set out at paragraph 4.45.

"**Trade Liabilities**" has the meaning set out at paragraph 4.45.

"**Transaction Support Agreement**" has the meaning set out at paragraph 5.21.

"**TSA Consent Premium**" has the meaning set out at paragraph 5.24.

"**WHOA Companies**" has the meaning set out at paragraph 6.6.

"**WHOA Creditors**" has the meaning set out at paragraph 6.1(b)

"**WHOA Proposals**" has the meaning set out at paragraph 6.1(b)

## APPENDIX 2

## SIMPLIFIED STRUCTURE CHART

